## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| HAROLD JOHN DAVIS, JR., and CRAIG WORSTER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:22-cv-00275-JDL |
| JANET THERIAULT, et al., | ) ) | |
| Defendants. | ) | |

### OMNIBUS ORDER ON MOTIONS

Plaintiffs Harold John Davis, Jr., and Craig Worster previously served as the Town Manager and Chief of Police of Millinocket, respectively. In their Amended Complaint (ECF No. 1-1), they assert a variety of claims against over a dozen Defendants stemming from the termination of their employment. Most of the Defendants have filed motions for judgment on the pleadings or motions to dismiss, including special motions to dismiss[1] pursuant to Maine's anti-SLAPP statute, 14 M.R.S.A. § 556 (West 2023). The Plaintiffs have moved to amend their Amended Complaint (ECF No. 112), to strike two of the Defendants' special motions to dismiss (ECF Nos. 78, 93), and for a default judgment as to one of the Defendants (ECF No. 72).

---

[1] The Union Defendants, as well as Defendants Jennifer Murray Stanley, Susan D'Alessandro, and Andrew Wright raise their anti-SLAPP arguments within broader motions to dismiss rather than filing separate special motions to dismiss. The Plaintiffs take issue with this, contending that a special motion to dismiss must be submitted in separate documents. But although raising anti-SLAPP arguments in a separate filing may be preferable, the Plaintiffs have not pointed to any authority that supports denying the motions on these grounds. Thus, for the purposes of this Order, I treat these Defendants as having properly filed special motions to dismiss.

# I.  BACKGROUND

## A.    Factual Background

The factual background is drawn from the allegations made in the Amended
Complaint and the affidavits accompanying the special motions to dismiss.  *See*
*Thurlow v. Nelson*, 2021 ME 58, ¶ 2, 263 A.3d 494.

Craig Worster was hired as the Chief of Police for the Town of Millinocket ("the
Town") in March of 2019.  Janet Theriault, then the Deputy Chief of Police, assisted
with the interview and selection of Worster.  After starting in his new position,
Worster began to have concerns about Theriault and raised them with Harold John
Davis, Jr., who had been the Town Manager since 2015.  Some of Worster's concerns
were, for example, that Theriault repeatedly brought her mother along for service
calls, misused the compensation time policy, and pressured the Assistant District
Attorney not to bring charges against a friend of hers.

Worster's concerns with Theriault came to a head on February 3, 2020, when
Theriault was posted at the local high school.  Worster was displeased that Theriault
was in a closed portion of the school building behind a locked door.  After Worster
broached the topic with Theriault, Theriault allegedly "became verbally angry" and
argued with Worster about his orders.  ECF No. 1-1 at 3, ¶ 4.  During a heated
discussion outside of the high school building, Theriault confronted and yelled at
Worster.

A local citizen, who claimed to have witnessed the encounter between Worster
and Theriault at the high school, reported the incident to the Town's Director of
Human Resources and, later, to Davis.  The citizen alleged that it was Worster who

had acted unprofessionally and that he had sworn and screamed at Theriault. This report prompted Davis to begin an internal investigation. As part of the investigation, Davis spoke separately with both Theriault and Worster, who both agreed that Worster did not scream or swear at Theriault during the incident.[2] Davis also watched surveillance footage of the incident and concluded that it did not support the citizen's account of events. He felt that although Theriault did not act completely appropriately and both parties could have handled the situation differently, neither party engaged in misconduct.

On April 30, 2020, while Theriault was out of work on medical leave, Theriault's attorney, Michael Cunniff, filed a misconduct complaint with the Town against Worster on Theriault's behalf. The misconduct complaint purportedly also contained some allegations of misconduct against Davis. This was the first time that Theriault raised any formal complaints about either Worster or Davis. The misconduct complaint challenged Worster's conduct at the high school and asserted that he had created a hostile workplace environment. Cunniff subsequently filed supplements to the misconduct complaint that added further allegations against Worster, some of which related to Worster's prior employment with the Police Departments in Wiscasset, Maine, and Ridgefield, Connecticut.

---

[2] Theriault apparently disagrees with this assertion, noting in her affidavit that Worster engaged in "abusive treatment" and that she told "Davis and [a Human Resources official] that there were multiple witnesses to the incident, which was an enormous embarrassment for [the Police Department] and the Town." ECF No. 58-1 at 6, ¶¶ 28, 29, 32. However, at this stage of the proceedings, the Plaintiffs' well-pleaded facts are taken as true, and all favorable inferences must be drawn in their favor. *See Thurlow*, 2021 ME 58, ¶¶ 2, 26 n.8, 263 A.3d 494 (noting this rule for anti-SLAPP special motions to dismiss); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (noting this rule for motions to dismiss for failure to state a claim).

Around the same time as Theriault's misconduct complaint was filed, Lorne Smith, the Secretary-Treasurer for the Teamsters Local Union #340, which represented Theriault, filed a complaint with the Town against Davis based on his handling of Theriault's allegations against Worster.  Smith, on behalf of the Teamsters Local Union #340 and Theriault, may also have filed a grievance with the Town.  Smith had previously interacted with Cunniff concerning Worster, and the Amended Complaint asserts that Smith "had been deeply involved in the allegations being made against both Plaintiffs" by Theriault.  ECF No. 1-1 at 18, ¶ 87.

Cunniff also filed what the Amended Complaint characterizes as a "criminal complaint" against Worster with the Attorney General's Office, although the precise timing of this is unclear.  ECF No. 1-1 at 20, ¶ 94.  The Attorney General's Office declined to prosecute, "and the accusations asserted by Defendant Cunniff were dismissed."  ECF No.1-1 at 20, ¶ 94.

Additionally, Cunniff filed a report with the Maine Criminal Justice Academy ("the Academy") about Worster's alleged conduct even though, according to the Plaintiffs, he was not legally entitled to do so.  The Academy ultimately dismissed the report, but it did issue a letter of guidance to Worster advising him that creating a hostile workplace for female employees constitutes inappropriate conduct.[3]

The Town, through Davis, hired a licensed professional investigator to look into Theriault's accusations.  On the Plaintiffs' information and belief, Cunniff agreed to the hiring of this private investigator.  The investigator, after a "lengthy and

---

[3] The letter of guidance also referenced misconduct allegations that had previously been made by other people against Worster.

4

thorough investigation" involving the interviewing of witnesses, determined that Worster had not engaged in misconduct. ECF No. 1-1 at ¶ 113. Although the precise timing is unclear, at some point Davis reviewed the findings of the investigator's report and agreed that Worster did not engage in misconduct, so he closed the investigation.

In June 2020, the public became aware of Theriault's accusations regarding Worster and, the Amended Complaint asserts, "[a] public campaign began against . . . Worster, in favor of . . . Theriault," with Jennifer Murray Stanley and Susan D'Alessandro "at the spearhead." ECF No. 1-1 at 16, ¶ 73. The "smear campaign" was carried out in part through postings on the "Katahdin Citizen's Group," a Facebook group, of which D'Alessandro was the administrator and moderator. ECF No. 1-1 at 16, ¶ 74. The Amended Complaint asserts that posts in the group were "used to spread false and misleading information about both Plaintiff Worster and Plaintiff Davis in an attempt to tarnish their names and reputations and also to encourage Town Councilors to terminate both Plaintiffs from their jobs." ECF No. 1-1 at 16, ¶ 74.

Murray Stanley and D'Alessandro also organized protests and car parades outside of Davis's residence. Protestors honked their horns and attached signs to their vehicles urging Davis to "do his job" and terminate Worster. ECF No. 1-1 at 16-17, ¶ 76. The Amended Complaint asserts that, at some point, "Murray Stanley, with the aid and/or encouragement of D'Alessandro" and other individuals "were communicating with Plaintiff Worster's minor child  . . . in an attempt to further alienate the child from her father, in what they knew to be an already strained

relationship; the relationship is now fatally interfered with." ECF No. 1-1 at 18, ¶ 83.

While the public campaign was ongoing, Theriault was receiving money from a GoFundMe fundraising drive, organized by another individual, that stated that Theriault "had been on unpaid leave since February 3, 2020 and had been the victim of a hostile workplace environment and bullying tactics by Chief of Police Craig Worster . . . with no protection from the town manager John Davis." ECF No. 1-1 at 17, ¶ 78. Theriault did not disclose that she had actually been receiving pay while she was out of work and did not rebut any of the characterizations made on the fundraising page.

Throughout the public campaign, confidential documents were disseminated to the public, including, but not limited to, Theriault's misconduct complaints, Smith's complaints, private email correspondence between Smith and Davis, and Worster's employment records. On the Plaintiffs' information and belief, these documents were disseminated to the public by Theriault, Cunniff, and/or Smith through Murray Stanley and D'Alessandro, who were used as a mechanism to disseminate the documents. Some of these documents were records from Worster's former employer, the Wiscasset Police Department, that had been released pursuant to Maine's Freedom of Access Act ("FOAA"). According to the Plaintiffs, "there remains . . . a question as to the ability of the [Wiscasset Police Department] to disseminate some or all of the documents obtained by Defendant Cunniff." ECF No. 1-1 at 15, ¶ 69.

The Town Council eventually became involved in the public outcry.  Members of the Town Council, including Councilor Louis Pelletier, discussed the issues about Davis and Worster on the Katahdin Citizen's Group page.  Councilor Pelletier stated that he was looking for a way to fire Davis and have the investigation into Worster reopened.  Members of the Town Council, on the Plaintiffs' information and belief, began their own personal investigations into the allegations against the Plaintiffs.  Notably, Councilor Michael Madore communicated directly with Theriault during the investigation about her allegations against the Plaintiffs.  At a Town Council meeting on June 25, 2020, Councilor Steven Golieb initiated an oral Motion to Condemn Davis that was procedurally improper.  Councilor Golieb also made allegedly misleading comments to a newspaper about Davis's tenure as Town Manager.  On the Plaintiffs' information and belief, Smith was communicating with the Town Council, urged them to terminate Davis, and imposed a deadline for them to do so.

Davis made a comment to the Town Council Chairman that he had a meeting with an attorney to discuss the defamation that he had been subjected to by, among others, members of the Town Council.  About a month-and-a-half later, two Town Councilors, Golieb and Randy Jackson, went to Davis's office and "fired" Davis in a manner that was allegedly not in accordance with Davis's employment contract.  ECF No. 1-1 at 26, ¶ 130.  The Amended Complaint asserts that this action was taken because of Davis's conclusion that Worster had not committed any misconduct.  Davis was subsequently officially terminated by the Town Council.

Around the same time that Davis was terminated, the public outcry against Worster and Davis escalated, with one public comment on the Facebook page calling

for unspecified members of the Teamsters Local Union #340 to act violently toward the Plaintiffs.

About a week after Davis was terminated, the Town Council Chairman sent a letter to every citizen of the Town.[4]  The letter "respond[ed] to the controversy concerning the Millinocket Police Department" and asserted that "the controversy persists based on rumors as well as incomplete and erroneous information and we ask that the public not reach any conclusions until all of the facts are known."  ECF No. 1-1 at 53.  The letter also explained that the results of Davis's investigation were confidential, even to the Town Council, and that conclusions reached by the public might therefore be based on "incomplete or misleading information."  ECF No. 1-1 at 54.  The letter also urged members of the community to "put this controversy behind [them] and move forward."  ECF No. 1-1 at 54.

After Davis's firing, the Town Council hired Annette Padilla as the "interim" Town Manager.  ECF No. 1-1 at 31, ¶ 154.  Padilla had previously been a contributor to the public campaign against Davis and Worster, and she had commented on some of the social media posts about them and had attended rallies against both men. Within a month of becoming Interim Town Manager, Padilla called a meeting with Worster.  At the meeting, Padilla accused Worster of wrongdoing based on the issues that had been raised in Smith's and Theriault's complaints and ultimately terminated him.[5]

---

[4]  I consider the contents of this letter because the Plaintiffs have attached it to their Amended Complaint.  *See Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 73 (1st Cir. 2014).

[5]  This termination also came shortly after Worster had submitted a letter requesting that he be placed on light duty for medical reasons.

Worster appealed his firing to the Millinocket Personnel Appeals Board, resulting in his reinstatement as Police Chief.  However, prior to Worster's reinstatement, Padilla disbanded the Millinocket Police Department so that Worster did not have a position to return to.

The Bangor Daily News (BDN) published articles about the controversy.  One article, published on December 8, 2020, contained what the Amended Complaint characterizes as inaccurate information and "parroted" information from the misconduct complaints against Worster.  ECF No. 1-1 at 32, ¶ 162.  Another article was published on March 26, 2021.  In this article, Andrew Wright, Esq., and Natasha Irving, Esq., the District Attorney for Prosecutorial District VI, stated or implied that there were concerns about Worster's credibility based on disclosures that had been made to criminal defendants under the doctrine of *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).[6]  According to the Plaintiffs, this information was disclosed in violation of a confidentiality order that had been entered by a Judge in a Maine criminal case in which Worster served as a witness.  Additionally, Worster was never previously notified that he had been designated as *Giglio*-impaired.  In the article, Wright made additional comments stating that he had concerns about Worster's credibility and honesty.

Theriault also made comments to the BDN about the Plaintiffs' civil lawsuit, originally filed in Maine Superior Court, that revealed details about the misconduct

---

[6] Under *Giglio*, prosecutors have an obligation to disclose information potentially useful to impeaching the credibility of a government witness, including police officers, where that information is favorable to a defendant and material to guilt or punishment.  405 U.S. at 153-55.

complaint against Worster, notwithstanding that (1) her misconduct complaint against Worster was confidential by statute and (2) Theriault had previously entered into a settlement agreement with the Town that included a confidentiality agreement.

## B.   Procedural History

Plaintiffs Davis and Worster originally brought this case in the Maine Superior Court (Penobscot County) on June 6, 2022 (ECF No. 28-1 at 3).   They filed an Amended Complaint on July 29, 2022 (ECF No. 28-1 at 3; ECF No. 1-1).   The Amended Complaint names the following Defendants: Theriault, Golieb, Madore, Pelletier, Jackson, Padilla, the Town of Millinocket, D'Alessandro, Murray Stanley, Cunniff, Teamsters Local Union #340, Brett Miller, Smith, the Wiscasset Police Department, Jeffrey Lange, Wright, and Irving.[7]   The claims against Theriault, Golieb, Madore, Pelletier, Jackson, Padilla, Miller, Smith, Lange, and Irving were brought against them both in their individual and official capacities.   The Amended Complaint asserts sixteen counts: negligence; negligent infliction of emotional distress; defamation; tortious interference with economic advantage; violation of the Equal Protection Clause of the U.S. Constitution; fraudulent misrepresentation; intentional infliction of emotional distress; civil conspiracy; breach of contract (asserted only by Davis against Defendants related to the Town); employment discrimination and unlawful termination; violation of Article I, section 1, of the Maine

---

[7]   The Amended Complaint is the first time that Cunniff had been named as a Defendant.   The Amended Complaint also named Stephen Brown and the Ridgefield Police Department as Defendants, but the parties stipulated that the claims against these two Defendants would be dismissed (ECF No. 151), and they were dismissed from this case on March 10, 2023 (ECF No. 152).

Constitution; violation of Article I, section 6-A, of the Maine Constitution; interference with Maine Civil Rights (asserted against all elected and official Defendants); invasion of privacy (asserted only by Worster); violation of Article I, section 19, of the Maine Constitution; and punitive damages.

After the Amended Complaint was filed, Defendants Golieb, Madore, Pelletier, Jackson, Padilla, and the Town of Millinocket removed the case, with the consent of the other Defendants, to this Court pursuant to 28 U.S.C.A. §§ 1331, 1367, 1441, and 1446 (West 2023) (ECF No. 1).

Most of the Defendants—all except for Golieb, Madore, Pelletier, Jackson, the Town, and Lange—have filed at least partial motions to dismiss or motions for judgment on the pleadings (ECF Nos. 14, 20, 34, 39, 54, 55, 57, 58, 73, 138). The motions filed by Murray Stanley, D'Alessandro, Padilla, Wright, Theriault, Cunniff, and the Union Defendants raise anti-SLAPP arguments and, therefore, I treat them as anti-SLAPP special motions to dismiss and separately address the other arguments raised in those motions. *See supra* note 1.

## II.  LEGAL ANALYSIS

### A.  Anti-SLAPP Special Motions to Dismiss and Related Motions

Before reaching the other arguments raised by the Defendants, I will address the arguments raised in the Defendants' anti-SLAPP Special Motions to Dismiss (ECF Nos. 14, 34, 55, 57, 58, 73, 138). I will also address the Plaintiffs' two Motions to Strike (ECF Nos. 78, 93) and the Plaintiffs' Motion to Amend (ECF No. 112), both of which are related to the anti-SLAPP motions.

### 1. Anti-SLAPP Overview

"A number of states have adopted statutes designed to guard against meritless lawsuits brought with the intention of chilling or deterring the free exercise of a defendant's First Amendment right to petition the government by threatening would-be activists with litigation costs." 4 Barry A. Lindahl, *Modern Tort Law: Liability and Litigation* § 35:41 (2d ed. 2023). These lawsuits are known as SLAPP suits— Strategic Lawsuits Against Public Participation—and the statutes guarding against them are known as anti-SLAPP statutes. *Thurlow*, 2021 ME 58, ¶ 8, 263 A.3d 494. Traditionally, these statutes were intended to remedy "lawsuits directed at individual citizens of modest means for speaking publicly against development projects." *See id.* (quoting *Morse Bros., Inc. v. Webster*, 2001 ME 70, ¶ 10, 772 A.2d 842, *abrogated by Nader v. Me. Democratic Party* ("*Nader II*"), 2013 ME 51, ¶ 12 n.9, 66 A.3d 571). However, these statutes have been "proven to be capable of abuse and tactical manipulation." *Bradbury v. City of Eastport*, 2013 ME 72, ¶ 10, 72 A.3d 512.

Maine's anti-SLAPP statute, 14 M.R.S.A. § 556, is "intended to provide for the swift and early dismissal of frivolous lawsuits that are meant to discourage the defendant's exercise of his or her First Amendment right to petition." *Weinstein v. Old Orchard Beach Fam. Dentistry, LLC*, 2022 ME 16, ¶ 4, 271 A.3d 758. This statute applies to cases in federal court. *Godin v. Schencks*, 629 F.3d 79, 92 (1st Cir. 2010).

Whether a lawsuit was brought in retaliation for petitioning activity is not an all-or-nothing proposition. *See Camden Nat'l Bank v. Weintraub*, 2016 ME 101, ¶ 9, 143 A.3d 788. Thus, "discrete claims within a single action *may* be individually dismissed pursuant to a special motion to dismiss, and only the claims specifically

based on the moving party's petitioning activities are properly considered for dismissal." *Id.*

> In relevant part, the anti-SLAPP statute provides:

> When a moving party asserts that the civil claims . . . against the moving party are based on the moving party's exercise of the moving party's right of petition under the Constitution of the United States or the Constitution of Maine, the moving party may bring a special motion to dismiss. . . . The court shall grant the special motion, unless the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

14 M.R.S.A. § 556.

This language has engendered considerable confusion and conflicting interpretations, especially because of the difficulty in balancing the rights at issue. *See Thurlow*, 2021 ME 58, ¶¶ 9-10, 263 A.3d 494 (discussing the difficulty in balancing the right to petition, the right to access the courts, and the right to a jury trial); *Franchini v. Inv.'s Bus. Daily* ("*Franchini IV*"), 2022 ME 12, ¶ 51, 268 A.3d 863 (Hjelm, A.R.J., dissenting) (discussing the "fluid" effects and "multiple significant changes in . . . case law" resulting from the Law Court's "jurisprudential efforts to properly interpret and determine the proper use of section 556 and the process governing it").

In light of these concerns, the Law Court has prescribed a multi-step burden-shifting framework for analyzing anti-SLAPP cases. "First, 'the defendant must file a special motion to dismiss and establish, based on the pleadings and affidavits, that

the claims against him are based on his exercise of the right to petition pursuant to the federal or state constitutions.'" *Weinstein*, 2022 ME 16, ¶ 5, 271 A.3d 758 (quoting *Gaudette v. Davis* ("*Gaudette I*"), 2017 ME 86, ¶ 16, 160 A.3d 1190, *abrogated by Thurlow*, 2021 ME 58, ¶ 19, 263 A.3d 494). "If the defendant meets the burden of establishing that the claims are based on petitioning activity, the burden shifts to the plaintiff to establish 'through the pleadings and affidavits, prima facie evidence that the defendant's petitioning activity was devoid of any reasonable factual support or any arguable basis in law *and* that the defendant's petitioning activity caused actual injury to the plaintiff.'" *Id.* (quoting *Gaudette I*, 2017 ME 86, ¶ 17, 160 A.3d 1190).[8]

### (a) Step One: Exercise of the Right to Petition

A movant must first show that the claims against him or her are based on the exercise of his or her right to petition. The anti-SLAPP statute defines the exercise of the right to petition "very broadly." *Schelling v. Lindell*, 2008 ME 59, ¶ 11, 942 A.2d 1226. Specifically, the statute defines petitioning activity as:

> [A]ny written or oral statement made before or submitted to a legislative, executive or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.

---

[8] There was a third step to this procedure: if the second step revealed a dispute of material facts, the plaintiff/nonmoving party was required "to convince the trial court by a preponderance of the evidence that the assertions articulated in the second step were in fact true." *Thurlow*, 2021 ME 58, ¶ 14, 263 A.3d 494. However, the Law Court jettisoned this third step in *Thurlow* on the ground that it was constitutionally dubious. *Id.* ¶¶ 19-20.

14 M.R.S.A. § 556. "'This definition is informed by the First Amendment,' and therefore, 'a petition conveys the special concerns of its author to the government and, in its usual form, requests action by the government to address those concerns.'" *Hearts with Haiti, Inc. v. Kendrick*, 2019 ME 26, ¶ 12, 202 A.3d 1189 (quoting *Nader II*, 2013 ME 51, ¶ 16, 66 A.3d 571); *see, e.g.*, *Pollack v. Fournier*, 2020 ME 93, ¶¶ 16-19, 237 A.3d 149 (considering whether the service of a notice of claim for prejudgment interest could convey the special concerns of its author or request action by the government to address those concerns).

Determining whether a specific activity fits within this definition, though, depends heavily on the facts of the case. *See Franchini IV*, 2022 ME 12, ¶ 17, 268 A.3d 863 ("The determination of whether and on whose behalf a . . . party has engaged in petitioning activity is a case-specific, fact-driven inquiry."). "Petitioning activity" has been held to encompass, among other things, (1) letters published in a newspaper that are designed to expand the public consideration of controversial legislative issues, *Schelling*, 2008 ME 59, ¶ 13, 942 A.2d 1226; (2) statements to a newspaper and to a public forum alleging that a police officer had committed sexual abuse, *Gaudette I*, 2017 ME 86, ¶¶ 2, 23, 160 A.3d 1190; (3) complaints made to municipal, state, or federal bodies, *Thurlow*, 2021 ME 58, ¶¶ 23-24, 263 A.3d 494; *Morse Bros.*, 2001 ME 70, ¶ 19, 772 A.2d 842; *Carey v. Me. Bd. of Overseers of the Bar*, No. CV-17-17, 2017 Me. Super. LEXIS 269, at *80-81 (Oct. 25, 2017); (4) statements made to law enforcement about matters of public safety, *see Desjardins v. Reynolds*, 2017 ME 99, ¶ 11, 162 A.3d 228; *Lynch v. Christie*, 815 F. Supp. 2d 341, 346 n.6 (D. Me. 2011); and (5) letters to a city council, a mayor, and a newspaper regarding the behavior of a city

contractor, *Maietta Constr., Inc. v. Wainwright*, 2004 ME 53, ¶ 7, 847 A.2d 1169.

Petitioning activity, however, is not unlimited: it does not include threatening or

derogatory messages that urge private parties not to do business with a plaintiff.

*Hearts with Haiti*, 2019 ME 26, ¶ 13, 202 A.3d 1189.  Nor does it encompass the

submission of an investigatory report to a public institution that had commissioned

the report as part of an internal personnel matter.  *Hamilton v. Drummond

Woodsum*, 2020 ME 8, ¶¶ 16-18, 223 A.3d 904.

### (b) Step Two: Devoid of Any Reasonable Factual Support and Actual Injury

If the movant meets its burden of showing that the claims against him or her

are based on petitioning activity, the burden shifts to the nonmovant to establish,

"through the pleadings and affidavits, prima facie evidence that the defendant's

petitioning activity was devoid of any reasonable factual support or any arguable

basis in law *and* that the defendant's petitioning activity caused actual injury to the

plaintiff."  *Weinstein*, 2022 ME 16, ¶ 5, 271 A.3d 758 (quoting *Gaudette I*, 2017 ME

86, ¶ 17, 160 A.3d 1190).  If the nonmovant fails to meet either portion of their burden

at the second step, the special motion to dismiss must be granted.  *Id.*

### (i)     Devoid of Any Reasonable Factual Support

With respect to this element, "[t]he showing required by the statute is a prima

facie case, and production of some evidence is enough to satisfy this burden."  *Camden

Nat'l Bank*, 2016 ME 101, ¶ 11, 143 A.3d 788.  "Prima facie evidence requires only

some evidence on every element of proof necessary to obtain the desired remedy.

Thus, prima facie proof is a low standard that does not depend on the reliability or

16

credibility of the evidence, all of which may be considered at some later time in the process." *Id.* (quoting *Nader v. Me. Democratic Party* ("*Nader I*"), 2012 ME 57, ¶ 34, 41 A.3d 551, *abrogated by Gaudette I*, 2017 ME 86, ¶ 14, 160 A.3d 1190); *see also Nader I*, 2012 ME 57, ¶ 35, 41 A.3d 551 ("A plaintiff may meet its burden of proof responding to a special motion to dismiss if, through 'the pleading and supporting and opposing affidavits,' the plaintiff presents 'some evidence' that the defendant's petitioning activity was devoid of factual or legal support . . . . Even when faced with conflicting evidence from a defendant, a plaintiff [who is] able to meet this 'low standard' could avoid dismissal of his or her claim." (quoting 14 M.R.S.A. § 556).

In keeping with this standard, "the focus is not on what [the anti-SLAPP movants] considered to be a reasonable factual support for their [petitioning behavior] or their interpretation of the facts." *Thurlow*, 2021 ME 58, ¶ 26, 263 A.3d 494. Instead, the focus is "on whether the facts as presented by [the non-movant], if believed, would prove that the [movant's] allegations are devoid of any reasonable factual support or have no arguable basis in the law." *Id.* This is because "[p]rima facie evidence is not determined by comparing the facts as presented by each side; all favorable inferences must be given to the plaintiff/nonmoving party in a special motion brought pursuant to the anti-SLAPP statute." *Id.* ¶ 26 n.8; *see also Camden Nat'l Bank*, 2016 ME 101, ¶ 11, 143 A.3d 788 ("As with all motions to dismiss, and pursuant to section 556, a court is permitted to infer that the allegations in the nonmoving party's pleading and factual statements in affidavits . . . are true."). In cases involving multiple petitioning activities, the non-movant need only show that

one of the activities at issue was devoid of a reasonable or factual basis—not all of the activities. *Gaudette I*, 2017 ME 86, ¶ 12, 160 A.3d 1190.

The Law Court's recent discussion of this issue in *Thurlow* is illustrative. In that case, the plaintiff, a former high school vice principal, brought a lawsuit against two parents who sent a letter to the school board and others complaining about his conduct with respect to their son. The parents brought an anti-SLAPP special motion to dismiss. In response, Thurlow filed an affidavit that "provided details as to why the allegations were devoid of any reasonable factual support." *Thurlow*, 2021 ME 58, ¶ 27, 263 A.3d 494. The affidavit contained "specific denials countering the Nelsons' allegations of wrongdoing," and denied that he had mistreated the Nelsons' son, discouraged the Nelsons' advocacy, destroyed school records, or covered up school wrongdoing. *Id.* The Law Court concluded that "[t]hese specific assertions of facts by Thurlow, including his reference to his exoneration following an investigation of the allegations contained in the Nelsons' letter, constitute prima facie evidence that the Nelsons' letter was devoid of any reasonable factual support." *Id.* ¶ 28. Accordingly, the Law Court concluded that the special motion to dismiss should have been denied. *Id.* ¶ 31.

### (ii)   **Actual Injury**

The Law Court has interpreted the actual injury requirement to mean "a reasonably certain monetary valuation of the injury suffered by the plaintiff." *Weinstein*, 2022 ME 16, ¶ 7, 271 A.3d 758 (quoting *Desjardins*, 2017 ME 99, ¶ 14, 162 A.3d 228). "Actual injury could include . . . quantifiable losses of money or other resources or identifiable special damages.'" *Id.* (alteration in original) (quoting *Nader*

18

*I*, 2012 ME 57, ¶ 38, 41 A.3d 551).  Plaintiffs need not provide an "actuarial analysis" of damages; instead, damages may be determined based on "the exercise of judgment applied to facts in evidence" if those facts allow for calculation based on "reasonable, as distinguished from mathematical, certainty by the exercise of sound judgment." *Id.* (first quoting *Schelling*, 2008 ME 59, ¶ 18, 942 A.2d 1226; then quoting *Dairy Farm Leasing Co. v. Hartley*, 395 A.2d 1135, 1140-41 (Me. 1978)).

The factual basis for the actual injury cannot be alleged for the first time in response to an anti-SLAPP special motion to dismiss.  *See Desjardins*, 2017 ME 99, ¶ 19, 162 A.3d 228; *Weinstein*, 2022 ME 16, ¶ 8, 271 A.3d 758.  And although notice pleading suffices in most civil actions, notice pleading alone is insufficient for the purposes of alleging actual injury; instead, a party opposing a special motion to dismiss must make a more precise showing "that the moving party's acts caused actual injury to [him.]"  *Weinstein*, 2022 ME 16, ¶ 10, 271 A.3d 758 (alteration in original) (quoting 14 M.R.S.A. § 556).  However, recognizing the reality that "a plaintiff may not always foresee that his complaint will be subject to a special motion to dismiss, . . . a plaintiff who otherwise follows the edicts of notice pleading and is later required to defend against a special motion to dismiss may preserve his claim through the anti-SLAPP process by seeking to amend his complaint to allege actual injury with greater specificity."  *Id.*  "[S]uch motions to amend should be liberally granted."  *Id.*

Certain types of injury are insufficient for showing actual injury.  "[E]motional injury" alone, divorced from quantifiable losses, does not qualify "unless it is so severe that no reasonable person could be expected to endure it."  *Id.* ¶ 11 & n.3 (quoting

*Schelling*, 2008 ME 59, ¶¶ 22, 25-26, 942 A.2d 1226); *see also Desjardins*, 2017 ME 99, ¶ 20, 162 A.3d 228 ("Thus, 'loss of sleep, mental suffering, . . . embarrassment, . . . [d]istress, irritation, and emotional upset' are not 'legally sufficient' to constitute 'actual injury,' nor are 'minor emotional injuries, such as hurt feelings.'" (alterations in original) (quoting *Schelling*, 2008 ME 59, ¶¶ 18, 25-26, 942 A.2d 1226)).  And although defamation relating to a plaintiff's business or profession constitutes injury per se at common law, that rule does not apply to anti-SLAPP cases.  *See Weinstein*, 2022 ME 16, ¶ 12, 271 A.3d 758; *Desjardins*, 2017 ME 99, ¶ 14, 162 A.3d 228 ("The requirement of reasonable certainty also precludes the establishment of 'actual injury' when the plaintiff asserts only presumed damages ('damages per se'), as is associated with common law causes of action for libel or slander.").

Two recent Law Court cases show both sides of this divide.  In *Thurlow*, 2021 ME 58, ¶¶ 29-30, 263 A.3d 494, the Law Court concluded that a plaintiff had properly alleged actual injury when he alleged that the defendants' defamatory accusations had caused him to seek medical, psychological, and psychiatric treatment and that he had not been able to return to work or renew his credentials, causing him to lose income.  But in *Weinstein*, 2022 ME 16, ¶¶ 11-12, 271 A.3d 758, the Law Court concluded that a plaintiff who alleged emotional and reputational injuries, but had not proved quantifiable losses, had not shown actual injury, so the defendant's special motion to dismiss was granted.

## 2.  Theriault's Special Motion to Dismiss

I first turn to Theriault's Special Motion to Dismiss (ECF No. 58).  Before addressing this motion, though, I must address the Plaintiffs' Motion to Strike (ECF

No. 93).  The Plaintiffs argue that certain portions of Theriault's Special Motion to Dismiss and her accompanying affidavit should be stricken pursuant to Fed. R. Civ. P. 12(f) because Theriault included allegedly confidential information—namely, details about the misconduct complaints and supplements that she and Cunniff filed against Worster—in the motion in violation of her settlement agreement with the Town of Millinocket, the Town of Millinocket's Personnel Policy, and several state statutes.  For several reasons, I deny the Plaintiffs' Motion to Strike.

First, Fed. R. Civ. P. 12(f), which permits parties to move to strike "redundant, immaterial, impertinent, or scandalous matter," applies only to pleadings.  Motions and affidavits are not pleadings, and a party cannot move to strike them under Rule 12(f).  *See id.*; *Meyer v. Panera Bread Co.*, No. 17-cv-2565 (EGS/GMH), 2018 WL 5017747, at *3 (D.D.C. Oct. 6, 2018) (declining to strike a declaration under Rule 12(f)); *Sewell v. Westat, Inc.*, No. TJS-20-1895, 2021 WL 5233753, at *7 (D. Md. Nov. 10, 2021) (declining to strike a motion to dismiss under Rule 12(f)); *see also* 5C Charles Alan Wright, Arthur R. Miller, and A. Benjamin Spencer, *Federal Practice and Procedure* § 1380 (3d ed. 2023) ("Rule 12(f) motions only may be directed towards pleadings as defined by Rule 7(a); thus, motions, affidavits, briefs, and other documents outside of the pleadings are not subject to Rule 12(f).").

Second, the information that Theriault included in her filings is crucial to the resolution of this case.  The Plaintiffs have brought a variety of claims against Theriault based in part on the misconduct complaints that she filed against Worster.  The Plaintiffs have not included Theriault's actual complaints in the record, and they now contend that it would be inappropriate for Theriault to even discuss the content

of these complaints.  Contrary to the Plaintiffs' argument that "[t]he present litigation does not require the specific facts, or references found within those confidential complaints be disclosed," ECF No. 93 at 2, ¶ 12, without the opportunity to review the substance of these documents, it is not possible for the Court to determine whether Theriault's complaints constitute petitioning activity or if they were devoid of any reasonable factual basis.  And the Plaintiffs' talismanic reliance on the fact that, according to them, Worster was "exonerate[ed]" by repeated investigations, ECF No. 93 at 2, ¶ 12, is unavailing because even under *Thurlow*, that is just one of several considerations.  *See* 2021 ME 58, ¶¶ 27-28, 263 A.3d 494.  The Plaintiffs, therefore, have waived their right to keep the content of Theriault's misconduct complaints out of the public domain by bringing this suit challenging Theriault's conduct.  *See Hughes v. Lincoln Nat'l Life Ins. Co.*, 2:22-cv-00098-NT, 2022 U.S. Dist. LEXIS 133914, at *2-3 (D. Me. July 28, 2022) (citing *White v. Worthington Indus.*, 266 F.R.D. 178, 196 (S.D. Ohio 2010) (denying a motion to seal an administrative record that was crucial to the disposition of the case but permitting redaction of certain documents).

Third, the Plaintiffs have not provided any authority to support their position that the guarantees of confidentiality and freedom from public disclosure in 30-A M.R.S.A. § 2702 (West 2023) and 25-A M.R.S.A. § 2806-A(7)[9] (West 2023) prevent a litigant from even discussing the content of confidential documents when they are facing a legal action based upon those documents.  Moreover, Theriault did not

_____

[9] The Plaintiffs erroneously refer to this section as 25 M.R.S.A. § 2806.

actually include the records that are deemed confidential by sections 2702 and 2806-A—she simply described them in her affidavit and motion.

Fourth, the Plaintiffs have not included, either as an attachment to their Motion to Strike or in response to Theriault's Special Motion to Dismiss, a copy of Theriault's settlement agreement with the Town of Millinocket, which they contend prevents her from disclosing the information. I therefore cannot determine if this agreement in fact would preclude her from disclosing the information in her motion and affidavit. Therefore, the Plaintiffs' Motion to Strike Theriault's Special Motion to Dismiss (ECF No. 93) is denied, and I will reach the merits of Theriault's motion.

### (a)  Step One: The Movant's Burden to Show Petitioning Activity

Theriault bears the burden of showing that her conduct fell within the "very broad[]" definition of petitioning activity set forth in the anti-SLAPP statute. *Schelling*, 2008 ME 59, ¶ 11, 942 A.2d 1226. The Plaintiffs' position with respect to whether Theriault has met her burden is unclear. In their opposition to Theriault's motion, the Plaintiffs argue that Theriault cannot show that some of her conduct constitutes petitioning activity because some of her conduct, such as filing a complaint with the Town, was simply that of a public employee handling a workplace grievance and not a matter of public concern within the scope of the First Amendment's Petition Clause. *See* ECF No. 104 at 4-5 (citing *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 399 (2011)). But both the Worster and Davis affidavits admit that Theriault's actions, "at least in so far as the complaints that were filed at

the Town of Millinocket level, were likely protected, constitutional petitioning activity, initially."[10]  ECF No. 104-1 at 6, ¶ 36; *see also* ECF No. 104-2 at 8, ¶ 41.

Some of the claims against Theriault may be based upon her petitioning activity.  For example, to the extent that the claims against Theriault are based on her participation in the public campaign to get Worster and Davis fired, that participation constitutes petitioning conduct for the reasons explained with respect to Defendants Murray Stanley, D'Alessandro, and Padilla, *see infra* pp. 45-46, 51-52, 56.  But the crux of the claims against Theriault is the misconduct complaint that Theriault filed with the Town against Worster.  Whether the misconduct complaint constitutes petitioning activity presents an issue that the Law Court has not yet addressed: Does a public employee's filing of a workplace grievance fall within the protections of the anti-SLAPP statute?  In other words, assuming that Theriault's misconduct complaint does not constitute petitioning behavior under the First Amendment, *see Guarnieri*, 564 U.S. at 399, may it still constitute protected petitioning activity under the anti-SLAPP statute?[11]  I do not answer that question

---

[10]  The Plaintiffs concede, for example, that the July 10, 2020, misconduct complaint supplement filed with the Town "may be a public concern" because it pertained to alleged abuses affecting the community.  ECF No. 104 at 4 n.1.

[11]  *Compare Franchini v. Inv.'s Bus. Daily* ("*Franchini III*"), 981 F.3d 1, 8 (1st Cir. 2020) ("The Maine Law Court has determined the right to petition under the [anti-SLAPP] statute is *at least* coextensive with the constitutional right to petition." (emphasis added)), *and* 14 M.R.S.A. § 556 (defining petitioning conduct broadly and not expressly limiting the conduct to asking the government for redress on matters of public concern), *and Duracraft Corp. v. Holmes Prods. Corp.*, 691 N.E.2d 935, 941 (Mass. 1998) (declining to read Massachusetts' anti-SLAPP statute as requiring that the petitioning activity involve a matter of public concern), *with Nader II*, 2013 ME 51, ¶ 16, 66 A.3d 571 (noting that the anti-SLAPP statute's definition of petitioning activity is "informed by the First Amendment" and citing *Guarnieri*); *Hearts with Haiti*, 2019 ME 26, ¶ 12, 202 A.3d 1189 (same); *Gaudette I*, 2017 ME 86, ¶ 16, 160 A.3d 1190 (noting that a movant must show that "the claims against [him] are based on [his] exercise of the right to petition *pursuant to the federal or state constitutions*" (alterations in original) (emphasis added) (quoting *Morse Bros.*, 2001 ME 70, ¶ 19, 772 A.2d 842)).

here, however, because even if Theriault has met her burden to show that the claims against her are based on petitioning activity, her Special Motion to Dismiss must still be denied for separate reasons.

### (b)  Step Two: The Non-Movant's Prima Facie Burden

Even when the claims against a defendant are based on his or her protected petitioning activity, "the special motion to dismiss must be denied if the opposing party presents 'prima facie evidence that at least one of the moving party's petitioning activities was "devoid of any reasonable factual support or any arguable basis in law and . . . caused actual injury to the [nonmoving party]."'" *Thurlow*, 2021 ME 58, ¶ 19, 263 A.3d 494 (alterations in original) (quoting *Nader II*, 2013 ME 51, ¶ 14, 66 A.3d 571).  Taking all reasonable inferences in the Plaintiffs' favor, *see id.* ¶ 26 n.8, I conclude that they have met that burden.

### (i)    Devoid of Any Reasonable Factual Support

With respect to the "devoid of any reasonable factual support or any arguable basis in law" element of the Plaintiffs' burden, that inquiry is governed by the Law Court's recent opinion in *Thurlow*.  Under *Thurlow*, the focus is on whether "the facts as presented by [the Plaintiffs], if believed, would prove that [Theriault's] allegations are devoid of any reasonable factual support or have no arguable basis in the law." 2021 ME 58, ¶ 26, 263 A.3d 494.  And the Plaintiffs need only meet their burden as to any one of Theriault's petitioning activities.  *Id.* (citing *Gaudette I*, 2017 ME 86, ¶ 12, 160 A.3d 1190).

The Plaintiffs have met their prima facie burden to show that at least one of Theriault's petitioning activities—namely, her initial misconduct complaint—was

devoid of any reasonable factual support.  Among other things, the misconduct complaint involved the incident between Worster and Theriault at the high school. Theriault's affidavit (ECF No. 58-1) describes the incident and notes that she spoke to Davis and the Human Resources Director about it, as did a member of the public. Theriault's misconduct complaint about Worster discussed, among other issues, the incident at the high school and how, from Theriault's perspective, Worster had engaged in a pattern of workplace bullying and had created a hostile workplace.  The Plaintiffs' Amended Complaint and affidavits tell a different story of what occurred at the high school and whether Worster had created a hostile environment.  According to the Amended Complaint and Worster's affidavit, it was Theriault who "became verbally angry and confronted Plaintiff Worster."  ECF No. 1-1 at 3, ¶ 4.  The Amended Complaint also asserts that "Theriault said that Plaintiff Worster did not scream or swear at her."  ECF No. 1-1 at 4, ¶ 7.  The Amended Complaint, and Davis's affidavit, explain that Davis reviewed the video footage of the incident, which showed that although both parties could have handled the situation better and Theriault had not acted appropriately, there was no evidence of any misconduct by Worster at the high school.

Moreover, the Amended Complaint and affidavits explain that (1) an internal investigation of Worster by a private investigator revealed no evidence of misconduct; (2) Davis, in his role as Town Manager, reviewed the private investigator's report and agreed with the report's conclusion that Worster had not committed any misconduct; (3) when Theriault's misconduct complaint was later provided to the Attorney General's Office, it declined to take action against Worster based on that complaint;

(4) when Theriault's misconduct complaint was later provided to the Academy, the Academy determined that there was no misconduct and dismissed the matter, although it did issue a letter of guidance; and (5) Worster was ultimately awarded his job back after being terminated by Padilla.  Taken together, these representations, along with the representations in the Amended Complaint and affidavits about the incident at the high school, are sufficient to provide prima facie evidence that Theriault's original misconduct complaint was devoid of any reasonable factual support.

This case is, as the Plaintiffs assert, somewhat similar to *Thurlow*.  As discussed in greater detail earlier, *see supra* p. 18, Thurlow's affidavit contained "specific denials" countering the movants' allegations of wrongdoing, and included a "reference to his exoneration following an investigation of the allegations contained in the [parents'] letter."  *Thurlow*, 2021 ME 58, ¶¶ 27-28, 263 A.3d 494.  Here, as in *Thurlow*, Davis's and Worster's affidavits, as well as the Amended Complaint, provide specific denials of Theriault's allegations of Worster's misconduct.  Worster also references the fact that he was repeatedly found not to have engaged in any misconduct by multiple bodies.  The circumstances of Worster's "exonerations" are as follows: (1) the Academy ultimately issued a letter of guidance even though it did not impose any discipline;[12] (2) Theriault ultimately settled her lawsuit with the Town;

---

[12]  "A letter of guidance or concern may be used to educate, reinforce knowledge regarding legal or professional obligations or express concern over action or inaction by the certificate holder that does not rise to the level of misconduct sufficient to merit disciplinary action.  The issuance of a letter of guidance or concern is not a formal proceeding and does not constitute an adverse disciplinary action of any form."  25 M.R.S.A. § 2806-A(7).

(3) Davis himself admitted that Worster could have handled the events at the high school differently; and (4) Padilla, upon her review, apparently determined that Worster had engaged in misconduct.  *See Ellis v. Shirikawa*, No. 1:21-cv-00030-LEW, 2021 WL 5112829, at *4 (D. Me. Nov. 3, 2021) (noting that a nonmovant failed to show that a report to the Army was without reasonable factual support because, among other things, a Board of Inquiry investigation showed that he engaged in conduct unbecoming of an officer even though it did not find that he had engaged in abusive and assaultive behavior).[13]  These circumstances, particularly the fact that the Academy decided to issue a letter of guidance, are admittedly less clear-cut than in *Thurlow*, in which the non-movant represented that he was "exonerated."  2021 ME 58, ¶ 28, 263 A.3d 494.  But the existence of contrary evidence does not preclude non-movants from meeting their prima facie burden, *see Nader I*, 2012 ME 57, ¶ 35, 41 A.3d 551, and the Plaintiffs' assertions are viewed in the light most favorable to them.

Theriault asserts that because there was a local citizen who also witnessed the incident at the high school and made a complaint against Worster, the Plaintiffs cannot meet their prima facie burden to show that her petitioning related to this event was devoid of any reasonable factual basis.  But, again, although the existence of an eyewitness supporting Theriault's account of mistreatment would certainly be helpful to a trier of fact, the existence of contrary evidence does not preclude the

---

[13]  Notably, *Ellis* preceded *Thurlow* and the extent to which the standards *Ellis* employed have been superseded by *Thurlow* has not yet been addressed.  *See Ellis*, 2021 WL 5112829, at *4 (noting that the Board of Inquiry's findings "do not tend to evince that Defendant's petition *was more likely than not* devoid of any reasonable factual support").

Plaintiffs from meeting their prima facie burden.  *See id.*[14]  Accordingly, under the circumstances of this case, I conclude that the Plaintiffs have met their burden.

### (ii)    Actual Injury

The Plaintiffs have also met their burden to show prima facie evidence that they were actually injured by Theriault's conduct. The Amended Complaint and Plaintiffs' affidavits show that Davis and Worster were both terminated from their positions with the Town.   The resulting loss of income is sufficient to meet the Plaintiffs' burden of showing actual injury, even if they did not include specifics about how much income they lost.  *See Thurlow*, 2021 ME 58, ¶ 30, 263 A.3d 494 ("Thurlow's assertions of lost employment and credentials are sufficient to meet his prima facie burden on the element of actual injury."); *Leighton v. Lowenberg*, 2023 ME 14, ¶¶ 36-37, 290 A.3d 68 (concluding that a plaintiff had shown actual injury by alleging that she incurred legal expenses defending against a baseless defamation action even though she did not include copies of legal bills or invoices); *see also id*, 2023 ME 14, ¶ 33, 290 A.3d 68 ("Damages may be determined 'based on the exercise of judgment applied to facts in evidence' as long as those facts allow a calculation based on 'reasonable, as distinguished from mathematical, certainty by the exercise of sound judgment.'" (quoting *Dairy Farm Leasing Co.*, 395 A.2d at 1140-41)).

The Plaintiffs have also sufficiently pleaded that Theriault's petitioning activity caused this harm.  With respect to Worster, the Plaintiffs allege that he was

---

[14]  Theriault also argues that because Worster and Davis were public figures and must show actual malice to recover for defamation under *New York Times v. Sullivan*, 376 U.S. 254, 279-83 (1964), it is more difficult for them to show that a party's petitioning activity was devoid of any reasonable factual support.  Theriault has not cited to any authority for this proposition, and there appears to be none in the Law Court's jurisprudence.

terminated as a consequence of Theriault's complaints about his conduct (including his conduct at the high school), notwithstanding the fact that he was repeatedly cleared by investigations.  With respect to Davis, the causal connection is a closer question.  Although Davis undoubtedly suffered an actual injury when he was terminated as Town Manager, the causal link between Theriault's misconduct complaint and this injury is more attenuated.  Taking all inferences in favor of the Plaintiffs, though, *Thurlow*, 2021 ME 58, ¶ 26 n.8, 263 A.3d 494, I conclude that the Plaintiffs have shown that Davis was terminated because of his refusal to take disciplinary action against Worster based on Theriault's misconduct complaint.  Thus, Theriault's petitioning conduct caused Davis's injury.

Theriault contends that the Plaintiffs have failed to establish that she caused them actual injury because "Plaintiffs repeatedly allege that no action was taken on Ms. Theriault's complaints."  ECF No. 58 at 19.  This argument is unpersuasive. Although the Plaintiffs repeatedly invoke the fact that multiple investigations found that Worster committed no misconduct, they also note that Worster was eventually fired by Padilla on the basis of the complaints made against him by Theriault.

Accordingly, I conclude that the Plaintiffs have met their prima facie burden. Theriault's Special Motion to Dismiss (ECF No. 58) must be denied.

### 3.  The Union Defendants' Special Motion to Dismiss

The Union Defendants argue that all of the claims against them are based on their petitioning the Town. They also argue that because the Plaintiffs were terminated and the Town entered into a settlement agreement with Theriault, the

Plaintiffs cannot meet their prima facie burden of showing that the Union Defendants' petitioning activity was devoid of any reasonable factual basis.

The Plaintiffs oppose the Special Motion to Dismiss, arguing that the Union Defendants have not shown that they were involved in petitioning activity (ECF No. 45). They also argue that the Union Defendants' activity was devoid of any reasonable factual support and that they suffered actual injury due to the Union Defendants' conduct.

### (a)  Step One: The Movant's Burden to Show Petitioning Activity

The burden initially falls on the Union Defendants to show that they were engaged in petitioning activity. The Plaintiffs argue that the Union Defendants cannot meet their burden because they did not file an affidavit along with their Special Motion to Dismiss. The Plaintiffs are incorrect.[15] Although the anti-SLAPP statute contemplates that affidavits may be filed in connection with a special motion to dismiss, it does not require the filing of affidavits. *See* 14 M.R.S.A. § 556 (noting that a court, when ruling on a special motion to dismiss, "shall consider *the pleading and supporting and opposing affidavits* stating the facts upon which the liability or defense is based" (emphasis added)). The filing of an affidavit along with a special motion to dismiss may aid the court in determining whether the movant engaged in petitioning activity. *See, e.g., Thurlow*, 2021 ME 58, ¶ 22, 263 A.3d 494. But when such an affidavit is not filed, the Court may still make a determination from the pleadings. *See* 14 M.R.S.A. § 556.

---

[15]  The Plaintiffs raise this argument with respect to several other Defendants as well, and it is equally unpersuasive as to those Defendants.

According to the Amended Complaint, Theriault was "represented" by Smith, one of the Union Defendants,[16] who was "working in conjunction with Defendant Cunniff against the Plaintiffs on behalf of Defendant Theriault." ECF No. 1-1 at 18-19, ¶¶ 85, 88. Smith, on behalf of the Union, filed a complaint with the Town against Davis, on July 29, 2020, and supplemented that complaint on September 8, 2020. The "focus" of Smith's complaint and supplement "was the firing, *inter alia*, of Plaintiff Davis in order to either force him to fire Plaintiff Worster, or, alternatively, to have Plaintiff Davis replaced with someone who would terminate Plaintiff Worster." ECF No. 1-1 at 21, ¶ 99. Smith's complaint, which the Plaintiffs suggest was actually drafted by Cunniff, contended that Worster and Davis were improperly acting in concert. Additionally, according to the Amended Complaint and on the Plaintiffs' information and belief, "Smith sent an email to some or all of the Millinocket Town Councilors demanding that action be taken against . . . Plaintiff Davis." ECF No. 1-1 at 28, ¶ 137. The Amended Complaint further asserts that Smith participated in the campaign of disparagement against Worster and Davis and that he improperly disseminated confidential documents to the public. The Plaintiffs contend that Smith was motivated, essentially, by a personal vendetta against Worster.[17]

Considering the facts presented in the Amended Complaint, I conclude that the claims against the Union Defendants are based on their petitioning activity. The

---

[16] Almost all of the allegations in the Amended Complaint about the Union Defendants relate specifically to Defendant Lorne Smith.

[17] The Amended Complaint also attacks Smith as having a "mobster mentality" and a "history of behaving badly," ECF No. 1-1 at 29, ¶¶ 147-48, and characterizes Smith's behavior as "vile and misleading." ECF No. 1-1 at 30, ¶ 149. These attacks on Smith's character are of no consequence to the anti-SLAPP issues, unnecessary to the pleading of Plaintiffs' claims, and are not considered further.

Union Defendants' complaint and emails to the Town of Millinocket, in which they requested the Town Manager to either terminate the Police Chief or be terminated himself, is quintessential petitioning activity under the anti-SLAPP statute. *See* 14 M.R.S.A. § 556; *see also Thurlow*, 2021 ME 58, ¶¶ 23-24, 263 A.3d 494 (concluding that a letter to school officials who supervised an assistant principal accused of misconduct constituted petitioning activity); *Gaudette I*, 2017 ME 86, ¶¶ 2, 23, 160 A.3d 1190 (concluding that statements to a public forum and submitted to state officials constituted petitioning activity); *Nader II*, 2013 ME 51, ¶ 17, 66 A.3d 571 (concluding that complaints to the Secretary of State about the propriety of nomination petitions constitutes petitioning activity). Additionally, to the extent that the claims against the Union Defendants are based on their participation in the public campaign against the Plaintiffs, that conduct would also constitute petitioning activity for the reasons described below with respect to Defendant Murray Stanley. *See infra* pp. 45-46; *see also* 14 M.R.S.A. § 556. Finally, although it is a closer call as to whether the Union Defendants' dissemination to the public of allegedly confidential documents constitutes petitioning activity, that conduct (to the extent that the claims against the Union Defendants are based on it) falls within the anti-SLAPP statute because it is "reasonably likely to enlist public participation in an effort to effect consideration of an issue by a legislative, executive, or judicial body."[18]

---

[18] Although it is not necessary to my decision because it is the movant's burden to show that they were engaged in petitioning activity, I observe that the Plaintiffs make little effort to distinguish between the different types of conduct engaged in by the Defendants and do not develop an argument that the dissemination of documents should be treated differently from the rest of the Union Defendants' conduct. Accordingly, I assume, without deciding, that the Union Defendants' dissemination of allegedly confidential documents constitutes petitioning activity.

*See* 14 M.R.S.A. § 556.  Therefore, contrary to the Plaintiffs' argument that "[i]t is not constitutionally protected to 'demand' that a town council fire the town manager for closing an investigation with no findings of misconduct[] when an individual is not privy to any facts surrounding the investigation," ECF No. 45 at 13, the Union Defendants' conduct is *precisely* the type of conduct that falls within the reach of the anti-SLAPP statute.

The Plaintiffs' additional arguments as to this issue are unpersuasive.  The Plaintiffs argue that Smith's conduct cannot constitute petitioning activity because Smith's campaign was driven by personal animus and was baseless.  *See, e.g.*, ECF No. 45 at 12, 14.  But the motivation behind Smith's conduct is not relevant to whether Smith was engaged in petitioning activity.  *See Mabee v. Eckrote*, No. 1:19-cv-00432-JDL, 2020 WL 1171939, at *4 n.4 (D. Me. Mar. 11, 2020) ("[A] court at step one [of the anti-SLAPP analysis] does not consider the moving party's motivation in making its 'petition.'"); *Millett v. Atl. Richfield Co.*, No. cv-98-555, 1999 Me. Super. LEXIS 240, at *8-9 (Aug. 30, 1999) ("[F]ederal constitutional law makes clear that the motive of an individual or entity in exercising their right to petition is irrelevant to whether their exercise is protected."); *see also Kobrin v. Gastfriend*, 821 N.E.2d 60, 68 n.14 (Mass. 2005) ("We care not whether a defendant seeking dismissal under the anti-SLAPP statute is 'sincere' in his or her statements . . . .").  Nor does the fact that the Plaintiffs allege that the petitioning activity was baseless implicate whether it was, in fact, petitioning behavior—that is instead a consideration for the second step of the anti-SLAPP analysis.  *See Nader I*, 2012 ME 57, ¶ 29 n.12, 41 A.3d 551

(rejecting an argument that only statements that are "not knowingly baseless or false" can constitute protected petitioning conduct under the anti-SLAPP statute).

I am also unpersuaded by the Plaintiffs' argument that all of the conduct that was allegedly committed after the Town Council's Chairman sent a letter to the citizens of the Town was necessarily unprotected conduct. There is no reason why the Chairman's letter, which simply asked citizens to cease spreading rumors about the closed investigation into Worster's alleged misconduct because they did not have all of the relevant information, would constitute such a bright line, and the Plaintiffs have not pointed to any authority to the contrary. In fact, the Law Court has, under analogous circumstances, concluded that the fact that a particular legislative issue was moot did not create such a bright line. *See Schelling*, 2008 ME 59, ¶ 14, 942 A.2d 1226 (noting that a letter about a legislative issue could still constitute petitioning activity even if the bill at issue had already become law).

The only difficult aspect of this analysis is an issue that the Plaintiffs have not argued: whether the Union Defendants were petitioning on their own behalf or if they were simply petitioning on behalf of Theriault. If the Union Defendants were not petitioning on their own behalf, then their conduct may not be protected. *See Gaudette v. Mainely Media, LLC* ("*Gaudette II*"), 2017 ME 87, ¶ 17, 160 A.3d 539 (concluding that the anti-SLAPP statute only protects the conduct of a newspaper when that newspaper petitions "on its own behalf," not when it simply broadcasts the petitioning activities of others); *see also Fustolo v. Hollander*, 920 N.E.2d 837, 842 (Mass. 2010) ("[T]he salient and dispositive point is that . . . Hollander's articles did not contain statements seeking to redress a grievance or to petition for relief *of her*

*own*.").  On the other hand, the Law Court has previously permitted attorneys acting on behalf of their clients to claim the protection of the anti-SLAPP statute.  *See Maietta Constr.*, 2004 ME 53, ¶¶ 3, 7, 847 A.2d 1169; *see also Gaudette II*, 2017 ME 87, ¶ 16, 160 A.3d 539 (discussing, and distinguishing *Maietta Construction*, in the context of a newspaper that was not petitioning on its own behalf).  In this case, though, despite the allegation that Smith was representing Theriault and was acting in concert with Cunniff, the Amended Complaint as a whole supports the conclusion that Smith, and by extension the rest of the Union Defendants, were petitioning on their own behalf, in part because of animus against Worster and Davis.

Accordingly, the Union Defendants have met their burden to show that the claims against them are based on their petitioning activity.

### (b)  Step Two: The Non-Movant's Prima Facie Burden

The burden then shifts to the Plaintiffs to show that at least one of the Union Defendants' petitioning activities was devoid of any reasonable factual basis and caused them actual injury.  The Plaintiffs have met this burden.

### (i)      Devoid of Any Reasonable Factual Support

According to the Amended Complaint and affidavits, the Union Defendants appealed to Davis and the Town Council to have Worster terminated as the Police Chief based on Theriault's allegations.  And after Davis concluded, following an investigation conducted by a private investigator, that Worster did not engage in any misconduct and dismissed Theriault's complaints, the Union Defendants began a "campaign"—which included filing complaints—to get Davis terminated because of an alleged conspiracy between Worster and Davis.  ECF No. 45-3 at 3, ¶ 15.

The Plaintiffs have successfully provided prima facie evidence that these activities were without any reasonable factual basis. As described above with respect to Theriault, the representations in the Amended Complaint, along with Worster's affidavit, about the events at the high school and the determinations that Worster engaged in no misconduct are prima facie evidence that Worster did not engage in misconduct regarding Theriault. And, taken at face value, the Amended Complaint and Worster's affidavit show that Davis's decision-making regarding Worster was motivated by an independent review of the evidence rather than any type of bias as alleged by the Union Defendants. In fact, Davis, reached the same decision as the private investigator. Davis's decision not to discipline Worster was arguably later supported by the Attorney General's Office and the Academy—both of which failed to take any action. Taking all inferences in the light most favorable to the Plaintiffs, they have met their burden to provide prima facie evidence that at least one of the Union Defendants' petitioning activities was devoid of any reasonable factual support. *See Thurlow*, 2021 ME 58, ¶¶ 26-28 & 28 n.6, 263 A.3d 494.

The Union Defendants' arguments to the contrary are unpersuasive. They contend that because Worster and Davis were ultimately terminated and because the Town entered into a settlement agreement with Theriault to resolve her grievances against Worster, the Plaintiffs cannot meet their prima facie burden. But although the Union Defendants accurately identify evidence pointing in their favor, the existence of contrary evidence in the record does not prevent the Plaintiffs from meeting their prima facie burden. *See Nader I*, 2012 ME 57, ¶ 35, 41 A.3d 551; *see*

*also Thurlow*, 2021 ME 58, ¶ 26 & n.8, 263 A.3d 494 ("Prima facie evidence is not determined by comparing the facts as presented by each side . . . .").

### (ii)   Actual Injury

The Plaintiffs have also met their burden to show actual injury.[19]  As described above, both Worster and Davis were terminated as employees of the Town, resulting in lost income—a quantifiable injury.   And the causal connection between the Plaintiffs' injuries and the Union Defendants is clear: Davis has adequately alleged that he was terminated as a direct consequence of the Union Defendants' petitioning, and Worster has adequately alleged that Davis was terminated so that a new Town Manager (Padilla) could fire Worster.  For those reasons, the Plaintiffs have met their prima facie burden, and the anti-SLAPP portion of the Union Defendants' Motion to Dismiss (ECF No. 14) must be denied.

### 4.  Cunniff's Special Motion to Dismiss

Next, I consider Cunniff's Special Motion to Dismiss (ECF No. 55).  As they did with Theriault's Special Motion to Dismiss, the Plaintiffs have moved to strike Cunniff's Special Motion to Dismiss because it allegedly includes confidential information (ECF No. 78).  The Plaintiffs' Motion to Strike is denied for the same reasons explained earlier with respect to Theriault, *see supra* pp. 21-23, and I reach the merits of Cunniff's Special Motion to Dismiss.

---

[19]  The Union Defendants do not argue that the Plaintiffs have failed to provide prima facie evidence that they were actually injured by the Union Defendants' conduct.

### (a)  Step One: The Movant's Burden to Show Petitioning Activity

The claims against Cunniff are based on (1) Cunniff's representation of Theriault by filing a misconduct complaint and supplements to that complaint; (2) Cunniff filing a "criminal complaint against Plaintiff Worster with the Attorney General's Office," ECF No. 1-1 at 20, ¶ 94;[20] (3) Cunniff filing a report about Worster with the Academy; (4) Cunniff improperly disseminating confidential documents; and (5) Cunniff participating in the campaign to oust Worster and Davis.[21]  Both the Amended Complaint and the affidavit (ECF No. 55-1) that Cunniff filed along with his Special Motion to Dismiss are helpful in determining whether these actions constitute petitioning activity.

With respect to Cunniff's filing of the misconduct complaint (and supplements) with the Town, the Plaintiffs admit that Cunniff "may have been engaged in protected activity."  ECF No. 77 at 3.  However, they then argue that "when Defendant Cunniff began his assault on Plaintiff Worster outside of this context, Defendant's likely protected activity ceased."  ECF No. 77 at 3; *see also* ECF No. 77 at 4.  In light of these representations and the Law Court's case law holding that an attorney petitioning on behalf of a client may be entitled to protection under the anti-SLAPP statute, *see Maietta Constr.*, 2004 ME 53, ¶¶ 3, 7, 847 A.2d 1169; *Gaudette II*, 2017 ME 87, ¶ 16,

---

[20] Cunniff characterizes this action differently, noting that he provided a copy of the misconduct complaint to the Attorney General's Office and informed the Chief of Investigations that it was worth investigating whether Worster had committed any crimes or if there were concerns about his credibility.  The characterization of Cunniff's actions in contacting the Attorney General's Office does not affect my analysis of whether these acts constitute petitioning activity.

[21] The parties dispute whether Cunniff "lobb[ied]" the Millinocket Town Council to fire Worster.  ECF No. 77 at 4; ECF No. 88 at 2.  But even if Cunniff had, lobbying a Town Council is clearly petitioning activity.  *See Maietta Constr.*, 2004 ME 53, ¶¶ 3, 7, 847 A.2d 1169.

160 A.3d 539, I conclude, on the limited record before me and without finally deciding, Cunniff's conduct qualifies as protected petitioning activity.

The main thrust of the Plaintiffs' argument is that Cunniff is not entitled to the protection of the anti-SLAPP statute because he has not shown that his filing of a criminal complaint with the Attorney General's Office and a report with the Academy constituted protected petitioning activity. I disagree. Making a report to law enforcement, as well as to administrative bodies, constitutes petitioning activity. *See Lynch*, 815 F. Supp. 2d at 346 n.6 (report to law enforcement and to administrative agency); *Desjardins*, 2017 ME 99, ¶ 11, 162 A.3d 228 (report to law enforcement); *Thurlow*, 2021 ME 58, ¶ 23, 263 A.3d 494 (letter to school board); *Carey*, 2017 Me. Super. LEXIS 269, at *80-81 (filing a grievance with the Maine Board of Overseers of the Bar). Cunniff's reports to the Attorney General's Office and the Academy, as described in the Amended Complaint and in Cunniff's affidavit, thus constitute petitioning activity.

The Plaintiffs' arguments to the contrary are unpersuasive. The Plaintiffs argue that because Cunniff filed these allegedly baseless reports to personally attack Worster, they cannot constitute petitioning activity.[22] As described above, though, the veracity of a party's petitioning behavior is considered at the second step of the anti-SLAPP analysis. The Plaintiffs also emphasize that the Attorney General's Office and the Academy declined to find wrongdoing by Worster. While this also is

---

[22] The Plaintiffs assert: "Defendant Cunniff acted irrationally and vindictively, seeking to ruin Plaintiff Worster's reputation, job opportunities, and life liberties, when he went to the A.G.'s office and the [Academy] while an investigation was pending in Millinocket." ECF No. 77 at 8.

40

relevant at the second step of the anti-SLAPP analysis, the fact that a government agency took no action on a petition does not mean that there was no petitioning activity in the first place. Finally, the Plaintiffs assert that Cunniff's conduct in bringing a complaint to the Attorney General's Office and filing a report with the Academy violates the Maine Rules of Professional Conduct, as does his conduct in this litigation. But even if Cunniff's conduct violated the Maine Rules of Professional Conduct—an issue that I do not decide because it is, in context, beside the point—it does not follow that he was not engaged in petitioning conduct.

With respect to Cunniff's alleged participation in the campaign to oust the Plaintiffs and his dissemination of confidential materials, I conclude that these also constitute petitioning activity for the reasons discussed with respect to the Union Defendants and Murray Stanley.

Accordingly, I conclude that Cunniff has met his burden to show that the claims against him are based on his protected petitioning activity.

### (b)  Step Two: The Non-Movant's Prima Facie Burden

The burden shifts to the Plaintiffs to show that at least one of Cunniff's petitioning activities was devoid of any reasonable factual support or any arguable basis in law and that the activity caused them actual injury. I conclude that the Plaintiffs have met their burden.

### (i)     Devoid of Any Reasonable Factual Support

For the reasons discussed above with respect to Theriault's Special Motion to Dismiss and the Union Defendants' Special Motion to Dismiss, I conclude that the Plaintiffs have met their prima facie burden to show that the misconduct complaint

filed with the Town was devoid of any reasonable factual support. The Amended Complaint, as well as Davis's and Worster's affidavits (ECF Nos. 77-2, 77-5), contain sufficient factual assertions that, when taken as true, show that the allegations of Worster's misconduct at the high school were baseless and devoid of any factual support. In addition to the representations about the events at the high school, this conclusion is based, in part, on the facts that (1) the Town's investigation found that Worster had committed no misconduct, (2) the Academy took no disciplinary action against Worster, and (3) the Attorney General's Office took no action based on Cunniff's report.

Cunniff's arguments to the contrary are unpersuasive. First, Cunniff, citing *Nader II*, 2013 ME 51, ¶¶ 19-22, 66 A.3d 571, argues that the Plaintiffs have failed to meet their prima facie burden because they have not actually produced the complaints at issue or the results of the investigations into Worster's conduct. In *Nader II*, the plaintiff, third-party presidential candidate Ralph Nader, brought claims against several defendants who allegedly filed several unsuccessful challenges to his inclusion on voting ballots. *Id.* ¶¶ 3-5. At the second step of the anti-SLAPP analysis, the Law Court considered whether Nader had shown that the challenges were devoid of any reasonable factual support and concluded that he had not. *Id.* ¶¶ 20-23. This conclusion was based in part on the fact that "Nader had the burden of production at the second step of the anti-SLAPP procedure, and he failed to incorporate into his pleadings any of the documents that might have assisted him in meeting that burden," such as the complaints at issue, transcripts, or the ultimate decision. *Id.* ¶¶ 20, 22.

42

It is true that here, like in *Nader II*, the Plaintiffs (citing confidentiality concerns) did not incorporate Cunniff's misconduct complaint or the decisions of the Town or the Attorney General's Office into their pleadings.  But *Nader II* does not mandate that the documents at issue must be included in the record to satisfy a non-movant's prima facie burden.  Instead, particularly in light of *Thurlow*, 2021 ME 58, ¶¶ 26-28, 263 A.3d 494, such documentation is required if, as in *Nader II*, the affidavits are insufficient to provide prima facie evidence.[23]  Here, the statements in the Amended Complaint and affidavits are sufficient to show that the misconduct complaint was devoid of any reasonable factual basis.

Cunniff also takes issue with Worster's claim that he was exonerated three times and notes that the Academy's letter of guidance is persuasive evidence that Cunniff's misconduct complaint had some reasonable factual support.  *See* ECF No. 88 at 5 ("The fact that the [Academy] did not simply dismiss the allegations against Plaintiff Worster but chose to publicly admonish him speaks volumes.").  For the reasons discussed above with respect to Theriault's Special Motion to Dismiss, *see supra* pp. 27-29, this argument is ultimately unpersuasive.

Accordingly, I conclude that the Plaintiffs have carried their prima facie burden to show that Cunniff's Misconduct Complaint was devoid of any reasonable factual support.[24]

---

[23]  In *Thurlow*, the Law Court found it persuasive that the non-movant included a "*reference to his exoneration* following an investigation of the allegations contained in the [movants'] letter." 2021 ME 58, ¶ 28, 263 A.3d 494 (emphasis added).  The Law Court's phrasing indicates that it was sufficient that the non-movant included statements in his affidavit about his exoneration; there is no indication that the non-movant filed, or was required to file, a copy of the investigation report.

[24]  The Plaintiffs also argue, at least implicitly, that they have met their prima facie burden to show that Cunniff's petitioning activity was devoid of any arguable basis in law because (1) Cunniff had no

### (ii)    Actual Injury

The Plaintiffs have also met their burden to show that they were actually injured by Cunniff's conduct:  they provided prima facie evidence that Worster was terminated as a consequence of Cunniff's petitioning activity, including his complaints with the Town on behalf of Theriault.  Worster's termination as Chief of Police and corresponding loss of income qualifies as an actual injury for purposes of the anti-SLAPP statute.

It is a closer question whether the Plaintiffs have shown that Davis was actually injured by Cunniff's petitioning activity.  For the same reasons discussed above with respect to Theriault, I conclude that they have met this burden because they have provided prima facie evidence that Davis was terminated because of his refusal to take disciplinary action against Worster based in part on Cunniff's misconduct complaint.

Because the Plaintiffs have met their prima facie burden, Cunniff's Special Motion to Dismiss (ECF No. 55) is denied.

### 5.  Murray Stanley's Special Motion to Dismiss

In her Special Motion to Dismiss (ECF No. 34), Murray Stanley argues that all of the allegations against her in the Amended Complaint—which are "few and far between"—relate to statements she made and documents that she disseminated in an effort to convince Town officials to take action against Worster.  ECF No. 34 at 4.

---

authority under 25 M.R.S.A. §§ 2806-A, 2807 (West 2023), to make reports to the Academy and (2) that Cunniff's petitions to the Office of the Attorney General and the Academy involved the unlawful disclosure of materials made confidential by statute.  Because I conclude that the Plaintiffs have met their prima facie burden with respect to Cunniff's misconduct complaint, I need not reach these other arguments.

She further argues that her statements were true, and therefore the Plaintiffs cannot show that her petitioning activity was devoid of any reasonable factual support. The Plaintiffs oppose Murray Stanley's Special Motion to Dismiss (ECF Nos. 61, 61-1, 61-2).

### (a)   Step One: The Movant's Burden to Show Petitioning Activity

Because Murray Stanley has not filed an affidavit, the decision of whether she was engaged in petitioning activity rests on the Amended Complaint and the Plaintiffs' affidavits. *See* 14 M.R.S.A. § 556. These documents allege that Murray Stanley "spearhead[ed]" a public campaign to oust the Plaintiffs from their positions, including by organizing public protests and car parades, because Worster allegedly mistreated Theriault and Davis failed to discipline Worster. ECF No. 1-1 at 16, ¶ 73; *see also* ECF No. 61-1 at 2-3, ¶¶ 13, 14; ECF No. 61-2 at 3, ¶15. Murray Stanley also participated in the Katahdin Citizen's Group Facebook page and shared confidential documents about the Plaintiffs there and possibly elsewhere. According to Davis, Murray Stanley commented on the Facebook page about Davis and Worster being in a "good 'ol boys club." ECF No. 61-2 at 3-4, ¶ 17. Finally, Murray Stanley also allegedly contacted Worster's minor daughter, causing a rift in Worster's relationship with his daughter.

Contrary to the Plaintiffs' arguments, the majority of Murray Stanley's conduct comfortably falls within the definition of protected petitioning activity. Much of Murray Stanley's conduct, including her posting on the Katahdin Citizen's Group page, sharing of documents, and her organization of car parades and protests, are related to her campaign to have the Town fire the Plaintiffs for what she perceived

as their collaboration and misconduct.  Her alleged conduct is protected because the anti-SLAPP statute protects "any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body, or any other governmental proceeding" and "any statement reasonably likely to enlist public participation in an effort to effect such consideration."  14 M.R.S.A. § 556.  Murray Stanley's conduct, which was part of a public campaign on the issue of whether the Town should continue to employ the Plaintiffs, fits within this definition.  *See Gaudette I*, 2017 ME 86, ¶ 23, 160 A.3d 1190 (concluding that statements, including statements made at a public forum, that were intended to inform an ongoing public discussion about the sexual abuse of minors by police officers, constituted petitioning activity); *Maietta Constr.*, 2004 ME 53, ¶ 7, 847 A.2d 1169 (concluding that statements made to the city council, mayor, and newspaper about the violation of the terms of a public contract constituted petitioning activity); *see also Lynch*, 815 F. Supp. 2d at 346-47 (assuming, but not deciding, that Maine's anti-SLAPP statute covers website statements accusing a chiropractor of sexual assault).

The Plaintiffs argue that Murray Stanley's conduct involved making baseless and knowingly false allegations and, therefore, her conduct cannot constitute protected petitioning activity.  But the Law Court has specifically rejected this type of argument and held that a party seeking the protection of the anti-SLAPP statute need not show at the first step that their statements were true or otherwise protected by the First Amendment.  *See Nader I*, 2012 ME 57, ¶ 28 n.12, 41 A.3d 551.  Therefore, I conclude that most of the claims against Murray Stanley are based on her protected

petitioning activity.  As such, the burden shifts to the Plaintiffs to show that the claims based on this conduct are not barred by the anti-SLAPP statute.

However, one of the claims against Murray Stanley is not based on her petitioning activity and, therefore, her special motion to dismiss must be denied with respect to that claim.  *See Camden Nat'l Bank*, 2016 ME 101, ¶ 9, 143 A.3d 788.  The invasion-of-privacy claim against Murray Stanley (which is brought only by Worster) is based on the allegation that Murray Stanley contacted Worster's daughter and interfered in Worster's relationship with her.  This alleged conduct, which involves one private individual contacting another private individual, is not aimed at a government entity or the public and, therefore, does not constitute petitioning activity.  *See* 14 M.R.S.A. § 556; *Hearts with Haiti*, 2019 ME 26, ¶ 13, 202 A.3d 1189 (concluding that statements made from a private individual to private benefactors of a nonprofit were "fundamentally different" from statements that were previously held to be protected by the anti-SLAPP statute).  Therefore, the invasion-of-privacy claim is not barred by the anti-SLAPP statute.

### (b)  Step Two: The Non-Movant's Prima Facie Burden

The burden then shifts to the Plaintiffs to show, by prima facie evidence, that at least one of Murray Stanley's petitioning activities was devoid of any reasonable factual support or any arguable basis in law, as well as that she caused actual injury to the Plaintiffs.  For the reasons that follow, the Plaintiffs have met their burden.  Murray Stanley's Special Motion to Dismiss must be denied.

### (i)      Devoid of Any Reasonable Factual Support

The Plaintiffs have met their prima facie burden of showing that at least one of Murray Stanley's petitioning activities was devoid of any reasonable factual support.  Taken at face value, the Amended Complaint and affidavits contain statements that show that Murray Stanley's demands that Davis terminate Worster were without any factual support because the underlying allegations that Worster had committed misconduct were without any reasonable factual support. Additionally, the affidavits and Amended Complaint contain specific facts rebutting Murray Stanley's statements about the existence of a "good 'ol boys club" and that Davis should be fired because he was biased in his handling of the Worster complaints.  *See Thurlow*, 2021 ME 58, ¶¶ 27-28, 263 A.3d 494 (concluding that a non-movant had met his burden at step two of the anti-SLAPP analysis because "[h]is affidavit contains specific denials countering the [movants'] allegations of wrongdoing," including specific denials of "bullying, intimidating, or hurting the [movants'] son" and "destroying school records and covering up school wrongdoing"); *Camden Nat'l Bank*, 2016 ME 101, ¶ 11 n.4, 143 A.3d 788 ("In her affidavit, Weintraub alleged that she did not threaten to murder anyone, and that the Bank's statement to the police was a total fabrication.  As the court correctly determined, this was sufficient to establish, as a prima facie showing, that at least one of the moving party's petitioning activities was devoid of any reasonable factual support."). Specifically, the Amended Complaint and Davis's affidavit provide prima facie support for the view that Davis's decision-making was motivated by a neutral evaluation of the evidence and the results of an independent investigation, and not

by bias or sexism. Additionally, as noted above, the Plaintiffs aver that (1) a private investigator also concluded that Worster had committed no misconduct; (2) when a criminal complaint was filed against Worster, no action was taken on it by the Attorney General's Office and the accusations were dismissed; and (3) the Academy took no formal disciplinary action against Worster.

Thus, Murray Stanley's car parades, which called for Davis to do his job and fire Worster, were "devoid of any reasonable factual support." Although the Amended Complaint and affidavits include many conclusory statements and fail to include more details about specific statements made by Murray Stanley, taking all inferences in favor of the Plaintiffs, *see Thurlow*, 2021 ME 58, ¶ 26 n.8, 263 A.3d 494, the Plaintiffs have put forth sufficient evidence showing that at least some of Murray Stanley's petitioning conduct was devoid of any reasonable factual support.[25]

### (ii)   Actual Injury

The Plaintiffs have also met their prima facie burden to show that they were actually injured by Murray Stanley's conduct. Although I agree with Murray Stanley that the reputational and emotional harm alleged by the Plaintiffs is likely insufficient in anti-SLAPP cases, *see Weinstein*, 2022 ME 16, ¶ 11, 271 A.3d 758; *Desjardins*, 2017 ME 99, ¶¶ 20-21, 162 A.3d 228; *Schelling*, 2008 ME 59, ¶ 20, 942 A.2d 1226, that is not all that the Plaintiffs have alleged. As noted above, the

---

[25] Murray Stanley takes issues with the fact that some of the Plaintiffs' assertions are made "upon information and belief," arguing that "'a party cannot satisfy its burden to produce prima facie evidence with averments made "on information and belief." ECF No. 87 at 3 (quoting *Nader II*, 2013 ME 51, ¶ 19, 66 A.3d 571). Although Murray Stanley is correct that these statements alone are insufficient to constitute prima facie evidence, there are sufficient additional well-pled allegations in the Amended Complaint and affidavits to meet the prima facie standard.

Amended Complaint and Plaintiffs' affidavits make clear that both Worster and Davis were terminated as employees of the Town as a result of the campaign to oust them. Furthermore, the Plaintiffs have pleaded a clear causal connection between Murray Stanley's petitioning activity and the decision to terminate them from their employment based on the fact that it was Murray Stanley who helmed the campaign to have them terminated.

Accordingly, the Plaintiffs have met their prima facie burden to show both that at least one of Murray Stanley's petitioning activities was devoid of any reasonable factual basis and that her petitioning activities caused actual injury to them. Therefore, Murray Stanley's anti-SLAPP arguments are unavailing, and the anti-SLAPP component of her motion (ECF No. 34) is denied.

### 6. D'Alessandro's Special Motion to Dismiss

The analysis for D'Alessandro's Special Motion to Dismiss (ECF No. 138) is similar to the analysis for Murray Stanley's motion, and her anti-SLAPP arguments are rejected on essentially the same grounds.[26]

The allegations in the Amended Complaint as to D'Alessandro are almost identical to the allegations against Murray Stanley. The Amended Complaint alleges that D'Alessandro is the administrator of the Katahdin Citizen's Group Facebook page, and that she (along with Murray Stanley) led the public campaign against the

---

[26] The anti-SLAPP statute provides that a special motion to dismiss "may be filed within 60 days of the service of the complaint, or, in the court's discretion, at any later time upon terms the court deems proper." 14 M.R.S.A. § 556. D'Alessandro's Special Motion to Dismiss was seemingly filed more than sixty days after she was served. Under the circumstances of this case, I exercise my discretion to deem D'Alessandro's Special Motion to Dismiss timely. *See Bradbury*, 2013 ME 72, ¶ 14, 72 A.3d 512 (noting that a court has "broad discretion" to allow the filing of a special motion to dismiss more than sixty days after service of the complaint).

Plaintiffs and organized car parades calling for Davis to fire Worster. The Amended Complaint further alleges that D'Alessandro disseminated confidential information and aided or encouraged Murray Stanley to contact Worster's daughter "in an attempt to further alienate the child from her father." ECF No. 1-1 at 18, ¶ 83.[27]

### (a) Step One: The Movant's Burden to Show Petitioning Activity

The pleadings demonstrate that D'Alessandro engaged in petitioning activity in the course of almost all of her actions. For the same reasons given earlier with respect to Murray Stanley, D'Alessandro's activities were aimed at influencing the Town with respect to Davis and Worster's continued employment. This falls comfortably within the broad definition of petitioning activity provided by section 556.[28]

The Plaintiffs contend that D'Alessandro's conduct does not constitute petitioning activity because "her actions were not based on a *public concern* but were instead based on Defendant Theriault's personal workplace grievances." ECF No. 145 at 4. In support, the Plaintiffs cite *Guarnieri*, 564 U.S. at 386, a case about the scope of the First Amendment's Petition Clause. The Plaintiffs' argument does not stand up to scrutiny because it is clear, both from the Amended Complaint and the Plaintiffs' own affidavits, that D'Alessandro's statements and concerns involved more

---

[27]  The nature and extent of D'Alessandro's involvement in the alleged contact with Worster's daughter is unclear from the face of the Amended Complaint. This lack of clarity is compounded by the fact that Worster's responsive affidavit (ECF No. 145-1) repeatedly refers to Murray Stanley rather than D'Alessandro, possibly in error. For the purposes of D'Alessandro's Special Motion to Dismiss, though, I assume that the invasion-of-privacy claim against D'Alessandro is based on her contacting, or encouraging Murray Stanley to contact, Worster's daughter.

[28]  Although this fact does not appear expressly in the Amended Complaint, Davis's affidavit admits that D'Alessandro authored and circulated a petition calling for Davis and Worster's firing. This activity falls within the contours of the anti-SLAPP statute's definition of petitioning activity.

than just workplace grievances; instead, they involved a concern that senior municipal officials—a Town Manager and a Police Chief—were  inappropriately discharging their duties or engaging in misconduct.  This undoubtedly is a matter of public concern and falls within the scope of the anti-SLAPP statute's definition of petitioning activity.

However, as with Murray Stanley, the claim against D'Alessandro is based on her allegedly contacting (or aiding Murray Stanley in contacting) Worster's daughter, an act that falls outside the scope of petitioning activity.  Thus, the Special Motion to Dismiss must be denied with respect to the invasion-of-privacy claim.

### (b)  Step Two: The Non-Movant's Prima Facie Burden

The burden then shifts to the Plaintiffs to show, by prima facie evidence, that at least one of D'Alessandro's petitioning activities was devoid of any reasonable factual support or any arguable basis in law, as well as that she caused actual injury to the Plaintiffs.

### (i)      Devoid of Any Reasonable Factual Support

As with Murray Stanley, I conclude that the Plaintiffs have met their prima facie burden to show that at least one of D'Alessandro's petitioning activities was without any reasonable factual support.  For the same reasons discussed above, the Plaintiffs' Amended Complaint and affidavits sufficiently assert that (1) Worster did not engage in any misconduct at the high school, (2) Davis did not act with bias in deciding not to take action against Worster based on Theriault's complaint, and (3) Worster was repeatedly cleared by investigations into his conduct.

D'Alessandro cites *Ellis*, 2021 WL 5112829, a case that pre-dated *Thurlow*, in support of her argument that the Plaintiffs have not met their burden. *Ellis* involved a report filed with the Army alleging sexual abuse, and the Court concluded that a non-movant had failed to show that a petitioner's conduct was without any reasonable factual basis because the non-movant's materials "d[id] not address the substance of [the movant's] report to the Army" and instead "only afford[ed] notice of the general contours of [the] claim." *Id.* at *4. Additionally, the Court observed that in that case, although a Board of Inquiry had found no punishable misconduct based on the movant's report, it concluded that the non-movant had engaged in conduct unbecoming an officer. *Id.*

Here, although the Plaintiffs could certainly have included more details about D'Alessandro's statements, I conclude that they have alleged enough, taking all of the factual statements in the Plaintiffs' Amended Complaint and affidavits as true, to make it clear that D'Alessandro's petitioning to have Worster and Davis fired was without any reasonable factual basis. I note also that, unlike in *Ellis*, the private investigation ordered by the Town found, apparently without qualification, that Worster did not engage in misconduct. Thus, although it is close, I conclude that the Plaintiffs' filings in this case bear more resemblance to *Thurlow* than to *Ellis*, and the Plaintiffs have met their prima facie burden to show that D'Alessandro's petitioning activity was devoid of any reasonable factual support.

### (ii)   Actual Injury

Third, for the reasons explained above with respect to Murray Stanley, the Plaintiffs have met their prima facie burden to show actual injury due to their

termination based on D'Alessandro's petitioning.  Notably, D'Alessandro concedes that the Plaintiffs met their prima facie burden with respect to actual injury.

Accordingly, I reject D'Alessandro's contention that the case against her should be dismissed pursuant to the anti-SLAPP statute, and thus, the anti-SLAPP component of her motion (ECF No. 138) is denied.

### 7.  Padilla's Special Motion to Dismiss

Padilla argues in her Special Motion to Dismiss (ECF No. 57) that the claims against her—or at least some of them—should be dismissed pursuant to the anti-SLAPP statute.

#### (a)  Step One: The Movant's Burden to Show Petitioning Activity

Determining whether the claims against Padilla were based on her petitioning activity is complex because, as I will explain, Padilla acted both as a citizen contributing to the campaign against Davis and Worster *and* as the Interim Town Manager who fired Worster.  Padilla was a citizen participant in the campaign to oust Worster and Davis.[29]  The allegations in the Amended Complaint about this participation are particularly sparse, though.  The Plaintiffs allege that Padilla participated in a "conspiracy" against Worster, ECF No. 1-1 at 18, ¶ 84, and that, upon their information and belief, Padilla communicated with members of the Town Council about having Worster and Davis removed from their positions.  The Amended Complaint also states that "Padilla was a contributor to the online campaign against

---

[29]  It is unclear whether Padilla was a Town Councilor prior to being named as Interim Town Manager.  One paragraph of the Amended Complaint implies that she was, but this is the only such suggestion in the record.  For purposes of Padilla's Special Motion to Dismiss, I assume that she was not a Town Councilor prior to assuming the role of Interim Town Manager.

Plaintiffs Davis and Worster, having made comments to various posts against both Plaintiffs on social media and/or attending rallies against both men." ECF No. 1-1 at 31, ¶ 155.  Padilla was then hired as the Interim Town Manager after Davis's termination.  After assuming this position, Padilla accused Worster of wrongdoing based on the allegations that Theriault had made and terminated him.  Worster's termination, though, was ultimately reversed by a Review Board, which led Padilla to disband the Millinocket Police Department, again depriving Worster of his job.

Due to the nature of the Plaintiffs' Amended Complaint, *see infra* pp. 161-62, and the overly general language used to describe the claims for relief, it is unclear which of the claims are based on Padilla's role as a citizen and which are based on her role as Interim Town Manager.  After careful consideration, I conclude that Padilla cannot meet her burden to show that the claims against her that are related to her official conduct towards Worster—including his termination—qualify as petitioning activity.[30]  Specifically, Padilla's Special Motion to Dismiss is denied as to Count V (equal protection), Count X (employment discrimination and unlawful termination); Counts XI, XII, and XV (violations of the Maine Constitution); and Count XIII (interference with Maine Civil Rights), as those counts are asserted by Worster.  The same cannot be said about these counts as pleaded by Davis because Padilla was not Interim Town Manager at the time of his termination, and thus she

---

[30] Padilla acknowledges that some of the claims against her appear to be based on the fact that, when acting as the Interim Town Manager, she fired Worster and disbanded the Millinocket Police Department.  She notes, though, that the remainder of the claims against her are still possibly subject to the anti-SLAPP statute because they are based on her petitioning activity.  I agree with Padilla and, for the most part, with her assessment of which claims possibly fall within the auspices of the statute, *see* ECF No. 57 at 3 n.1.  The Plaintiffs' Objection to Padilla's Special Motion to Dismiss does not help to clarify the issue, so the Plaintiffs have waived any argument on this point.

was acting as a citizen in the course of her conduct related to Davis.  The motion is denied as to Davis's Count IX, breach of contract, which is asserted against Defendants "related" to the Town of Millinocket.

With respect to the remaining counts, Padilla has met her prima facie burden of showing that they were brought because of her protected petitioning activity.  The allegations about Padilla's behavior as a citizen—which are few and far between—make it clear that she was a participant in the campaign to oust Worster and Davis spearheaded by Murray Stanley, D'Alessandro, and others.  As described above, participation in such a campaign, including signing petitions, circulating documents, and contacting town officials, is quintessential petitioning activity and is therefore protected by the anti-SLAPP statute.

As to the invasion-of-privacy claim, there is no well-pleaded factual allegation that Padilla ever contacted Worster's daughter.  Thus, unlike the claims made against Murray Stanley and D'Alessandro, I conclude that, as asserted against Padilla, this claim is based on petitioning activity.

### (b)  Step Two: The Non-Movant's Prima Facie Burden

Because Padilla has shown that some of the claims against her were based on protected petitioning activity, the burden thus shifts to the Plaintiffs to provide prima facie evidence that Padilla's petitioning activity was devoid of any reasonable factual basis or support in law and that the activity caused them actual injury.

Here, unlike with Murray Stanley and D'Alessandro, the Plaintiffs fail at the first hurdle because they have not included sufficient evidence that Padilla's petitioning activity was devoid of any reasonable factual support.  Although the

Amended Complaint—barely—contains sufficient information to determine the content of Murray Stanley and D'Alessandro's petitioning activity, the same is not true for Padilla. As in *Ellis*, the Amended Complaint "does not address the substance of" Padilla's petitioning and provides only the "general contours" of her alleged activity. 2021 WL 5112829, at *4. Without more details, it is impossible to tell whether Padilla's petitioning activity was actually devoid of any reasonable factual basis.

Furthermore, the Plaintiffs' affidavits are not helpful because they provide essentially no context for or details about Padilla's petitioning behavior. As an example, the Davis affidavit notes only that Padilla, prior to becoming Interim Town Manager, "had engaged in significant dialogue, through social media, as well as through protests in town and through the signing of petitions, which supported both [Davis's] and Chief Worster's terminations." ECF No. 102-2 at 7, ¶ 31. Thus, the Plaintiffs' affidavits are similar to those in *Ellis*, in which the affidavit "provide[d] no detail concerning the circumstances underlying Defendant's petitioning activity." 2021 WL 5112829, at *4; *see also Thurlow*, 2021 ME 58, ¶¶ 27-28, 263 A.3d 494 (concluding that a nonmovant had met his burden to show that a movant's petitioning behavior was devoid of any reasonable factual basis when he included a "detailed affidavit" that provided "specific assertions of fact" showing that the petitioning activity—a letter—was based on false accusations and events that did not occur).

The Plaintiffs have therefore failed to meet their burden as to the second step of the *Thurlow* analysis because they have not provided prima facie evidence that

Padilla's petitioning activities were devoid of any reasonable factual basis.[31]   For those reasons, Padilla's Special Motion to Dismiss (ECF No. 57) is granted as to all of the Counts asserted by Davis except Count IX.  It is also granted with respect to Worster's Counts I, II, III, IV, VI, VII, VIII, and XIV, but denied as to Worster's Counts V, IX, XI, XII, XIII, and XV.

### 8.  Wright's Special Motion to Dismiss

The claims against Wright are different in kind from those against the other Defendants who filed anti-SLAPP motions to dismiss.  As an initial point, the Plaintiffs and Wright agree that all of Davis's claims against Wright should be dismissed because any claims against Wright can only be asserted by Worster.

The only mention of Wright in the Amended Complaint is in connection with a March 26, 2021, article about Worster that was published in the Bangor Daily News.[32]   The article, entitled "*A prosecutor worried he wasn't credible.   Then Millinocket hired him as police chief*," notes that before Worster was Chief of Police in Millinocket, he had been a sergeant for the Wiscasset Police Department.  ECF No. 73-3 at 1.  The article discussed Worster's employment history and that Wright, a

---

[31]  The Plaintiffs do not argue that Padilla's petitioning behavior was devoid of "any arguable basis in law." *Thurlow*, 2021 ME 58, ¶ 25, 263 A.3d 494.  I decline to address the issue, and I also decline to address whether the Plaintiffs would have met their prima facie burden to show that Padilla's petitioning conduct caused them actual injury.

[32]  It is unclear whether the Plaintiffs included a copy of the article when they filed their Amended Complaint in the Maine Superior Court.  Regardless, Defendants Irving and Wright included a copy along with their motions to dismiss (ECF Nos. 39-1, 73-3).  Because the Bangor Daily News article is "absolutely central" to the Plaintiffs' claims and its authenticity is undisputed, I consider it merged with the pleadings. *Franchini v. Bangor Publ'g Co.* ("*Franchini I*"), 383 F. Supp. 3d 50, 56 n.1 (D. Me. 2019) (quoting *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988)).  Likewise, I will consider the confidentiality order discussed in this section—which was attached to the Amended Complaint, ECF No. 1-1 at 56—to be merged with the pleadings.

defense attorney, had learned while representing a defendant that Worster was *Giglio*-impaired. The article noted that Wright also said that "it wasn't the first time he had doubts about Worster's credibility" and that there were "significant questions" about the "reliability of [Worster's] reports." ECF No. 73-3 at 5.

According to the Amended Complaint, Wright provided this information in violation of a confidentiality order entered in the criminal case from which he learned that information, *State of Maine v. Rebecca Fuller*, the 2018 criminal case discussed in the article. The Plaintiffs contend that "no such *Giglio* impairment was ever previously discussed with Plaintiff Worster, nor was Plaintiff Worster ever prevented from testifying in court during his time working at the Wiscasset Police Department or anytime thereafter."[33] ECF No. 1-1 at 32, ¶ 164. They further contend that the information provided by Wright was false and misleading and that Wright further disparaged Worster by noting that he had questions and concerns about Worster's credibility and honesty.

For the reasons given below, I grant Wright's Special Motion to Dismiss (ECF No. 73).

### (a)  Step One: The Movant's Burden to Show Petitioning Activity

Wright bears the initial burden to show that the claims against him are based on his exercise of protected petitioning activity. Here, Wright made statements to

---

[33] Worster also apparently contends that it would violate due process to be deemed *Giglio*-impaired without giving him an opportunity to weigh in on the issue. But this case is not a challenge to the procedure by which prosecutors determine whether an officer is *Giglio*-impaired, so I decline to address this argument. In any event, the First Circuit has ruled that a police officer does not have a protected liberty interest in a prosecutor's decision to label them as *Giglio*-impaired or disclose *Giglio* information to defendants. *Roe v. Lynch*, 997 F.3d 80, 85 (1st Cir. 2021).

the Bangor Daily News about Worster's *Giglio* impairment and the fact that Worster was hired as the Millinocket Police Chief despite this impairment.  He also noted that he had concerns about Worster's credibility.  It is undisputed that all of the claims against Wright arise from these statements.  Therefore, the remaining question is whether Wright has shown that he was engaging in petitioning behavior when he made the comments at issue.  I conclude that he has.

The anti-SLAPP statute defines petitioning activity "very broadly," *Schelling*, 2008 ME 59, ¶ 11, 942 A.2d 1226, and includes "any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive[,] or judicial body" and "any statement reasonably likely to enlist public participation in an effort to effect such consideration," 14 M.R.S.A. § 556.  There is no requirement that a statement be made directly to a legislative, executive, or judicial body.  *See id.*  And the Law Court has concluded that statements to a newspaper about an issue of public concern can constitute petitioning activity.  *See Gaudette I*, 2017 ME 86, ¶¶ 2, 23, 160 A.3d 1190 (declining to disturb the trial court's conclusion that a movant who made a statement to a newspaper about sexual abuse committed by a police officer constituted petitioning conduct because such statements "were intended to 'inform an ongoing public discussion and investigation into allegations of sexual abuse of minors by members of the Biddeford Police Department . . ., as well as the handling of such allegations by the Maine Attorney General's Office'"); *Schelling*, 2008 ME 59, ¶¶ 13-14, 942 A.2d 1226 (concluding that a legislator engaged in petitioning activity when he wrote a letter to a newspaper editor in support of a recently enacted law and critiquing a legislator who voted against it); *Maietta Constr.*, 2004 ME 53, ¶ 7, 847

A.2d 1169 (concluding that statements to newspapers, as well as letters to the mayor, about a contractor allegedly violating a contract with the city, constituted petitioning activity).  Here, taking Wright's statements in the context of the article in which they appeared, they fall within this broad definition.

As in *Gaudette I*, *Schelling*, and *Maietta Construction*, Wright's statements about Worster were intended to inform the public discussion about controversial issues, namely the allegations of misconduct within the Millinocket Police Department.  The subject of the Bangor Daily News Article was whether Maine's current system for handling *Giglio* impairments allows officers who are designated as *Giglio*-impaired to avoid consequences, despite the fact that being designated as *Giglio*-impaired should raise concerns regarding an officer's credibility.  Thus, I conclude that Wright's statements fall within the reach of the anti-SLAPP statute because they constitute statements "reasonably likely to encourage consideration or review of an issue by a legislative, executive[,] or judicial body" and because they are statements "reasonably likely to enlist public participation in an effort to effect such consideration."[34]  14 M.R.S.A. § 556.

Worster argues that because the investigation of his alleged misconduct towards Theriault was closed and because the Millinocket Police Department had been disbanded, Wright's comments could not constitute petitioning activity.  This argument is unpersuasive.  Not only does this too narrowly construe the potential issues that Wright was commenting on, Worster is incorrect as a matter of law

---

[34]  As with Padilla, I conclude that the assertion of the invasion-of-privacy claim against Wright is based on his petitioning activity because there is no assertion in the Amended Complaint that Wright contacted Worster's daughter.

because "[t]he definition of the right to petition the government . . . is unquestionably broad enough to encompass activities related to matters not currently pending before a legislative body." *Schelling*, 2008 ME 59, ¶ 14, 942 A.2d 1226 (rejecting an argument that because a bill had already become law, statements about that bill could not constitute petitioning activity).

### (b)  Step Two: The Non-Movant's Prima Facie Burden

The burden now shifts to Worster to show that Wright's petitioning activity was devoid of any reasonable factual support or basis in law, as well as that he suffered actual injury.  Worster, however, has not met his burden.

Worster summarily argues that "Defendant Wright's commentary to [the Bangor Daily News] regarding Plaintiff Worster was devoid of factual support because Plaintiff Worster was never adjudged as *Giglio* impaired."  ECF No. 106 at 7.  His opposition provides no other details on this point beyond his statement that "Worster's credibility was considered by the prosecutor . . . and there was no finding of *Giglio* impairment."  ECF No. 106 at 7.

These statements, however, are inconsistent with the Amended Complaint, which notes that, with respect to the confidentiality order about *Giglio* impairment, "this protected individual was and is Plaintiff Worster, as noted by Defendant Wright, publicly in the BDN article."  ECF No. 1-1 at 33, ¶ 166.  Nor are these statements supported by Worster's affidavit, which repeatedly emphasizes the confidential nature of the *Giglio* information and the fact that Worster had previously been unaware that he was *Giglio*-impaired, but does not include specific details countering the assertion that Worster was, in fact, *Giglio*-impaired.  The bare statement in

Worster's affidavit that it was "not true" that someone had determined that he was *Giglio*-impaired is not sufficient to meet Worster's prima facie burden of showing that Wright's statements were devoid of any reasonable factual support. Nor does Worster include any specific averments showing that Wright's statements about his lack of reliability had no reasonable basis in fact.[35]

Because Worster has failed to meet his prima facie burden to show that Wright's petitioning activity was devoid of any reasonable factual support, Wright's Special Motion to Dismiss (ECF No. 73) is granted and the claims against him must be dismissed.[36]

### 9. Plaintiffs' Motion to Amend

The Plaintiffs also seek to amend the Amended Complaint (ECF No. 112) to include "language that explicitly itemizes the actual calculable economic harm beyond emotional harm" for purposes of the "actual injury" requirement of the anti-SLAPP statute. ECF No. 112 at 1, ¶ 1. Specifically, the Plaintiffs seek to assert that they were injured because (1) they were wrongfully terminated; (2) they lost income and income opportunities; (3) they have not been able to return to work in similar fields; (4) Davis was denied another Town Manager position; (5) they have not been able to renew their credentials; (6) they incurred moving expenses to relocate out of Millinocket; (7) they suffered ridicule, scorn, and humiliation; and (8) they suffered

---

[35] Although Worster repeatedly complains of the fact that Wright's comments were made in violation of a confidentiality order, he does not make the argument (or cite to any authority in support) that Wright's comments were devoid of any arguable basis in law. Instead, he argues only that Wright's comments were devoid of any reasonable factual support. Because of Worster's failure to argue that Wright's comments were devoid of any arguable basis in law, I decline to address the issue.

[36] I do not reach any of Wright's arguments that are unrelated to the anti-SLAPP statute.

through extreme and outrageous conduct that no reasonable person could be expected to endure.  The Motion to Amend also seeks to add requests for attorney fees to five of the counts and to remove Count XVI, for punitive damages, from the Amended Complaint.

For the following reasons, I deny, in almost all respects, the Motion to Amend.

### (a)  Requests to Add Additional Allegations of Injury

For several reasons, I deny the Plaintiffs' request to add details about their alleged injuries, including their request to add an express statement that they suffered "extreme and outrageous" emotional harm that "no reasonable person would be expected to endure," ECF No. 112 at 2, ¶ 2.

First, as explained above, the Plaintiffs have already included sufficient details in their Amended Complaint and their affidavits to meet their prima facie burden to show actual injury, at least with respect to all of the special motions to dismiss for which I reach that issue.[37]  Therefore, permitting the Plaintiffs to amend the Amended Complaint to assert additional bases for actual injury would "serve no useful purpose" and would unduly delay the progress of this case.  *Calderón-Serra v. Wilmington Tr. Co.*, 715 F.3d 14, 19 (1st Cir. 2013) ("[T]he court may deny the request [to amend] if the proposed amendment 'would serve no useful purpose.'" (quoting *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 58 (1st Cir. 2006)).

Second, to the extent that the Motion to Amend seeks to assert new categories of injuries that were not previously included in the Amended Complaint, the

---

[37]  Because I conclude that the Plaintiffs have failed to meet their burden of showing that Wright and Padilla's petitioning activities were devoid of any reasonable factual support, it would be futile for the Plaintiffs to amend the Amended Complaint with respect to these Defendants.

Plaintiffs are not permitted to do so at this juncture.  The Law Court has explained that "[t]he existence of actual injury may be considered . . . only to the extent that the asserted injury was both alleged in the complaint and established on a prima facie basis in opposition to the special motion to dismiss."  *Weinstein*, 2022 ME 16, ¶ 8, 271 A.3d 758; *see also Desjardins*, 2017 ME 99, ¶ 19, 162 A.3d 228 ("[B]oth parties must be limited in their anti-SLAPP filings to the universe of facts as actually alleged in the plaintiff's complaint.  By alleging a new form of harm solely in response to the special motion to dismiss, Desjardins has attempted to thwart the purpose of the anti-SLAPP statute by expanding the scope of the litigation that Reynolds must defend against." (footnote omitted)).  And although the Plaintiffs note that the Law Court's *Weinstein* opinion contemplates that trial courts should liberally grant motions to amend for the purpose of alleging actual injury with more specificity, *Weinstein* does not stand for the proposition that non-movants should be permitted to amend their complaint to allege new types of harm that were not raised in the original complaint.  According to the Law Court in *Weinstein*, "a plaintiff *who otherwise follows the edicts of notice pleading* and is later required to defend against a special motion to dismiss may preserve his claim . . . by seeking to amend his complaint to allege actual injury *with greater specificity*, and such motions to amend should be liberally granted."  2022 ME 16, ¶ 10, 271 A.3d 758 (emphasis added).  Thus, a motion to amend should be liberally granted when it seeks to add details about an injury that has previously been pleaded—not when it seeks to assert new categories of injuries.

Third, as several of the Defendants note, the Law Court permits liberal amendment of pleadings to allege actual injury with more specificity because, as

*Weinstein* observed, "a plaintiff may not always foresee that his complaint will be subject to . . . a special motion to dismiss." *Id.* Here, though, it is plain from the face of the Amended Complaint that the Plaintiffs contemplated that they could face one or more special motions to dismiss, even if they did not concede that such a motion was warranted. Under these circumstances, allowing the Plaintiffs to add a needless amendment at this stage would contravene the reasons behind the Law Court's decision to liberally permit amendment of pleadings at certain stages of the anti-SLAPP process.

Finally, because the Plaintiffs failed to show that the proposed amendments concerning actual injury would affect the outcome of the case, it would "serve no useful purpose" to permit such an amendment because the new allegations are either redundant or conclusory. *Calderón-Serra,* 715 F.3d at 19 (quoting *Aponte-Torres*, 445 F.3d at 58). Although the precise wording of the Plaintiffs' intended amendments is unclear because they failed to file a proposed amended complaint along with their motion,[38] the new allegations largely either parrot existing allegations or are conclusory legal allegations, such as statements that the Plaintiffs suffered "extreme and outrageous" emotional harm that "no reasonable person would be expected to endure." ECF No. 112 at 2, ¶ 2. Under these circumstances, permitting the Plaintiffs

---

[38] Filing a proposed amended complaint is the best practice when a party seeks to amend a complaint. *See US Bank Tr. Nat'l Ass'n v. Tenpenny*, No. 2:22-cv-00034-JDL, --- F. Supp. 3d ---, 2023 WL 2388332, at *13 n.14 (D. Me. Mar. 7, 2023); *Bernard v. Town of Lebanon*, No. 2:16-cv-00042-JAW, 2017 WL 1232406, at *7 (D. Me. Apr. 3, 2017); *Levitt v. Sonardyne, Inc.*, No. 2:12-cv-00032-JAW, 2012 WL 5350037, at *2 (D. Me. Oct. 29, 2012). In fact, "[t]he absence of supporting information may, in and of itself, be a sufficient reason for the denial of leave to amend." *Aponte-Torres*, 445 F.3d at 58 (citing *Twohy v. First Nat'l Bank*, 758 F.2d 1186, 1197 (7th Cir. 1985)).

to amend the Amended Complaint to add more specificity about their injuries would be a costly and time-wasting "exercise in futility." *Aponte-Torres*, 445 F.3d at 58.

### (b) Request to Remove Count XVI

The Plaintiffs also seek to remove Count XVI, the claim for punitive damages. No Defendants oppose this request, which I grant.

### (c) Request to Add Attorney Fees Claims

The Plaintiffs also seek to "amend the requests for relief under Counts V, X, XI, XII[,] and XIII to include requests for attorney's fees." ECF No. 112 at 2, ¶ 4. I conclude that the Plaintiffs may not do so at this stage because this request is characterized by undue and unjustified delay.

"[U]ndue delay, on its own, may be enough to justify denying a motion for leave to amend." *Hagerty ex rel. U.S. v. Cyberonics, Inc.*, 844 F.3d 26, 34 (1st Cir. 2016); *see also Calderón-Serra*, 715 F.3d at 20 ("Appreciable delay alone, in the absence of good reason for it, is enough to justify denying a motion for leave to amend."). "[W]hen 'a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some valid reason for [its] neglect and delay.'" *Nikitine v. Wilmington Tr. Co.*, 715 F.3d 388, 390-91 (1st Cir. 2013) (quoting *Hayes v. New Eng. Millwork Distribs., Inc.*, 602 F.2d 15, 19-20 (1st Cir. 1979)). And if a party has already had an opportunity to amend their Complaint, that weighs against permitting them to do so again. *See id.* at 390 ("Whether the plaintiff, by rule or court order, had a prior opportunity to amend is one data point to be taken into account . . . .").

67

Here, the original Complaint was filed in the Maine Superior Court on June 6, 2022, and it was previously amended on July 29, 2022.  But the Plaintiffs did not seek to amend their Complaint to request attorney fees until December 8, 2022—more than six months after the Complaint was first filed.  The Plaintiffs have not provided any reason as to why they did not seek attorney fees on Counts V, X, XI, XII, and XIII in their Original or Amended Complaints.  Nor have they provided any reason why they waited six months to assert that request for relief.  Considering the circumstances of this case, I conclude that the Plaintiffs have failed to show, as required by Fed. R. Civ. P. 15, that "justice so requires" granting them leave to amend the Amended Complaint to seek attorney fees.  *See Nikitine*, 715 F.3d at 390-91 (denying a motion to amend when a plaintiff waited nine months to assert new claims and provided no explanation for doing so); *Villanueva v. United States*, 662 F.3d 124, 127 (1st Cir. 2011) (denying a motion to amend made four months after a complaint was filed when the plaintiff failed to provide a justification for waiting); *U.S. Bank Tr. Nat'l Ass'n v. Tenpenny*, No. 2:22-cv-00034-JDL, --- F. Supp. 3d ----, 2023 WL 2388332, at *14-15 (D. Me. Mar. 7, 2023) (denying a motion to amend when the plaintiffs waited nine months to assert a fraud claim).

For the preceding reasons, the Plaintiffs' Motion to Amend is granted in part as to the request to remove Count XVI, which is ordered dismissed.  The Motion to Amend (ECF No. 112) is denied in all other respects.

**B.    Motions Related to the Wiscasset Police Department and Jeffrey Lange**

The Wiscasset Police Department has filed a Motion to Dismiss (ECF No. 20),[39] and the Plaintiffs have filed a Motion for Default Judgment against Jeffrey Lange, the former chief of the Wiscasset Police Department (ECF No. 72).  For the reasons that follow, I grant the Wiscasset Police Department's Motion to Dismiss and deny the Plaintiffs' Motion for Default Judgment as to Lange.

### 1.  The Wiscasset Police Department's Motion to Dismiss

The Wiscasset Police Department raises three primary arguments as to why all of the claims against it should be dismissed:  First, it is not a separate entity from the Town of Wiscasset and, therefore, cannot be sued.  Second, the Plaintiffs' state law tort claims are barred because of the Plaintiffs' failure to properly provide notice under the Maine Tort Claims Act ("MTCA"), 14 M.R.S.A. § 8107 (West 2023).  Third, the Amended Complaint, which barely mentions the Wiscasset Police Department, fails to state a claim on which relief can be granted.

In Response (ECF No. 24), the Plaintiffs argue that the Wiscasset Police Department can be held liable for the conduct of its former employee, Jeffrey Lange, who is also a named Defendant.  The Plaintiffs contend that Lange violated the terms of Worster's Release Agreement by defaming Worster when Lange spoke to a news outlet and, presumably, by disclosing confidential documents in response to a FOAA request.  The Plaintiffs also appear to argue that the Wiscasset Police Department violated the terms of the Release Agreement when it disclosed Worster's employment

---

[39]  This motion was previously filed in Maine Superior Court prior to removal, and the Wiscasset Police Department re-filed it in this Court on September 7, 2022.

records pursuant to a FOAA request.[40]   Finally, the Plaintiffs contend that they complied with the MTCA's notice requirements.

To survive a Rule 12(b)(6) motion to dismiss,[41] "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *García-Catalán v. United States*, 734 F.3d 100, 102 (1st Cir. 2013) (quoting Fed. R. Civ. P. (8)(a)(2)).   Such a statement "needs only enough detail to provide a defendant with '"fair notice of what the . . . claim is and the grounds upon which it rests."'" *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   "However, in order to 'show' an entitlement to relief a complaint must contain enough factual material 'to raise a right to relief above the speculative level on the assumption that all the allegations of the complaint are true (even if doubtful in fact).'" *Id.* (quoting *Twombly*, 550 U.S. at 555); *see also García-Catalán*, 734 F.3d at 102-03 ("[T]he plaintiff need not demonstrate that she is likely to prevail, but her claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))).

In applying this standard, district courts use a two-step approach.   "First, the court must distinguish 'the complaint's factual allegations (which must be accepted

---

[40]   The precise basis for the Plaintiffs' arguments is unclear from their Response, which blends allegations about Lange and the Police Department.

[41]   Although the Wiscasset Police Department's Motion to Dismiss relies primarily on the standard for a motion to dismiss under Maine law—understandably, since the motion was filed prior to removal—I apply the standard relevant to the Federal Rules of Civil Procedure.   *See Dunbar v. Wells Fargo Bank, N.A.*, 709 F.3d 1254, 1257 (8th Cir. 2013); Fed. R. Civ. P. 81(c); *Rinsky v. Cushman & Wakefield, Inc.*, 918 F.3d 8, 17 (1st Cir. 2019) ("The Federal Rules of Civil Procedure govern an action once it is removed from the state court.").

as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán*, 734 F.3d at 103 (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)).

Here, the only well-pled factual allegations about the Wiscasset Police Department are (1) that the Wiscasset Police Department provided, in response to FOAA requests,[42] materials that were later disseminated to the public and that "these materials were not a complete and accurate representation of the underlying situation[]," ECF No. 1-1 at 6, ¶ 15, and (2) that Cunniff supplemented the misconduct complaint filed with the Town of Millinocket with materials he received from the Wiscasset Police Department through a FOAA request. The Amended Complaint further vaguely states that "there remains . . . a question as to the ability of [the Wiscasset Police Department] to disseminate some or all of the documents obtained by Defendant Cunniff." ECF No. 1-1 at 15, ¶ 69.

These barebones allegations are insufficient to survive a motion to dismiss. The allegation that the Wiscasset Police Department released documents pursuant to a FOAA request does not support a reasonable inference that it is liable for negligence, intentional infliction of emotional distress, invasion of privacy, or the

---

[42]   Paragraph fifteen of the Amended Complaint refers to "FOIAA" requests. Based upon the Plaintiffs' other representations and the fact that the Town of Wiscasset is a municipality within the State of Maine, it appears that the materials were disclosed pursuant to Maine's Freedom of Access Act, not the federal Freedom of Information Act.

myriad other claims pleaded by the Plaintiffs.  And the allegation in the Amended Complaint that "there remains . . . a question" as to whether the Wiscasset Police Department had the "ability" to disclose the information is both speculative and amorphous, so it need not be credited.  In any event, that lone, undeveloped statement does not present a right to relief above a speculative level.

Nor is there any basis in the Amended Complaint for concluding, as the Plaintiffs argue, that the Wiscasset Police Department can be held liable for Lange's conduct.  There are *no* factual allegations in the Amended Complaint about Lange besides those identifying him as the former Chief of Police for the Wiscasset Police Department.  Thus, even if there were a basis for holding the Wiscasset Police Department vicariously liable for Lange's conduct,[43] the Amended Complaint would still fail to state a claim with respect to the Wiscasset Police Department.

In their Response to the motion, the Plaintiffs attempt to salvage their case against the Wiscasset Police Department by alleging entirely new facts about (1) the Release Agreement between Worster and the Wiscasset Police Department, (2) Lange's knowledge of the Release Agreement, and (3) allegedly defamatory statements by Lange.  They also attached a copy of the Release Agreement to their Response (ECF No. 24-1).  The Plaintiffs also appear to suggest that they are seeking

---

[43]  Even if the Plaintiffs had provided additional details about Lange's conduct, at least some of the Plaintiffs' claims would still be unavailing as a matter of law.  This is because vicarious liability cannot be imposed pursuant to section 1983; instead, a supervisor or municipality can only be held liable for its own conduct.  *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also Fowles v. Stearns*, 886 F. Supp. 894, 899 n.6 (D. Me. 1995) (applying section 1983 municipal liability analysis to a claim under the Maine Civil Rights Act).

to assert a breach of contract claim against Lange and the Wiscasset Police Department.

Parties cannot cure deficiencies in pleadings by asserting new facts and allegations in response to a motion to dismiss. *See Willits v. Life Ins. Co. of No. Am.*, No. 18-cv-11908-ADB, 2021 WL 735784, at *4 (D. Mass. Feb. 25, 2021) (citing cases); *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020) ("Plaintiffs cannot . . . amend their complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint."). Therefore, I disregard the Plaintiffs' assertions about the terms of the Release Agreement, Lange's knowledge of the Release Agreement, and Lange's alleged defamatory statements, as well as the Plaintiffs' assertion of breach of contract, because none of these assertions appear in the Amended Complaint itself.

Nor will I consider the attached Release Agreement, a document which was not attached to the Amended Complaint or, in fact, even mentioned in the Amended Complaint. *See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (noting that "[u]nder Rule 12(b)(6), the district court may properly consider only facts and documents that are part of or incorporated into the complaint" and may choose to disregard supplementary materials submitted with briefing on motions); *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 8 (1st Cir. 2020) ("[A] motion to dismiss under Rule 12(b)(6) generally provides no occasion upon which to consider documents other than the complaint."); *Birch Street Recovery Corp. v. Thomas*, No. CV-99-571-B, 2000 WL 1513799, at *9 n.15 (D.N.H. July 29, 2000) ("Plaintiffs may

not cure deficiencies in their complaint by appending evidentiary material to their opposition brief.").[44]

Besides seeking to supplement the record with new facts and allegations, which is inappropriate at this stage, the Plaintiffs otherwise present little developed argument.[45]  The three Law Court decisions cited by the Plaintiffs in support of their argument that they have stated a claim both against the Wiscasset Police Department and Lange (*Bernier v. Merrill Air Engineers*, 2001 ME 17, 770 A.2d 97; *Rippett v. Bemis*, 672 A.2d 82, 86 (Me. 1996); and *Halco v. Davey*, 2007 ME 48, 919 A.2d 626) are inapposite.  In addition, I need not and therefore do not reach the Wiscasset Police Department's additional argument regarding the MTCA's notice requirements.

For these reasons, the Wiscasset Police Department's Motion to Dismiss (ECF No. 20) is granted.

## 2.  The Plaintiffs' Motion for Default Judgment as to Jeffrey Lange

Jeffrey Lange, the former Police Chief of the Wiscasset Police Department, was named as a Defendant in this action but did not file an answer or responsive pleading.

---

[44]  Although there are exceptions to the general rule that courts will not consider documents not attached to the pleadings, *see Flores v. OneWest Bank, F.S.B.*, 886 F.3d 160, 167 (1st Cir. 2018), the Plaintiffs do not contend that the Release Agreement fits within one of these exceptions, such as a document being "central" to the allegations in a complaint.  In any event, the Release Agreement is not a document central to the Amended Complaint—in fact, it is not mentioned in the Amended Complaint except, perhaps, in the most oblique fashion.

[45]  To the extent that the Plaintiffs argue that they need not respond to all of the arguments raised by the Wiscasset Police Department because the Motion to Dismiss is "very, very lengthy," ECF No. 24 at 2, that argument is frivolous.  Not only is the motion not particularly lengthy—at fourteen pages, including the case caption and signature block, it is well within the twenty pages permitted by Local Rule 7(d)—the Plaintiffs risk waiver by failing to respond to developed arguments.  *See Iverson v. City of Bos.*, 452 F.3d 94, 103 (1st Cir. 2006).

On October 25, 2022, the Plaintiffs moved for entry of default (ECF No. 71) and for a default judgment (ECF No. 72) against him. Default was entered against Lange (ECF No. 74), and the Plaintiffs' Motion for Default Judgment remains pending. Two of the Defendants, the Wiscasset Police Department and Cunniff, have opposed this motion (ECF Nos. 94, 95), arguing that (1) entry of a default judgment would be premature because the Amended Complaint lacks any factual allegations against Lange and (2) granting the request could lead to inconsistent judgments. The Plaintiffs argue in Reply (ECF No. 96) that these Defendants lack standing to oppose the Motion for Default Judgment. For reasons I will explain, I deny the Motion for Default Judgment.

"After an entry of default, a court may examine a plaintiff's complaint to determine whether it alleges a cause of action. In making that determination, it must assume that all well pleaded factual allegations are true." *Quirindongo Pacheco v. Rolon Morales*, 953 F.2d 15, 16 (1st Cir. 1992) (per curiam). But because "a default judgment that inevitably would be set aside should not be entered in the first place," a district court must first be satisfied that the allegations in the pleadings are sufficient to establish liability before entering a default judgment. *See Elektra Ent. Grp. v. Carter*, 618 F. Supp. 2d 89, 92 (D. Me. 2009) (citing 10A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2685, at 40-41 (4th ed. 2023)); *see also Capitol Records v. Carmichael*, 508 F. Supp. 2d 1079, 1083 (S.D. Ala. 2007) ("[A] default is not 'an absolute confession by the defendant of his liability and of the plaintiff's right to recover,' but is instead merely 'an admission of facts cited in the Complaint, which by themselves may or may not be sufficient to

establish a defendant's liability.'  Stated differently, 'a default judgment cannot stand on a complaint that fails to state a claim.'" (citations omitted) (first quoting *Pitts ex rel. Pitts v. Seneca Sports, Inc.*, 321 F. Supp. 2d 1353, 1357 (S.D. Ga. 2004); then quoting *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997))).

Moreover, "[w]hen a party fails to cure its default in advance of a duly-noticed default judgment hearing, the party in default effectively concedes the truth of the factual allegations in the complaint," however, it "does not concede that the factual allegations suffice to establish liability." *Idexx Distribs. v. Daniel A. Lauridia DVM PC*, No. 2:19-cv-00412-LEW, 2020 WL 265194, at *1 (D. Me. Jan. 17, 2020); *see also Hooper-Haas v. Ziegler Holdings, LLC*, 690 F.3d 34, 41 (1st Cir. 2012) ("[O]nce the default is entered, *so long as the complaint states a claim for relief*, then the defaulted party has no further right to contest liability." (emphasis added)).  Thus, unless I am satisfied that the Amended Complaint states a claim for relief against Lange, I cannot grant the Plaintiffs' request for a default judgment. *See Elektra Ent. Grp.*, 618 F. Supp. 2d at 93 (considering, on the plaintiff's motion for default judgment, whether the facts in the complaint were sufficient to state a claim for relief); *Parker v. Dall-Leighton*, No. 2:17-cv-00216-GZS, 2018 WL 4604006, at *3 (D. Me. Sept. 25, 2018) (same).

Here, even when all of the well-pleaded factual allegations in the Amended Complaint are accepted as true, the Amended Complaint does not contain sufficient facts to conclude that the Plaintiffs are entitled to any relief on their claims against Lange. Lange is only mentioned by name once in the fifty-two page Amended

Complaint, and that allegation only establishes that (1) he was the former Chief of Police of the Wiscasset Police Department, (2) he acted under the color of state and federal law, and (3) he is being sued in his individual and official capacities.  He is not expressly mentioned elsewhere in the Amended Complaint, and general references to the actions of the "Defendants"—of which there are many—are insufficient to show that the Plaintiffs are entitled to any of the relief they request as against Lange.

Moreover, Lange's employer, the Wiscasset Police Department, is also barely mentioned in the Amended Complaint.  As discussed above, the claims against the Wiscasset Police Department seem to be based on the fact that it shared documents about Worster's employment pursuant to a FOAA request and that, according to the Plaintiffs, "there remains to be a question as to the ability of the [Wiscasset Police Department] to disseminate some or all of the documents obtained" by a FOAA request.  ECF No. 1-1 at 15, ¶ 69.  Even assuming (contrary to assertions in the Amended Complaint) that it was Lange, and not the Wiscasset Police Department, who responded to the FOAA request, the allegations still fail to state a claim upon which relief can be granted.  And, as discussed above, I decline to consider additional factual allegations about Lange that were not raised in the Amended Complaint and instead appear only in the Plaintiffs' Response to the Wiscasset Police Department's Motion to Dismiss.

With respect to the Plaintiffs' argument that the Wiscasset Police Department and Cunniff lack standing to challenge the entry of a default judgment as to Lange, the issue is not one of standing.  Rather, the issue is whether the Plaintiffs have

pleaded sufficient facts to state a claim against Lange upon which relief can be granted. Given that Lange's involvement, if any, in events giving rise to this case is barely mentioned in the Amended Complaint, the Plaintiffs have not done so.

For these reasons, I deny without prejudice the Plaintiffs' Motion for Default Judgment (ECF No. 72) as to Jeffrey Lange. *See Saeed v. Omex Sys., Inc.*, No. 16-cv-11715-ADB, 2017 WL 4225037, at *9 (D. Mass. Sept. 22, 2017) (denying without prejudice a motion for default judgment). Furthermore, given the paucity of allegations in the Amended Complaint with respect to Lange, it is ordered that the Plaintiffs must, within fourteen days of the issuance of this decision, show cause as to why their claims against Lange should not be dismissed. *See Auctus Fund, LLC v. Redwood Sci. Techs., Inc.*, No. 19-12138-MLW, 2020 WL 10313914, at *2-3 (D. Mass. Nov. 30, 2020) (ordering a plaintiff to show cause as to why the claims against the defaulted defendant should not be dismissed for failure to state a claim); *see also Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 30 (1st Cir. 2000) ("Although it is occasionally appropriate for a district court to 'note the inadequacy of the complaint and, on its own initiative, dismiss the complaint[,] a court may not do so without at least giving plaintiffs notice of the proposed action and affording them an opportunity to address the issue.'" (alteration in original) (quoting *Wyatt v. City of Bos.*, 35 F.3d 13, 14-15 (1st Cir. 1994) (per curiam))).

## C.   Irving's Motion to Dismiss

Natasha Irving, the District Attorney for Prosecutorial District VI during all of the events at issue, moves to dismiss all of the claims against her for failure to state a claim (ECF No. 39). Irving argues that (1) all state law tort claims brought

78

against her in her official capacity are barred by the MTCA; (2) all state law tort claims brought against her in her individual capacity are barred by the doctrine of discretionary function immunity under the MTCA; (3) all state law tort claims brought against her are barred by the doctrine of absolute prosecutorial function immunity under the MTCA; (4) all constitutional claims brought against her are barred by the doctrine of absolute prosecutorial immunity; and (5) all constitutional claims brought against her are barred by the doctrine of qualified immunity.  She also argues, albeit briefly, that the facts in the Amended Complaint fail to state *any* meritorious claim against her.[46]

In Response (ECF No. 62), the Plaintiffs contend that Irving is not subject to the MTCA because she is not a governmental entity and none of the immunities claimed by Irving apply because her conduct was not performed in accordance with her prosecutorial duties. The Plaintiffs, analogizing to cases involving prosecutors who improperly comment on the credibility of a criminal defendant during a trial, also contend that Irving is not entitled to qualified immunity because she made comments in violation of a state court's confidentiality order and deprived Worster of due process by commenting on his credibility.

### 1.  Factual Allegations About Irving

The only factual allegations in the Amended Complaint that relate to Irving involve the March 26, 2021, Bangor Daily News article about Worster, which also

---

[46]  Irving also argues that Count X (employment discrimination/wrongful termination) should be dismissed as to her, and that Count XVI (punitive damages) is a form of relief, not a separate cause of action.  The Plaintiffs concede that Count X should be dismissed as to Irving.  And the Plaintiffs have agreed to dismiss Count XVI as to all of the Defendants.

contained statements attributed to Wright.  The Plaintiffs allege that Irving's statements in the article about Worster were "false and misleading" and "violated a court[-]issued confidentiality order" entered in *State v. Rebecca Fuller*.  ECF No. 1-1 at 32, ¶ 163.  The Plaintiffs attached a copy of the confidentiality order to the Amended Complaint (ECF No. 1-1 at 55-56).  They further contend that Worster was never notified of the fact that he was *Giglio*-impaired until the article was published and that designating him as such without giving him an opportunity to be heard violates due process.  Based on these allegations, the Plaintiffs assert over a dozen claims against Irving.[47]

The article, which I consider merged with the pleadings, *see supra* note 32, contains the following content related to Irving:

> Jonathan Liberman, the Lincoln County district attorney at the time and now a prosecutor with the Cumberland County District Attorney's office, declined to comment.

> But current Lincoln County District Attorney Natasha Irving, who took office shortly after Worster left the Wiscasset Police Department, confirmed that her office sent information demonstrating potential credibility issues to multiple defendants in cases where Worster was a witness.  She declined to provide more information.

> "I will confirm that the discovery regarding this issue routinely, as a matter of course, went out to every defendant in which he was a witness after they were charged," she said.

> Due to confidentiality rules, Irving is barred from describing the Giglio information, something she said should change.

> "I don't think the public is going to stand for this being so opaque forever. Nor should they.  You should be able to know," Irving said.  "These are people paid by the taxpayers to protect and serve."

---

[47]  The Amended Complaint pleads no facts suggesting a connection between the statements attributed to Irving in the article and Davis.

ECF No. 39-1 at 9.  There is no other mention of Irving in the article.

### 2. State Tort Claims Against Irving in Her Official Capacity

I agree with Irving that the MTCA provision barring the assertion of tort claims against governmental entities, 14 M.R.S.A. § 8103(1) (West 2023), precludes tort claims from being asserted against her in her official capacity.

The MTCA provides immunity under different circumstances for governmental entities and employees of governmental entities.  *Compare* 14 M.R.S.A. § 8103(1) (immunity for governmental entities), *with* 14 M.R.S.A. § 8111 (West 2023) (immunity for employees of governmental entities).  With respect to governmental entities, the MTCA provides that "[e]xcept as otherwise expressly provided by statute, all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages."  14 M.R.S.A. § 8103(1).  Thus, under the statute, "as a general rule, governmental entities are immune from suit on any and all tort claims seeking recovery of damages."  *Klein v. Univ. of Me. Sys.*, 2022 ME 17, ¶ 8, 271 A.3d 477.  Although this general rule has exceptions, *see* 14 M.R.S.A. § 8104-A (West 2023), none of the exceptions are relevant here.[48]  The only question, then, is whether the official-capacity claims against Irving are claims against a governmental entity.  I conclude that they are.

Governmental entities under the MTCA include "the State" and "political subdivisions"—namely, cities, towns, counties, or other similar administrative entities.  *See* 14 M.R.S.A. § 8102(2), (3) (West 2023).  The Plaintiffs assert that

---

[48]  Although the broad immunity granted to governmental entities under the MTCA is waived in certain circumstances, *see* 14 M.R.S.A. § 8104-A(1)-(4), the Plaintiffs' claims against Irving do not fall within these exceptions.

because Irving is an individual, she falls outside of this definition. But this argument misunderstands the distinction between personal-capacity suits and official-capacity suits. Although "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions [the official] takes *under color of state law*[,] . . . [o]fficial capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." *Andrews v. Dep't of Env. Prot.*, 1998 ME 198, ¶ 20, 716 A.2d 212 (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)); *see also Brown v. Osier*, 628 A.2d 125, 128 (Me. 1993) ("Suits against employees in their official capacities are essentially suits against the government entities for which they work . . . ." (quoting *Gray v. Lacke*, 885 F.2d 399, 405 (7th Cir. 1989))). Thus, "while an award of damages against an individual in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages[-]judgment must look to the government entity itself." *Andrews*, 1998 ME 198, ¶ 20, 716 A.2d 212 (quoting *Graham*, 473 U.S. at 166).

Accordingly, a suit against Irving in her official capacity is really a suit against her employers, one or more counties, which are government entities. Such a suit is barred by the absolute immunity provided by section 8103, notwithstanding the fact that the claims against Irving in her individual capacity are not. *See Parlin v. Cumberland Cnty.*, 659 F. Supp. 2d 201, 213 (D. Me. 2009) (concluding that claims against a defendant in his official capacity were barred by the absolute immunity provided by the MTCA); *Woods v. York Cnty.*, 534 F. Supp. 2d 153, 161 (D. Me. 2008) (same); *Brooks v. Augusta Mental Health Inst.*, 606 A.2d 789, 791 (Me. 1992) (same).

It is therefore ordered that the state law tort claims (Counts I, II, III, IV, VI, VII, and XIV) against Irving in her official capacity are dismissed.

### 3. State Law Tort Claims Against Irving in Her Individual Capacity

The tort claims against Irving in her individual capacity require a different analysis.  As a district attorney, Irving undoubtedly qualifies as a government "employee," *see* 14 M.R.S.A. § 8102(1), and the MTCA provides that government employees sued in their personal capacities shall be immune from liability for, among other things: (1) undertaking, or failing to undertake, any legislative or quasi-legislative act; (2) undertaking, or failing to undertake, any judicial or quasi-judicial act; (3) performing or failing to perform any discretionary function or duty; (4) performing or failing to perform any prosecutorial function; and (5) any intentional act or omission within the course and scope of employment unless such act or omission involves bad faith.  *See* 14 M.R.S.A. § 8111(1)(A)-(E).  Irving contends that her actions fall within two of these categories: discretionary function immunity and prosecutorial function immunity.[49]  Unlike governmental entities, though, "liability is the rule and immunity the exception" for government employees under the MTCA.  *Day's Auto Body, Inc. v. Town of Medway*, 2016 ME 121, ¶ 20, 145 A.3d 1030.  An employee seeking to assert an immunity defense under the MTCA bears the burden of proof.  *Quintal v. City of Hallowell*, 2008 ME 155, ¶ 33, 956 A.2d 88.

---

[49]  Irving raises no argument that "intentional act immunity" under section 8111(1)(E) applies, so I do not address that issue.

### (a) Discretionary Function Immunity

With respect to discretionary function immunity, "Maine law grants 'governmental employees absolute immunity when performing a discretionary act . . . as long as that act is "encompassed by the duties of the governmental employee."'" *Cote v. Town of Millinocket*, 901 F. Supp. 2d 200, 240 (D. Me. 2012) (alteration in original) (quoting *Richards v. Town of Eliot*, 2001 ME 132, ¶ 32, 780 A.2d 281).  The purpose of this immunity is "to protect 'the "independence of action" necessary for the effective management of state government,'" and it applies even when discretion has been abused.  *Hilderbrand v. Washington Cnty. Comm'rs*, 2011 ME 132, ¶¶ 8-9, 33 A.3d 425 (quoting *Darling v. Augusta Mental Health Inst.*, 535 A.2d 421, 426 (Me. 1987)).  Discretionary function immunity can be lost, however, if the government employee clearly exceeds the scope of his or her discretion.  *Parlin*, 659 F. Supp. 2d at 214; *see also Hilderbrand*, 2011 ME 132, ¶ 9, 33 A.3d 425 ("[I]mmunity is lost when the conduct so clearly exceeds the scope of an employee's authority that the employee cannot have been acting in his [or her] official capacity.").

The first step in determining whether discretionary function immunity applies is to determine the employee's duties.  *Hilderbrand*, 2011 ME 132, ¶ 10, 33 A.3d 25.  If there is a statute that "clearly indicates" the duties of an employee, immunity is construed in light of that statute.  *Id.*; *see also Gove v. Carter*, 2001 ME 126, ¶ 13, 775 A.2d 368.  When there is no such statute, a four-factor test, sometimes called the *Darling* test,[50] applies:

---

[50] *See Darling*, 535 A.2d at 426.

84

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective? (2) Is the questioned act, omission or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Hilderbrand*, 2011 ME 132, ¶ 10, 33 A.3d 25 (quoting *Tolliver v. Dep't of Transp.*, 2008 ME 83, ¶ 19, 948 A.2d 1223 (plurality opinion)). The first, second, and forth factors inform "whether the governmental employee was performing or failing to perform an official function or duty," while the third factor "helps determine whether that function or duty was discretionary in nature, as opposed to merely ministerial." *Lawson v. Willis*, 2019 ME 36, ¶ 10, 204 A.3d 133 (quoting *Carroll v. City of Portland*, 1999 ME 131, ¶ 7, 736 A.2d 279); *see also id.* ("A governmental employee 'is not entitled to discretionary function immunity unless [her] allegedly tortious activity required the exercise of judgment or choice.'" (alteration in original) (quoting *Carroll*, 1999 ME 131, ¶ 9, 736 A.2d 279)).

"Discretionary function immunity may protect an employee, even when the employee's actions are not specifically authorized by statute or regulation, as long as the employee's actions were 'reasonably encompassed by [her] duties.'" *Hilderbrand*, 2011 ME 132, ¶ 12, 33 A.3d 425 (quoting 14 M.R.S.A. § 8111(1)); *Grossman v. Richards*, 1999 ME 9, ¶ 5, 722 A.2d 371 (discussing the broadening of discretionary function immunity doctrine to include acts "reasonably encompassed" by an employee's duties). But "[w]hen the conduct at issue has little to do with

85

governmental functions and instead resembles decisions or actions by the general population, discretionary function immunity does not apply." *Morgan v. Kooistra*, 2008 ME 26, ¶ 20, 941 A.2d 447.

Here, at all relevant times, Irving was the District Attorney of Prosecutorial District VI. And although there are statutes delineating many of the duties of district attorneys, *see* 30-A M.R.S.A. §§ 281-290 (West 2023), these statutes are largely silent about a district attorney's authority to make public statements.[51]  Consequently, I look to the four *Darling* factors to guide my inquiry. *See Hilderbrand¸* 2011 ME 132, ¶¶ 11-12, 33 A.3d 425 (noting that although there are duties generally setting forth the duties of Maine sheriffs, the Law Court had to look to the four *Darling* factors "[b]ecause there is no specific legislative mandate regarding a sheriff's authorization to make public statements"). Before doing so, however, it is useful to examine some of the precedents from this Court and the Law Court regarding when public disclosure of information does and does not constitute a discretionary act.

First, in *Rippett v. Bemis*, the Law Court addressed a situation in which a detective in the York County Sheriff's Office conducted an internal investigation into an allegation that the Sheriff's Office had illegally returned a gun to a convicted felon, and the detective then—against written policy—made public statements about the results of that investigation.  672 A.2d 82, 84-85 (Me. 1996).  The detective was subsequently sued for the public statements he had made, and he attempted to assert

---

[51]  Title 30-A M.R.S.A. § 288 seems to contemplate that district attorneys may make public statements.  Section 288 specifically circumscribes the authority of district attorneys to make "unnecessary pretrial public disclosure of information that may identify a minor victim of [sexual offenses]."  Thus, although it does not weigh heavily in my calculus, the Legislature has indirectly acknowledged the need for district attorneys to make public statements from time to time.

an MTCA discretionary function defense.  The Law Court rejected this argument, noting that although the internal investigation itself was a discretionary official act, the detective's "public statements concerning the results of that investigation . . . were not essential to accomplish any basic governmental policy, program, or objective and in fact violated a written policy of the York County Sheriff's Department." *Id.* at 88.

Next, in *Gove v. Carter*, the Law Court addressed whether a town manager's public disclosure of a complaint that he had made with the Maine Real Estate Commission constituted protected discretionary conduct.  2001 ME 126, ¶ 6, 775 A.2d 368.  The Law Court concluded that the town manager's conduct was protected discretionary conduct because it was reasonably encompassed by his duties as town manager, which were set out by statute.  *Id.* at ¶¶ 13-14.  It specifically rejected an analogy to *Rippett*, reasoning that unlike in that case, the town manager did not violate any stated policy, ordinance, or statute in disclosing the complaint.  *Id.* at ¶¶ 11-12.

In *Hilderbrand v. Washington County Sheriff's Office*, an elected sheriff made a public statement explaining that he would not work with the Maine Drug Enforcement Agency ("MDEA") because of a particular MDEA officer's conduct.  2011 ME 132, ¶ 4, 33 A.3d 425.  The officer sued the sheriff, who claimed in defense that the tort claims against him were barred by the doctrine of discretionary function immunity.  *Id.* ¶ 6.  The Law Court agreed with the sheriff, reasoning that all four of the *Darling* factors weighed in favor of concluding that the sheriff's decision to end cooperation with the MDEA was a discretionary function, as was the sheriff's public explanation of his decision.  *Id.* ¶¶ 12-18.  The Law Court noted that, as an elected

official, the sheriff's "employment responsibilities include publicly explaining his policy decisions" and that the sheriff's "public explanation of his change in policy was an integral part of the change itself, and we are unable to separate the two." *Id.* ¶ 18.

Finally, in *Charron v. County of York*, this Court addressed a similar situation involving public announcements made by a sheriff about the arrest of the plaintiff "pursuant to an office policy to keep the public informed of the office's activities." No. 2:18-cv-00105-JAW, 2020 WL 1868767, at *21 (D. Me. Apr. 14, 2020). This Court ultimately concluded that the sheriff's statements, which did not involve the violation of an internal policy, were an appropriate exercise of discretion and, therefore, closer to the facts of *Hilderbrand* than of *Rippett*. *Id.* at *53.

Having laid out these precedents, I now turn to the *Darling* factors. Ultimately, all four factors favor the conclusion that Irving's conduct was discretionary and that this case is more akin to *Hilderbrand* and *Charron* than it is to *Rippett*.

First, the challenged acts—Irving's decision to release *Giglio* material concerning Worster and her decision to discuss the fact that such material had been publicly released—necessarily involve basic governmental policies, programs, or objectives of the District Attorney's office. The District Attorney is elected to, among other things, "act for the State in all cases in which the State or county is an interested party" and to "prosecute all criminal cases" within their district. 30-A M.R.S.A. § 283. Handling *Giglio* impairments, which inherently affect criminal cases, thus contributes to the goals and objectives of the District Attorney's Office. *See*

88

*Harrington v. Almy*, 977 F.2d 37, 40 (1st Cir. 1992) (concluding that a prosecutor's decision not to prosecute cases brought by a specific officer was part of the prosecutor's prosecutorial duties); *Savage v. Maryland*, 896 F.3d 260, 272 (4th Cir. 2018) (concluding that a prosecutor's *Giglio* judgment was inextricably connected with the judicial phase of the criminal process). Likewise, so does making public statements about how the District Attorney's Office has previously treated officers with *Giglio* impairments in the interest of transparency and voter accountability. *See Charron*, 2020 WL 1868767, at *53; *Hilderbrand*, 2011 ME 132, ¶ 13, 33 A.3d 425.

Second, Irving's actions are essential to the accomplishment of these objectives. Labeling an officer as *Giglio*-impaired is necessary to prosecuting criminal cases. And Irving's disclosure of the fact that *Giglio* materials had been disclosed in cases involving Worster is essential to realizing the governmental interests in transparency and accountability. *See Charron*, 2020 WL 1868767, at *53; *Hilderbrand*, 2011 ME 132, ¶ 14, 33 A.3d 425. This concern is especially heightened in the context of *Giglio* impairments, which (as the Bangor Daily News article itself describes) involve case-specific decisions made by prosecutors that are not generally made known to the public. And, as described in more detail below, Irving made the disclosure in a way that arguably complied with the terms of the confidentiality order at issue in the underlying criminal case.

Third, Irving's actions required the exercise of basic policy evaluation, judgment, and expertise. This is true of both the decision to describe Worster as *Giglio*-impaired and the decision to inform the Bangor Daily News of the fact that *Giglio* orders had issued in multiple cases involving Worster. Like the sheriff in

*Hilderbrand*, Irving is an elected official, and it is her duty to properly discharge the duties of her office, including her responsibilities under *Giglio*. 2011 ME 132, ¶¶ 15-16, 33 A.3d 425. Her decision to explain that *Giglio* orders had issued in multiple cases involving Worster was not a mere ministerial fact; instead, it was calculated to inform the citizenry about an issue that had arisen regarding the District Attorney Office's compliance with its constitutional obligations.

Fourth, Irving had the authority to designate Worster as *Giglio*-impaired and to publicly explain that *Giglio* materials had been released to defendants in Worster's cases, notwithstanding the fact that no statute specifically authorized her to do so. *See id.* ¶ 18. Like sheriffs, district attorneys are elected officials and may be called upon to explain their decisions and respond to public criticism. *See id.*; *see also Grossman*, 1999 ME 9, ¶ 8, 772 A.2d 371. I conclude, therefore, that Irving acted within the bounds of her authority by making the statements attributed to her in the Bangor Daily News article.

The Plaintiffs argue that Irving did not have the requisite authority because of the confidentiality order issued by the Maine state court in *State of Maine v. Rebecca Fuller*. They reason that if Irving contravened a policy or order, that should weigh against concluding that she is protected by discretionary function immunity. *See Rippett*, 672 A.2d at 88. But Plaintiffs have failed to show that Irving violated the requirements of the confidentiality order, which provided:

> IT IS HEREBY ORDERED that the aforementioned *Giglio* records in the discovery materials provided to the Defendant by the State may not be copied or disseminated by defense counsel or any other person to anyone, except that said materials may be examined by the Defendant under the direct supervision of defense counsel. Said materials are to

> be kept at all times in defense counsel's files, except for use at trial or
> other court hearing.  Said materials shall be returned to the State
> immediately following final disposition in this case.

ECF No. 1-1 at 56.[52]  Irving is not accused of disseminating the *Giglio* records

themselves: according to the allegations in the Amended Complaint, she merely

confirmed that *Giglio* materials had been provided to criminal defendants in cases in

which Worster was involved.  Nor does the Amended Complaint contain any other

allegations suggesting that the fact that Worster had previously been found to be

*Giglio*-impaired was itself subject to a confidentiality order.  Thus, unlike in *Rippett*,

672 A.2d at 88, Irving did not contravene an existing policy or order through her

actions.  Nor was her decision to make the statement about Worster so clearly beyond

her authority that she is divested of the MTCA's protections for discretionary

functions.

Accordingly, taking the four *Darling* factors into account, as well as the

circumstances at issue, I conclude that the state law tort claims against Irving in her

individual capacity are barred by the doctrine of discretionary function immunity.  It

is therefore ordered that the state law tort claims (Counts I, II, III, IV, VI, VII, and

XIV) against Irving in her individual capacity are also dismissed.

### (b)  Prosecutorial Function Immunity Under the MTCA

Irving also argues that the state law tort claims against her are barred by the

grant of prosecutorial function immunity in 14 M.R.S.A. § 8111(1)(D).  Irving is

correct that this immunity can apply to conduct that is already protected under the

---

[52]  Because it is central to the Plaintiffs' claims and was attached to the Amended Complaint, I
consider the confidentiality order as being merged with the pleadings.

doctrine of discretionary function immunity.  *See Carey v. Bd. of Overseers of the Bar*, 2018 ME 119, ¶ 25, 192 A.3d 589.  The parties disagree, however, about the scope of section 8111(1)(D).  Irving contends that the grant of prosecutorial function immunity in section 8111(1)(D) sweeps more broadly than the absolute prosecutorial immunity generally afforded to prosecutors under section 1983.  The Plaintiffs, on the other hand, seem to argue that prosecutorial function immunity under section 8111(1)(D) is coextensive with the grant of absolute prosecutorial immunity—which, as explained below, they contend is inapplicable to Irving's conduct.

Few courts have had the opportunity to address the scope of section 8111(1)(D), and the few published orders addressing the topic discuss prosecutorial function immunity under section 8111(1)(D) and absolute prosecutorial immunity together. *See Palm v. Maine* ("*Palm I*"), 532 F. Supp. 2d 198, 199 (D. Me. 2008) (concluding that members of the Kennebec County District Attorney's Office had absolute immunity under both section 8111(1)(D) and federal common law).  There is, however, logical resonance to Irving's argument that the grant of immunity to "any prosecutorial function involving civil, criminal, or administrative enforcement" under section 8111(1)(D) sweeps more broadly than the absolute prosecutorial immunity discussed below.

The parties' arguments on this point present an important and unsettled question of state law.  Because I have separately concluded that discretionary function immunity, as provided in section 8111(1)(C), bars the state law tort claims against Irving in her individual capacity, I need not and do not resolve that question here.

92

### 4. Absolute Prosecutorial Immunity

Irving next argues that the federal and state constitutional claims against her fail because of the doctrine of absolute prosecutorial immunity. The Plaintiffs argue in response that absolute prosecutorial immunity does not apply here because their claims against Irving are based on her conduct outside the judicial process—namely, her statements to the Bangor Daily News. Irving acknowledges that statements to the press fall outside the protection of prosecutorial immunity, but she contends that she is entitled to absolute prosecutorial immunity to the extent that the claims against her are based on the fact that the District Attorney's Office deemed Worster to be *Giglio*-impaired, and made the decision not to inform him of that designation.

Both parties are partially correct. "[P]rosecutors are absolutely immune in exercising the core prosecutorial function of 'initiating a prosecution and . . . presenting the State's case.'" *Penate v. Kaczmarek*, 928 F.3d 128, 135 (1st Cir. 2019) (second alteration in original) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976)). This immunity is "designed to free the *judicial process* from the harassment and intimidation associated with litigation." *Burns v. Reed*, 500 U.S. 478, 494 (1991). It does not apply, however, to *all actions* remotely connected with prosecution; nor does it apply when the prosecutor acts only "in the role of an administrator or investigative officer." *Filler v. Kellet*, 859 F.3d 148, 153 (1st Cir. 2017) (quoting *Imbler*, 424 U.S. at 430-31). In keeping with these principles, absolute prosecutorial immunity is inapplicable to statements to the press because "(1) there was not a common-law immunity for a prosecutor's out-of-court statements to the press; and (2) comments to the press are not made in a prosecutor's role as advocate for the state." *Filler*, 859

F.3d at 153 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 277 (1993)).  Consequently, Irving is not entitled to absolute prosecutorial immunity from the Plaintiffs' claims that are based on her statements to the Bangor Daily News.

But on the other hand, Irving is correct that she is entitled to absolute prosecutorial immunity to the extent that the claims against her are based on the fact that she designated Worster as *Giglio*-impaired (which is unclear from the nature of the pleadings).  *See Harrington*, 977 F.2d at 40-42 (concluding that a prosecutor was absolutely immune from liability for his decision to decline to prosecute cases brought by an officer with credibility concerns); *Roe v. Lynch*, 997 F.3d 80, 86-87 (1st Cir. 2021) (Lipez, J., concurring) ("In addition to the merit issues identified by my colleagues, a federal suit challenging a prosecutor's *Brady*- or *Giglio*-determination might falter on immunity and related equitable grounds . . . ."); *Savage*, 896 F.3d at 270-72 (concluding that a prosecutor's decision to no longer call a police officer as a witness in criminal cases was entitled to absolute immunity).

Consequently, the constitutional claims against Irving can only proceed to the extent that they are based on her statements to the Bangor Daily News and not on the fact that she designated Worster as *Giglio*-impaired.  Thus, I turn to Irving's argument that she is entitled to qualified immunity on the constitutional claims against her.

### 5.  Qualified Immunity

According to Irving, she is entitled to qualified immunity because the Plaintiffs have not shown that she violated a clearly established constitutional right.  The Plaintiffs argue that qualified immunity should not protect Irving because she

violated the Plaintiffs' constitutional rights by violating a confidentiality order, interfering with Worster's relationship with his daughter, and violating principles of fundamental fairness. They further contend that these rights are "clearly established" and that Irving should have known that she had no right to make the comments that she did.

The qualified immunity doctrine applies to both claims arising under the U.S. Constitution (which are asserted under 42 U.S.C.A. § 1983) and claims arising under the Maine Constitution (which are asserted under the Maine Civil Rights Act). *See Hegarty v. Somerset Cnty.*, 848 F. Supp. 257, 269 (citing *Jenness v. Nickerson*, 637 A.2d 1152, 1155 (Me. 1994)). Under this doctrine, when government officials are sued in their individual capacity, they are immune from damages claims unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 63 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"'Clearly established' means that, at the time of the [official's] conduct, the law was '"sufficiently clear" that every "reasonable official would understand that what he is doing"' is unlawful." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Thus, "[i]t is not enough that the rule is suggested by then-existing precedent." *Id.* Instead, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* "In other

words, existing law must have placed the constitutionality of the [official's] conduct 'beyond debate.'" *Id.* at 64 (quoting *al-Kidd*, 563 U.S. at 741).

The Plaintiffs bear the "heavy burden" of demonstrating that the law was clearly established at the time of Irving's allegedly unconstitutional actions. *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021) (quoting *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015)). The Plaintiffs have not carried that heavy burden here.

The constitutional claims against Irving arise under the U.S. Constitution's Equal Protection Clause, as well as several provisions of the Maine Constitution. But the Plaintiffs have pointed to *no authority* supporting their contention that Irving violated these constitutional guarantees by making statements to the Bangor Daily News about *Giglio* information being disclosed in cases in which Worster was involved. Instead, they advance novel theories with little-to-no basis in existing law, such as the theory that a prosecutor commenting on a police officer's credibility presents the same due process concerns as when a prosecutor comments on a criminal defendant's silence during a criminal proceeding.[53] Although comparable precedents are not necessarily required for a right to be clearly established in obvious cases, *see Irish v. Fowler*, 979 F.3d 65, 76, 78 (1st Cir. 2020), liability under the novel and

---

[53] The Plaintiffs also argue that Irving violated Worster's clearly established fundamental constitutional rights by interfering with his family relationships because Irving's statements were "fed" to Worster's daughter by the other Defendants. ECF No. 62 at 8. This frivolous argument is not worthy of discussion. Nor is the Plaintiffs' argument that Irving violated constitutional principles of fundamental fairness by making a statement to the Bangor Daily News about Worster being *Giglio*-impaired without first notifying him.

unsupported legal theories advanced by the Plaintiffs is squarely foreclosed by qualified immunity.

The Plaintiffs also argue that Irving violated clearly established law because her disclosure to the Bangor Daily News violated the terms of a court-imposed confidentiality order. As I have already concluded, Irving's statements did not violate that order. But even if they did, the Plaintiffs have pointed to no authority supporting the idea that a prosecutor violates a police officer's clearly established constitutional or statutory rights by violating such an order. Thus, the Plaintiffs' reliance on the confidentiality order alone is insufficient to carry their burden to rebut a qualified immunity defense.

Accordingly, Irving is entitled to qualified immunity on the constitutional claims made against her in her individual capacity. However, the same is not true for the constitutional claims against Irving in her official capacity. As noted above, official-capacity claims represent just another method of pleading a case against the governmental entity employing the official. *See Andrews*, 1998 ME 198, ¶ 20, 716 A.2d 212. The justifications for qualified immunity are thus inapplicable to official-capacity claims, and the doctrine does not bar such claims. *See Febus-Rodríguez v. Betancourt-Lebrón*, 14 F.3d 87, 91 n.3 (1st Cir. 1994); *M.M.R.-Z ex rel. Ramírez-Senda v. Puerto Rico*, 528 F.3d 9, 12-13 (1st Cir. 2008). Consequently, the official-capacity constitutional claims against Irving are not barred by qualified immunity.

### 6. Failure to State a Claim

Finally, I address Irving's argument that, regardless of the immunity doctrines previously discussed, the Amended Complaint fails to state a claim against her. With

respect to the only remaining claims against Irving—the constitutional claims made against her in her official capacity—I agree.

As a preliminary note, there are insufficient allegations in the Amended Complaint connecting Irving to *any* damage to Davis because all of the allegations involving Irving relate to Worster alone.  As such, Davis's claims against Irving are dismissed.

The first of Worster's claims against Irving arises under section 1983 and asserts that Irving violated the Plaintiffs' rights under the Equal Protection Clause. "Generally, for an equal protection claim to survive a motion to dismiss, a plaintiff must allege facts plausibly demonstrating that '"compared with others similarly situated, [the plaintiff was] selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."'" *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 106 (1st Cir. 2015) (alterations in original) (quoting *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001)).  Here, the Plaintiffs have failed to meet that standard: there are no facts in the Amended Complaint supporting an inference that Irving treated the Plaintiffs differently than any other category of persons because of their protected status (or any other reason).  Although the Plaintiffs conclusorily state that they were targeted because of their gender, this is insufficient for two reasons.  First, it is unclear whether this allegation, which discusses the "campaign" against them without also indicating who conducted the campaign, ECF No. 1-1 at 41, ¶ 207, even applies to Irving.  Second, the Plaintiffs have not pointed to any similarly situated

person who was treated differently by Irving.  Thus, the Equal Protection claim fails, and Count V is dismissed.  *See Signs for Jesus v. Town of Pembroke*, 977 F.3d 93, 113 (1st Cir. 2020).

With respect to Count VIII for civil conspiracy, I construe that as the Plaintiffs' attempt to plead that Irving was engaged in a civil rights conspiracy against them because civil conspiracy is generally not an independent tort under Maine law.  *See Fiacco v. Sigma Alpha Epsilon Fraternity*, 484 F. Supp. 2d 158, 176 (D. Me. 2007).  But the Amended Complaint is devoid of any well-pleaded allegations that would support a finding that Irving had conspired with other state actors (or, for that matter, any other Defendants).  Thus, Count VIII is dismissed.

The rest of the constitutional claims against Irving are equally meritless.  Worster alleges, presumably pursuant to the Maine Civil Rights Act, 5 M.R.S.A. § 4682(1-A) (West 2023), that Irving violated his rights under three separate provisions of the Maine Constitution.  He also asserts, in Count XIII, a separate stand-alone claim for "Interference with Maine Civil Rights," pursuant to 5 M.R.S.A. § 4682.  ECF No. 1-1 at 48.  But the Maine Civil Rights Act establishes a "civil cause of action for any person whose state or federal constitutional or statutory rights have been intentionally interfered with through actual or threatened violence, damage or destruction of property, or trespass."  *Caldwell v. Fed. Express Corp.*, 908 F. Supp. 29, 32 (D. Me. 1995) (quoting 5 M.R.S.A. § 4682).  The Amended Complaint provides no facts establishing a connection between Irving's conduct and any use or threat of violence, damage or destruction of property, or trespass.  Thus, Worster cannot bring claims under the Maine Civil Rights Act against Irving and his claims under the

Maine Constitution (and his standalone Maine Civil Rights Act claim) fail.  *See id.*; *Bagley v. Raymond Sch. Dep't*, 1999 ME 60, ¶ 10 n.5, 728 A.2d 127; *Andrews*, 1998 ME 198, ¶ 23, 716 A.2d 212.[54]

Even if I were to reach the merits of Worster's state constitutional claims, I would conclude that he has failed to state a claim against Irving.  With respect to Count XI, the alleged violation of Article 1, section 1 of the Maine Constitution, that section provides, "All people are born equally free and independent, and have certain natural, inherent and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness."  Me. Const. art. I, § 1.  This provision is not clearly applicable to Irving's conduct, nor are there any Law Court decisions interpreting it to apply in any remotely comparable situation.  Thus, the Plaintiffs have failed to state a claim pursuant to this provision and Count XI is dismissed.  *See Hewes v. Pushard*, No. 1:21-cv-00125-DBH, 2021 WL 3863337, at *3 (D. Me. Aug. 30, 2021) (concluding that a plaintiff had failed to state a claim pursuant to Article I, section 1 of the Maine Constitution because "there are no Law Court cases suggesting this provision gives the plaintiff a cause of action against her abuser's relatives").

As to Count XII, the violation of the Maine Constitution's guarantees of due process and equal protection,[55] that claim is unavailing because the protection

---

[54] One decision of this Court, *Nillson-Borrill v. Burnheimer*, 505 F. Supp. 2d 180, 183 & n.3 (D. Me. 2007) arguably reached the opposite conclusion.  But that decision did not finally resolve the issue and, in any event, the result in that case is plainly limited to claims brought against prison officials for their alleged deliberate indifference to the safety of an inmate.  *See id.*

[55] This section provides: "No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of that person's civil rights or be discriminated against in the exercise thereof."  Me. Const. art. I, § 6-A.

provided by those provisions of the Maine Constitution is coextensive with the guarantees of the Fourteenth Amendment. *See MSAD 6 Bd. of Dirs. v. Town of Frye Island*, 2020 ME 45, ¶ 36, 229 A.3d 514; *see also State v. Mosher*, 2012 ME 133, ¶ 11, 58 A.3d 1070 (per curiam) (equal protection component); *Doe I v. Williams*, 2013 ME 24, ¶ 61, 61 A.3d 718 (due process component). Therefore, for the same reasons I have discussed with respect to the claim arising under the Fourteenth Amendment's Equal Protection Clause, the Plaintiffs have failed to state a claim that Irving violated the equal protection rights guaranteed by the Maine Constitution. Nor have the Plaintiffs raised any colorable argument that Irving violated their rights pursuant to the Maine Constitution's Due Process Clause. *See Roe*, 997 F.3d at 84-85 (concluding that there was no due process violation under the Maine Constitution when an officer was designated as *Giglio*-impaired).

And with respect to Count XV, alleging a violation of the "Open Courts" provision of the Maine Constitution,[56] the Plaintiffs identify no authority indicating that the due process and equal protection guarantees of the Maine Constitution provide a substantive right arising from the violation of a reputational injury. Instead, the Open Courts provision has been construed as providing a procedural right in the event that a plaintiff suffers, among other things, a reputational injury, with the remedy being equal and prompt access to fair judicial proceedings. *See State v. Bilynsky*, 2008 ME 33, ¶ 6, 942 A.2d 1234; *Me. Med. Ctr. v. Cote¸* 577 A.2d 1172,

---

[56] This section provides: "Every person, for an injury inflicted on the person or the person's reputation, property or immunities, shall have remedy by due course of law; and right and justice shall be administered freely and without sale, completely and without denial, promptly and without delay." Me. Const. art. I, § 19.

1175-76 (Me. 1990); *McGuire v. Sunday River Skiway Corp.*, No. 93-284-P-H, 1994 WL 505035, at *5 n.6 (D. Me. Sept. 2, 1994). There are no allegations in the Amended Complaint that Irving interfered in any way with the Plaintiffs' rights of access to the courts.

To conclude, Irving's Motion to Dismiss (ECF No. 39) must be granted in its entirety because (1) the state law tort claims against Irving in her official capacity are barred by the MTCA's grant of immunity to governmental entities; (2) the state law tort claims against Irving in her individual capacity are barred by discretionary function immunity under the MTCA; (3) the constitutional claims against Irving in her individual capacity are barred by qualified immunity; and (4) the remaining constitutional claims against Irving in her official capacity fail to state a claim.

## D.    The Union Defendants' Motion to Dismiss

In addition to raising an anti-SLAPP defense, the Union Defendants assert various other arguments as to why the claims against them should be dismissed. Specifically, they argue that (1) all tort claims against the Union Defendants are preempted by Maine's Municipal Public Employee Labor Relations Law; (2) the Amended Complaint fails to state any claim against Defendant Brett Miller; (3) the negligence and negligent infliction claims fail because the Union Defendants did not owe a duty of care to the Plaintiff; (4) the Plaintiffs failed to exhaust their remedies under the Maine Human Rights Act prior to bringing an employment discrimination claim; (5) no section 1983 claims can be asserted against the Union Defendants because they are not state actors; and (6) the Plaintiffs have failed to state any claims under the Maine Constitution.

### 1. Preemption of Common Law Claims

The Union Defendants argue that Maine's Municipal Public Employee Labor Relations Law ("MPELRL"), 26 M.R.S.A. §§ 961-976 (West 2023) preempts the common law tort claims against them. Specifically, they contend that because the claims against them depend on actions taken during their representation of Theriault, the claims against them implicate the duties of the Union Defendants and a public employer under the collective bargaining agreement and are, therefore, properly heard by the Maine Labor Relations Board. The Union Defendants acknowledge that no court has yet held that common law claims like those brought by Davis and Worster are preempted by the MPELRL, but they analogize to two distinct doctrines: the doctrine of *Garmon* preemption and the existence of a "comprehensive remedial scheme." ECF No. 14 at 6-7. For reasons that I will explain, I am unpersuaded by the Union Defendants' preemption arguments.

The MPELRL is intended to "promote the improvement of the relationship between public employers and their employees by providing a uniform basis for recognizing the right of public employees to join labor organizations of their own choosing and to be represented by such organizations in collective bargaining for terms and conditions of employment." 26 M.R.S.A. § 961; *see also Lewiston Firefighter's Ass'n v. City of Lewiston*, 354 A.2d 154, 160 (Me. 1976) ("[T]he MPELRL acknowledges and protects the public employee's right to self-organization and establishes the methods that may lawfully be used to implement that right. Thus, the MPELRL enables employees to form a bargaining unit and select bargaining representatives. It imposes upon the employer the duty to bargain with that

representative who has the exclusive power to bargain wages, hours and working conditions for all employees in the bargaining unit."). To effectuate those goals, the MPELRL provides, among other things, that public employers may not interfere with the right of public employees to join or not join a union and that public employees may not interfere with a public employer's selection of a representative for collective bargaining. 26 M.R.S.A. §§ 963, 964. The MPELRL further provides that the collective bargaining agent and the public employer must confer, negotiate, and bargain in good faith. 26 M.R.S.A. § 965(1)(C), (E); *City of Augusta v. Me. Labor Rels. Bd.*, 2013 ME 63, ¶ 15, 70 A.3d 268. The Maine Labor Relations Board is empowered to prevent employers, employees, or bargaining agents from violating the provisions of the MPELRL. *See* 26 M.R.S.A. § 968(5); *Minot Sch. Comm. v. Minot Educ. Ass'n*, 1998 ME 211, ¶ 5, 717 A.2d 372. The Union Defendants' contention is that the existence of this statutory scheme preempts the Plaintiffs' tort claims against them.

Although the Union Defendants are correct that courts decline to address issues that should have been brought to the Maine Labor Relations Board in the first instance, *see Wone v. City of Portland*, 466 A.2d 1256, 1256-57 (Me. 1983), this is not one of those situations.[57] The Plaintiffs seek relief against the Union Defendants because of allegedly unlawful acts committed during the scope of their representation of Theriault. But the allegedly unlawful acts, including making false statements and their harassing behavior, only tangentially relate to the Union Defendants' duties as

---

[57] The Law Court's opinion in *Wone* was based on the doctrine of primary jurisdiction rather than preemption. *See Wone*, 466 A.2d at 1256 n.2 (citing *Bar Harbor Banking & Tr. Co. v. Alexander*, 411 A.2d 74 (Me. 1980)). The two doctrines are related. *See Farmer v. United Bhd. of Carpenters & Joiners of Am.*, 430 U.S. 290, 295 n.5 (1977).

bargaining agents under the MPELRL. The primary case supporting the Union Defendants' argument, *Wone*, involved classification of an employee—an issue clearly within the heartland of Maine Labor Relations Board's jurisdiction. *See Wone*, 466 A.2d at 1256-577 (discussing cases in which the Maine Labor Relations Board had previously decided unit classifications).

Moreover, the Union Defendants have not identified any authority supporting their argument that the MPELRL preempts common law claims that relate to a union's representation of its member. And the authorities that they have provided for purposes of analogy are inapposite. First, the Union Defendants analogize to the doctrine of *Garmon* preemption, arising from the Supreme Court's decision in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). Under this doctrine, courts do not have jurisdiction over actions that attempt to directly regulate conduct that is arguably protected under Sections 7 or 8 of the National Labor Relations Act. *Tamburello v. Comm-Tract Corp.*, 67 F.3d 973, 976 (1st Cir. 1995); *Dir. of Bur. of Labor Standards v. Fort Halifax Packing Co.*, 510 A.2d 1054, 1061 (Me. 1986) (citing *Amalgamated Ass'n of Street, Electric Ry. & Motor Coach Emps. of Am. v. Lockbridge*, 403 U.S. 274 (1971)). *Garmon* preemption thus "protects the primary jurisdiction of the [National Labor Relations Board] to determine what kind of conduct is either prohibited or protected by the [National Labor Relations Act]." *Fort Halifax Packing Co.*, 510 A.2d at 1061.

The Union Defendants contend that although *Garmon* preemption itself does not apply in this case, it is nonetheless instructive of how the MPELRL should be interpreted. However, the Law Court has never indicated that it would construe the

MPELRL in the same way as the National Labor Relations Act, and the Union Defendants have provided no authority suggesting otherwise. Furthermore, *Garmon* preemption is not monolithic: there are multiple exceptions to its general principle, *see Tamburello*, 67 F.3d at 977, including under circumstances that are arguably comparable to those presented here. *See Farmer v. United Bhd. Of Carpenters & Joiners of Am.*, 430 U.S. 290, 301-02 (1977) (claim for intentional infliction of emotional distress against union member not preempted under *Garmon*); *Linn v. United Plant Guard Workers of Am.*, 383 U.S. 53, 61 (1966) (claim for malicious libel not entirely preempted by *Garmon*); *see also Condon v. Local 2944, United Steelworkers of Am.*, 683 F.2d 590, 595 (1st Cir. 1982) (noting that an exception to *Garmon* applies "where the union has engaged in improper conduct independent of the collective bargaining agreement such as a union's infliction of severe emotional distress on a member by its intentional and outrageous conduct, or malicious libel" (citations omitted)). In light of the absence of supporting case law from the Law Court and the Union Defendants' failure to discuss the applicability of the exceptions to *Garmon*, I do not adopt and apply a state analog to *Garmon* preemption in this case.

Second, the Union Defendants argue that the MPELRL provides a "comprehensive statutory alternative" to the common law claims brought by the Plaintiffs. ECF No. 14 at 6. In support, they cite to *Paquin v. MBNA Marketing Systems, Inc.*, 195 F. Supp. 2d 209, 210-11 (D. Me. 2002), a case in which this Court concluded that a plaintiff's claims of negligent hiring, training, and supervision were preempted by the Maine Human Rights Act. But *Paquin* and the cases upon which it was primarily based—*Bard v. Bath Iron Works Corp.*, 590 A.2d 152 (Me. 1991) and

*Greene v. Union Mutual Life Insurance Co.*, 623 F. Supp. 295 (D. Me. 1985)—involve redundant tort claims that were, in fact, amply covered by existing rights and remedies under the statute at issue.  Here, although the MPELRL certainly does present a comprehensive statutory scheme, it does not present an alternative method of obtaining relief for the various tort claims asserted by the Plaintiffs.  *See Bard*, 590 A.2d at 156 ("[W]here a statutory right and remedy are provided, there is no need to recognize a redundant tort.").   Instead, the MPELRL is primarily focused on protecting unionizing activity and establishes duties that are only tangentially related to the Plaintiffs' claims against the Union Defendants.   The Union Defendants' comparison of this case to *Paquin* and its predecessors is inapt.

Therefore, the common law claims against the Union Defendants are not preempted.

### 2.  Claims Against Brett Miller

I agree with the Union Defendants that the Plaintiffs have failed to state a claim against Defendant Brett Miller and that all of the claims against him should be dismissed.  Miller is mentioned only once in the Amended Complaint, in paragraph 38.  That paragraph states only that Miller was the "President and Business Agent" of Teamsters Local Union #340 and that he is sued in his "personal and professional capacity."  ECF No. 1-1 at 10-11, ¶ 38.  This lone averment is insufficient to support the more than a dozen claims for relief that the Plaintiffs have asserted against Miller.

The Plaintiffs contend that Miller can be held liable because he was Smith's supervisor.  But this argument is unpersuasive.  Vicarious liability cannot be imposed

107

here with respect to the tort claims because there are insufficient facts in the Amended Complaint to establish that Miller, the President and Business Agent of Teamsters Local Union #340, was in fact the "master" of Smith, the Secretary-Treasurer of Teamsters Local Union #340.[58]  *See Mahar v. StoneWood Transp.*, 2003 ME 63, ¶¶ 13-15, 823 A.2d 540 (discussing the elements of imposing vicarious liability on an employer).  And, with respect to the constitutional claims raised by the Plaintiffs, vicarious liability is inapplicable.  *See Richards*, 2001 ME 132, ¶ 38, 780 A.2d 281; *see also Palm v. Kennebec Cnty. Sheriff's Off.* ("*Palm II*"), No. 7-102-B-H, 2008 WL 3978214, at *5 (D. Me. Aug. 1, 2008) (recommended decision).  Instead, liability can be imposed only for the supervisor's own acts or omissions, and liability cannot be imposed for mere negligence.  *See Febus-Rodríguez*, 14 F.3d at 92 ("[A] supervisor's acts or omissions must amount to a reckless or callous indifference to the constitutional rights of others.").  Here, there are insufficient facts in the Amended Complaint to show that Miller—who, it bears repeating, was mentioned only once in the fifty-two page Amended Complaint—acted with deliberate indifference.

Accordingly, the Plaintiffs' claims against Miller are dismissed.

### 3.  Negligence Claims

The Union Defendants assert that the Plaintiffs' negligence and negligent infliction of emotional distress claims are unavailing because the Plaintiffs have not alleged that the Union Defendants owed them a duty of care.  According to the Union

---

[58] Nor do the Plaintiffs provide any developed discussion of whether the other elements for vicarious liability are present in this case.

Defendants, they owe no duty and thus cannot be held liable for either negligence or negligent infliction of emotional distress.  I agree.[59]

### (a)  General Negligence Claim

"A cause of action for negligence has four elements: (1) a duty of care owed to the plaintiff; (2) a breach of that duty; (3) an injury; and (4) causation, that is, a finding that the breach of the duty of care was a cause of the injury."  *Bell ex rel. Bell v. Dawson*, 2013 ME 108, ¶ 17, 82 A.3d 827 (quoting *Est. of Smith v. Cumberland Cnty.*, 2013 ME 13, ¶ 16, 60 A.3d 759).  The Union Defendants' challenge turns on the "duty of care" element.  The existence and scope of a duty of care is a question of law.  *Id.* ¶ 19.  "Duty refers to whether the defendant is 'under any obligation for the benefit of the particular plaintiff.'"  *Gniadek v. Camp Sunshine at Sebago Lake, Inc.*, 2011 ME 11, ¶ 17, 11 A.3d 308 (quoting *Bryan R. v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 1999 ME 144, ¶ 11, 738 A.2d 839).

The Law Court's recent opinion in *Boivin v. Somatex, Inc.*, 2022 ME 44, 279 A.3d 393, demonstrates that the duty usually owed in a general negligence case is the duty to avoid causing physical injury or property damage.  In *Boivin*, the plaintiff witnessed the death of a crane repairman after an accident and subsequently suffered from post-traumatic stress disorder and related mental, emotional, and behavior disorders.  *Id.* ¶¶ 4-5.  The Law Court concluded that the defendant, the employer of the repairman, was entitled to summary judgment on the plaintiff's general

---

[59] Because I agree with the Union Defendants that the Plaintiffs have failed to state a claim against them for negligence or negligent infliction of emotional distress, I will not reach the issue of whether the actual malice standard applies because the Plaintiffs are public officials.  Although Cunniff has raised this argument, the Union Defendants have not and there is no need to consider it with respect to them.

negligence claim.  *Id.* ¶ 14.  The Law Court explained that "[t]he duty of reasonable care that applies in an action for general negligence is a 'duty to act reasonably to avoid causing *physical harm* to others,'" and that the plaintiff had not shown that the defendant caused her any physical injury or harm.  *Id.* ¶¶ 12-13 (quoting *Curtis v. Porter*, 2001 ME 158, ¶ 18, 784 A.2d 18).  It further concluded that, under the facts of that case, the plaintiff had failed to show that post-traumatic stress disorder could qualify as a physical injury.  *Id.* ¶ 13.  Thus, the Law Court reasoned, because the defendant "owed no general duty of care to avoid causing [the plaintiff] the emotional harm that she asserts, the court appropriately entered summary judgment with respect to Boivin's general negligence claim."  *Id.* ¶ 14.

Here, the Plaintiffs have not included any non-conclusory assertions in their Amended Complaint that they suffered any physical harm or property damage from the Union Defendants' conduct.[60]  Their Amended Complaint contains only passing references to nonspecific physical harm and medical expenses; all of the other alleged injuries are either emotional, reputational, or economic.  Although these injuries may

---

[60]  In response to D'Alessandro's Motion to Dismiss, the Plaintiffs assert that their anti-SLAPP affidavits contain allegations showing that they suffered physical injuries sufficient to state a claim for general negligence.  Worster's anti-SLAPP affidavits all contain the following (essentially identical) statements: "I have had significant physical health issues, such as with my heart, my sleeping, fatigue related to my depression, I have had to move out of Millinocket, where I owned a home, my reputation as a person and a police officer are ruined, and I lost my job and income all causally linked to the actions of [the Defendant]."  *E.g.*, ECF No. 145-1 at 6, ¶ 34.  Davis' affidavits include similar statements, absent the mention of heart issues.  The representations in the affidavits are insufficient to state a claim for general negligence for several reasons.  First, a motion to dismiss tests the sufficiency of the pleadings, not facts asserted in other documents.  Second, the Plaintiffs have arguably waived this argument by raising it in only a single sentence in one of their response briefs and not developing it further.  Third, the actual maladies complained of largely track the maladies that the Law Court in *Boivin* determined were insufficient.  *See* 2022 ME 44, ¶ 12, 279 A.3d 393.  And fourth, the Plaintiffs have not adequately alleged that these physical manifestations of their emotional injuries constitute "physical harm" or are causally linked to the conduct of the Defendants.  *See id.* ¶ 13 & n.5.

be remediable by other torts, they cannot be asserted as part of a general negligence claim, without more. Thus, the Plaintiffs are unable to show that the Union Defendants owed the Plaintiffs a duty of care that they breached by engaging in the campaign against them. *See Boivin*, 2022 ME 44, ¶¶ 12-14, 279 A.3d 393; *Curtis*, 2001 ME 158, ¶ 18, 784 A.2d 18 ("Although each person has a duty to act reasonably to avoid causing *physical* harm to others, there is no analogous general duty to avoid negligently causing emotional harm to others." (emphasis added)); *In re Hannaford Bros. Customer Data Sec. Breach Litig.*, 2010 ME 93, ¶ 9, 4 A.3d 492 ("Liability in negligence, therefore, ordinarily requires proof of personal injury or property damage.").

The Plaintiffs' arguments to the contrary are unpersuasive and lack coherence. In their response to the Union Defendants' Motion to Dismiss, the Plaintiffs appear to argue that Local Union #340 can be held liable under the rationale of the tort of negligent supervision. But not only have the Plaintiffs failed to show the necessary special relationship between themselves and the Union because there is no "great disparity of position and influence," *Dragomir v. Spring Harbor Hosp.*, 2009 ME 51, ¶ 19, 870 A.2d 310, there was still no physical injury to the Plaintiffs.

Elsewhere in the record, the Plaintiffs argue that it was foreseeable that the Defendants' actions would cause harm to them, so a duty should be imposed. But the Law Court "has not adopted the concept of pure foreseeability as a principle of Maine law." *Baker v. Goodman*, 442 F. Supp. 3d 366, 375 (D. Me. 2020). To the contrary, it has explained that "[n]egligence . . . does not exist in the abstract." *Truisiani v. Cumberland & York Distribs., Inc.*, 538 A.2d 258, 261 (Me. 1988). I decline to create

111

the broad duty urged by the Plaintiffs—a negligence-based duty to prevent and refrain from "bullying" behavior that could lead to reputational injuries and economic harm, even absent any physical injury or property damage. The Plaintiffs have not pointed to any authority imposing a duty of care under any remotely comparable circumstances,[61] and this Court is not the place to establish a duty entirely detached from the current status of tort law in Maine. *See Baker*, 442 F. Supp. 3d at 380 ("[T]he federal court, as has been repeatedly said, is 'not the place to make new state law.'" (quoting *Pinkham v. Liberty Ins. Corp.*, No. 1:18-cv-00222-DBH, 2018 WL 3651578, at *2 (D. Me. Aug. 1, 2018))).

For those reasons, I grant the Union Defendants' Motion to Dismiss with respect to Count I.

### (b)  Negligent Infliction of Emotional Distress

I agree with the Union Defendants that the Plaintiffs have not shown that they have a duty of care with respect to the negligent infliction claim. "Although any person may be liable for the infliction of severe emotional distress if the conduct causing the harm is sufficiently outrageous and is intentional or reckless, the universe of those who may be liable in tort for the *negligent* infliction of emotional distress is much more limited." *Curtis*, 2001 ME 158, ¶ 17, 748 A.2d 18. At first blush, the elements of negligent infliction appear to be the same as the elements for general negligence, however, "[p]laintiffs claiming negligent infliction . . . face a

---

[61] The Plaintiffs cite to *Reid v. Town of Mount Vernon*, 2007 ME 125, ¶ 15, 932 A.2d 539, as support for their proposition that a duty was "clearly" owed here. ECF No. 61 at 15. *Reid* does not help the Plaintiffs—it merely stands for the proposition that when a legal duty exists, a defendant must act with reasonable care. But it does not follow from this that there is a general, overarching duty to act at all times with reasonable care.

significant hurdle in establishing the requisite duty, in great part because the determination of duty in these circumstances is not generated by traditional concepts of foreseeability." *Id.* ¶ 18.  This is because "[a]lthough each person has a duty to act reasonably to avoid causing physical harm to others, there is no analogous general duty to avoid negligently causing emotional harm to others." *Id.*  Instead, a duty to avoid negligently causing emotional harm arises only in "very limited circumstances." *Id.* ¶ 19.  Specifically, this duty arises in two circumstances: "first, in claims commonly referred to as bystander liability actions; and second, in circumstances in which a special relationship exists between the actor and the person emotionally harmed." *Boivin*, 2022 ME 44, ¶ 15, 279 A.3d 393 (quoting *Curtis*, 2001 ME 158, ¶ 19, 784 A.2d 18).  If there are no factual allegations supporting either of these limited circumstances, there cannot be a standalone claim for negligent infliction of emotional distress.[62]  *See id.* ¶ 16.

The Union Defendants' conduct fits into neither of these special circumstances. Clearly, this case does not involve bystander liability.  Nor is there a special relationship between the Union Defendants and the Plaintiffs.  As discussed by this Court in *Berry v. WorldWide Language Resources, Inc.*, 716 F. Supp. 2d 34, 50-52 (D.

---

[62]  A claim for negligent infliction of emotional distress can also lie when the tortfeasor has also committed another tort. *Curtis*, 2001 ME 158, ¶ 19, 784 A.2d 18.  However, "when the separate tort allows a plaintiff to recover for emotional suffering, the claim for negligent infliction of emotional distress is usually subsumed in any award on the separate tort." *Id.*; *see also Boivin*, 2022 ME 44, ¶ 15 n.6, 279 A.3d 393.  If, on the other hand, there can be no recovery for emotional harm caused by the separate tort, "a plaintiff may not circumvent that restriction by alleging negligent infliction in addition to the separate tort." *Curtis*, 2001 ME 158, ¶ 19, 784 A.2d 18.  Here, to the extent that emotional recovery would be available for the remaining torts asserted against the Union Defendants—an issue not discussed by the parties—I conclude that the negligent infliction claim is subsumed into those torts. *See Curtis*, 2001 ME 158, ¶¶ 19, 22, 784 A.2d 18; *Rippett*, 672 A.2d at 87-88.  This conclusion holds true with respect to all of the other Defendants who raise a duty argument about negligent infliction—namely, D'Alessandro, Murray Stanley, and Cunniff.

Me. 2010), Maine courts have been reluctant to expand the scope of special relationships for purposes of negligent infliction of emotional distress beyond narrow, well-delineated categories such as doctor-patient relationships and attorney-client relationships. There is no basis in Maine law for finding such a special relationship between a union (or its representatives) and public officials who are not represented by the union. This is true regardless of the fact that, according to the Plaintiffs, there was "[a] great disparity between the position and influence of the parties," particularly the Plaintiffs and Smith. ECF No. 45 at 6. *See Berry*, 716 F. Supp. 2d at 52 (finding no special relationship between an employer and employee); *James v. GMAC Mortg. LLC*, 772 F. Supp. 2d 307, 324 (D. Me. 2011) (declining to find the necessary special relationship between escrow agent and homeowner in light of the Law Court's refusal to expand the circumstances in which a special relationship exists); *Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 1999 ME 144, ¶ 32, 738 A.2d 839 (declining to find a special relationship between a church and its members). I decline to "innovate in state law" and find a special relationship as the Plaintiffs urge. *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 131 (1st Cir. 2000) (quoting *Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 694-95 (1st Cir. 1984)).

Thus, the Union Defendants' Motion to Dismiss is granted as to Count II.

### 4. Employment Discrimination

Next, the Union Defendants argue that the Plaintiffs have failed to state a claim for employment discrimination because they failed to file a complaint with the Maine Human Rights Commission prior to asserting this claim. In response, the Plaintiffs argue that the Maine Human Rights Act "does not apply here" and that, in

any event, they filed the necessary documents with the Maine Human Rights Commission with respect to the Town of Millinocket.  ECF No. 45 at 8.

I need not delve into whether the Plaintiffs were required to file a notice of right to sue with respect to the Union Defendants specifically.  The fact that the Union Defendants never employed the Plaintiffs means that any employment discrimination claim is unavailing.

Subchapter 3 of the Maine Human Rights Act prevents employers and employment agencies from unlawfully discharging an employee based on their sex. *See* 5 M.R.S.A § 4572(1)(A) (West 2023).  It only regulates labor unions "with respect to their employment of employees," not generally.  *See* 5 M.R.S.A. § 4553(4) (West 2023).  Thus, the actions of the Union Defendants fall outside the scope of this statute. The Plaintiffs appear to acknowledge this but nonetheless argue that their employment discrimination claim can still be asserted against the Union Defendants. But they have not identified which statute their employment discrimination and wrongful termination claims arise under.  Nor do they appear to arise under common law. *See Bond Builders, Inc. v. Com. Union Ins. Co.*, 670 A.2d 1388, 1390 (Me. 1996) (noting that an employment discrimination action was not a common law action).

Accordingly, I conclude that the Union Defendants' Motion to Dismiss must be granted with respect to Count X.  In fact, the Plaintiffs have conceded this point with respect to other Defendants, including Defendant Cunniff, and there is no reason why the same would not apply here.

**5.   Section 1983 Claims**

The Union Defendants argue that the Plaintiffs' Equal Protection claim against them fails because they are not state actors.  In response, the Plaintiffs argue that the Union Defendants were acting pursuant to the power given to them under Maine's Labor Relations Act and, therefore, qualify as state actors.

The Equal Protection claim against the Union Defendants is asserted pursuant to 42 U.S.C.A. § 1983.  Section 1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' by any person acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.'"  *Grapentine v. Pawtucket Credit Union*, 755 F.3d 29, 31 (1st Cir. 2014) (quoting 42 U.S.C.A. § 1983).   To assert a claim under section 1983, "a plaintiff must assert two allegations: (1) 'that some person deprived [her] of a federal right,' and (2) that such person 'acted under color of state or territorial law.'"  *Id.* (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).  The state action issue is crucial because section 1983 "does not apply to '"merely private conduct, no matter how discriminatory or wrongful."'"  *Id.* (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)).

Labor unions and their employees, like the Union Defendants, are ordinarily not state actors.  *See Mason v. Cent. Mass Transit Mgmt./Worcester Reg'l Transit Auth.*, 394 F. Supp. 3d 166, 173 (D. Mass. 2019); *Hallinan v. Fraternal Order of Police of Chic. Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009).  The Plaintiffs have not cited to any authority for their assertion that the Union Defendants automatically constitute state actors, rather than private actors, because they represent public

employees pursuant to state law.  Such a conclusion is doubtful.  *See Alston v. Int'l Ass'n of Firefighters, Loc. 950*, 998 F.3d 11, 33 (1st Cir. 2021) (inquiring into whether a public employees' union conspired with a municipality to determine if it could be treated as a state actor); *Hallinan*, 750 F.3d at 815-16 (same).

However, that does not end the inquiry.  Under certain circumstances, a private party can be treated as having acted under color of state law for purposes of section 1983 if their actions are "'fairly attributable to the State'" and it is "fair to characterize them as state actors."[63]  *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 4 (1st Cir. 2005) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)); *see also Grapentine*, 755 F.3d at 32.  But the bar for showing that a private actor can "fairly be said to be a state actor" is "quite high," *Jarvis v. Vill. Gun Shop, Inc.*, 805 F.3d 1, 8 (1st Cir. 2015) (quoting *Lugar*, 457 U.S. at 937), and the circumstances in which a private party can be treated as a state actor are "rare," *Mead v. Independence Ass'n*, 684 F.3d 226, 231 (1st Cir. 2012).  The party claiming that a private party qualifies as a state actor for purposes of section 1983 bears the burden of proof.  *Grapentine*, 755 F.3d at 32.

The First Circuit has explained that a private party can become a state actor if (1) "he assumes a traditional public function when performing the challenged conduct"; (2) "if the challenged conduct is coerced or significantly encouraged by the state"; or (3) "if the state has 'so far insinuated itself into a position of interdependence

---

[63]  Because the requirement that a defendant has acted under color of law for purposes of section 1983 is the "functional equivalent" of the Fourteenth Amendment's state action requirement, I "regard case law dealing with either of these formulations as authoritative with respect to the other, and [I] use the terminologies interchangeably."  *Jarvis v. Vill. Gun Shop, Inc.*, 805 F.3d 1, 8 (1st Cir. 2015) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011)).

with the [private party] that it was a joint participant in [the challenged activity].'" *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011) (alterations in original) (quoting *Estades-Negroni*, 412 F.3d at 5); *see also Alberto San, Inc. v. Consejo De Titulares Del Condominio San Alberto*, 522 F.3d 1, 4 (1st Cir. 2008) ("[A] private party can be fairly characterized as a state actor if the circumstances of the case meet one of three tests: the public function test, the joint action/nexus test, or the state compulsion test.").

Relatedly, a "plaintiff may demonstrate state action by showing that a private party has conspired with state actors to deprive him of a civil right." *Carney v. Town of Weare*, No. 15-cv-291-LM, 2017 WL 680384, at *14 (D.N.H. Feb. 21, 2017) (citing *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)); *see also Tauvar v. Bar Harbor Congregation of the Jehovah's Witnesses, Inc.*, 633 F. Supp. 741, 747 (D. Me. 1985) ("It is well settled that private persons may be held liable under section 1983 where, *inter alia*, the private parties conspire with or are otherwise willful participants in joint activity with the state or its agents.'"). But "bare conclusory allegations of conspiracy cannot survive a motion to dismiss," *Tauvar*, 633 F. Supp. at 747, and "[t]o show joint action or a conspiracy between the state and a private entity, "'the relationship or nature of cooperation between the state and a private individual must be pled *in some detail*,'"" *Webber v. Deck*, 433 F. Supp. 3d 237, 247 (D.N.H. 2020) (quoting *McGillicuddy v. Clements*, 746 F.2d 76, 77 (1st Cir. 1984)). *See also Dominic v. Goldman*, 560 F. Supp. 3d 579, 589 (D.N.H. 2021) ("Speculation about what might have occurred and general allegations of conspiracy or joint action with a state actor without supporting allegations of specific underlying facts are insufficient to establish that a private

118

party acted under color of state law.").  Meeting this standard "includes alleging 'the essential allegation of an agreement among' the alleged conspirators.'" *Carney*, 2017 WL 680384, at *14 (quoting *Tavares v. Gelb*, No. 15-13000-FDS, 2016 WL 6518424, at *9 (D. Mass. Nov. 2, 2016)).

Here, although the Plaintiffs do not make this argument in response to the Union Defendants' Motion to Dismiss, it is evident from their inclusion of Count VIII for civil conspiracy—which is not an independent tort—and their responses to the other motions to dismiss, that they allege the existence of a conspiracy between the Union Defendants and the state actors to deprive them of their civil rights.[64]  I accordingly examine whether the Plaintiffs have pleaded sufficient facts from which the requisite cooperation (and thus, state action) could be inferred.

Leaving aside the numerous conclusory allegations in the Amended Complaint, the relevant well-pleaded factual allegations against the Union Defendants are that (1) Smith filed multiple complaints with the Town, seeking to have Davis fired or to have Davis terminate Worster; (2) upon the Plaintiffs' information and belief, the Teamsters Local Union #340 filed a grievance on Theriault's behalf; (3) upon the Plaintiffs' information and belief, Smith and multiple state actors disseminated confidential documents that painted the Plaintiffs in a negative light; (4) Smith was "deeply involved" in the allegations against the Plaintiffs made by Theriault, ECF No. 1-1 at 18, ¶ 87; (5) upon the Plaintiffs'

---

[64] To the extent that the Plaintiffs intend to argue that MPELRL provides a basis for concluding that the Union Defendants can be treated as state actors under any of the three tests discussed above, they have failed to present a developed argument on that point, and I consider it waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

information and belief, Smith was communicating with members of the Town Council about the firing of the Plaintiffs; (6) upon the Plaintiffs' information and belief, Smith, Theriault, and the Town Council used members of the public to disseminate confidential documents; (7) Smith engaged in a campaign of disparagement against the Plaintiffs alongside state actors; and (8) upon the Plaintiffs' information and belief, Smith sent an email to some or all of the Town Council demanding that action be taken against Davis, and an action was subsequently taken prior to a deadline set by Smith.[65]

These allegations fall short of establishing that there was an agreement between any of the Union Defendants and the state actors to violate the Plaintiffs' rights. Similarly, they fail to describe in any detail the nature of the cooperation, if any, between the Union Defendants and the state actors. *See Tauvar*, 633 F. Supp. at 747-48; *Dominic*, 560 F. Supp. 3d at 589-90; *see also Storlazzi v. Bakey*, 894 F. Supp. 494, 501 (D. Mass. 1995) (concluding that there were insufficient allegations supporting a conclusion that a state actor had "compelled or even encouraged" a union president to deny a request to take complaints to arbitration). The mere fact that Smith communicated his demands to the Town Council is insufficient to show that he engaged in a conspiracy with any of the state actors. *See Chambers*, 2001 WL 263384, at *3 ("[T]he only non-conclusory aspect of this allegation is that Chairperson Tickle and [the movants] all placed phone calls to members of the [School Committee] and threatened adverse political consequences if their wishes were not followed. In

---

[65] There are also a number of factual allegations purporting to show a connection between Smith and Cunniff, but these are irrelevant because Cunniff is not a state actor. Thus, a conspiracy with Cunniff would not constitute state action for purposes of section 1983.

any event, assuming that the bare allegation that they 'conspired' to do so is sufficient to render them subject to a § 1983 claim, there is no constitutional deprivation.").

Moreover, as in *Chambers*, *see id.*, even if the Plaintiffs had made a showing of conspiracy, their section 1983 claim would fail regardless because they have not pleaded sufficient facts showing that they had been deprived of their rights under the Equal Protection Clause. "To establish an equal protection claim, a plaintiff needs to allege facts showing that '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations . . . .'" *Davis v. Coakley*, 802 F.3d 128, 132 (1st Cir. 2015) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)). The Plaintiffs do not come close to stating a claim against the Union Defendants under this standard. Besides baldly alleging that they were treated badly due to their gender, the Plaintiffs have pleaded no facts showing that the Union Defendants treated them differently than others similarly situated—let alone that they did so for an impermissible reason.[66]

Thus, the Union Defendants' Motion to Dismiss is granted as to Count V.

---

[66] The only allegation in the Amended Complaint about similarly situated persons is that "On information and belief, Worster, as Chief of Police, was treated differently than other Millinocket Town Department Heads; Plaintiff Worster was scrutinized by the Town Council more strictly than other Department Heads, as well as was the focus of multiple Town Councilors during Town Meetings, including improper rebukes from Town Councilors during Town Meetings." ECF No. 1-1 at 23, ¶ 109. Besides the fact that being Chief of Police is not a suspect classification under the Equal Protection Clause, this allegation does not relate to the Union Defendants or, in fact, to any of the Defendants who have moved to dismiss or for judgment on the pleadings.

### 6. Maine Constitutional Claims

The Union Defendants contend that the Plaintiffs have not stated a claim pursuant to the Maine Constitution or the Maine Civil Rights Act. The Union Defendants argue that the Plaintiffs cannot assert any claims arising under the Maine Constitution pursuant to the Maine Civil Rights Act because that statute only provides a private cause of action when the alleged deprivation is the result of actual or threatened physical force, violence, trespass, or harm to property.

For the reasons stated above with respect to Irving, *see supra* pp. 99-100, I agree with the Union Defendants.  Because the Plaintiffs have not shown that their rights under the Maine Constitution were violated by physical force, violence, trespass, or harm to property, they cannot assert claims under the Maine Constitution pursuant to the Maine Civil Rights Act.[67]  *See Andrews*, 1998 ME 198, ¶ 23, 716 A.2d 212.  In response to the Union Defendants' argument, the Plaintiffs suggest that their claims relating to the Maine Constitution are not raised under the Maine Civil Rights Act, stating that the Maine Civil Rights Act[68] is "not the only forum where constitutional violations can be asserted" and that "[t]here are several legislative acts, State and Federal, that also preserve the constitutional rights of individuals."  ECF No. 45 at 9.  This argument is unpersuasive.  If the state

---

[67]  The Amended Complaint states that there was a threat of violence against the Plaintiffs made by a non-party private citizen, who posted on the Katahdin Citizen's Group Facebook page that it was "[t]ime for the Teamsters to break some kneecaps!"  ECF No. 1-1 at 29, ¶ 145.  The Plaintiffs do not, however, argue that this statement, which was not attributed to the Union Defendants (or any other party) is sufficient to bring their claims within the ambit of the Maine Civil Rights Act.

[68]  Although the Plaintiffs refer to the Maine Human Rights Act in their Response, I assume, based on context and the Union Defendants' Motion to Dismiss, that the Plaintiffs' argument instead centers around the similarly named Maine Civil Rights Act.

constitutional claims are not brought pursuant to the Maine Civil Rights Act, the Plaintiffs "must rely either on an alternative statutory source of a private right of action or an implied right under the state constitution to seek damage remedies." *Grenier ex rel. Grenier v. Kennebec Cnty.*, 748 F. Supp. 908, 913 n.6 (D. Me. 1990); *see also Donovan v. Magnusson*, No. Civ. 04-102-B-W, 2005 WL 757585, at *17 (D. Me. Mar. 11, 2005) (concluding that because a party could not seek relief under the Maine Civil Rights Act, he could not sustain his free speech claim under the Maine Constitution) (recommended decision). But it is unclear to which "legislative acts" the Plaintiffs refer; they have not identified any statute, either state or federal, that would provide such a right of action.[69] Nor have they developed any argument that there is an implied right of action under any of the constitutional provisions at issue. I therefore consider the Plaintiffs' argument that they raised these state constitutional claims under a different statute waived. *See Grenier*, 748 F. Supp. at 913 n.6; *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

Furthermore, even if I were to consider the merits of the Maine constitutional claims, I would conclude, for the reasons stated above with respect to Irving, that the Plaintiffs have failed to state a claim that the Union Defendants violated their rights under any of the constitutional provisions at issue.

Thus, the Union Defendants are entitled to dismissal of Counts XI, XII, and XV, as well as Count XIII to the extent that those counts are asserted against them.

---

[69] Section 1983 does not provide a right of action for violations of state constitutions. *See Grenier*, 748 F. Supp. at 913.

### 7. Conclusion as to the Union Defendants

The Union Defendants' Motion to Dismiss (ECF No. 14) is granted in part and denied in part. Specifically, it is granted in part as to all claims against Defendant Brett Miller and Counts I, II, V, X, XI, XII, XIII, and XV. It is denied in all other respects.[70]

### E. Cunniff's Motion for Judgment on the Pleadings

In his Motion for Judgment on the Pleadings (ECF No. 54), Cunniff asserts a variety of arguments, including that (1) the Plaintiffs' claims are barred by the law of witness immunity; (2) the Plaintiffs' tort claims fail because they fail to allege actual malice; (3) the Plaintiffs' claims for defamation and invasion of privacy are untimely asserted against him; (4) the Plaintiffs' tort claims all fail to state actual claims; (5) the claim for employment discrimination should be dismissed because Cunniff never employed the Plaintiffs; (6) the Plaintiffs' claims under the U.S. Constitution and the Maine Constitution all fail; and (7) punitive damages and civil conspiracy are not independent claims, so those claims should be dismissed.

Motions for judgment on the pleadings are treated much the same as motions to dismiss. *Aponte-Torres*, 445 F.3d at 54. Thus, I must "view the facts contained in the pleadings in the light most flattering to the nonmovants (here, the plaintiffs) and draw all reasonable inferences therefrom in their favor." *Id.* And there is no

---

[70] Besides their broad arguments that all of the tort claims against them should be dismissed due to the anti-SLAPP statute and preemption, the Union Defendants do not raise any specific arguments with respect to Count III (defamation), Count IV (tortious interference with economic advantage), Count VI (fraudulent misrepresentation), Count VII (intentional infliction of emotional distress), Count VIII (civil conspiracy), and Count XIV (invasion of privacy). Consequently, I decline to dismiss these counts in light of my conclusion that the Union Defendants' broader arguments are unpersuasive.

resolution of contested facts; instead, a movant is entitled to judgment on the pleadings "only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." *Id.*

### 1. Witness Immunity

Cunniff argues that all of the claims against him are barred outright by the doctrine of witness immunity because the claims are based on actions he took in his capacity as Theriault's attorney. The Plaintiffs argue that the immunity claimed by Cunniff is inapplicable for a number of reasons, including that Cunniff's conduct was not pertinent to judicial proceedings, that Cunniff filed the Academy complaint and the complaint with the Attorney General on his own behalf and not as a representative for Theriault, and that Cunniff's actions are unprotected because he acted well outside the bounds of acceptable ethical representation.

Maine law has long recognized the existence of absolute immunity for witnesses in a judicial proceeding, at least so long as the witness's testimony is relevant. *See, e.g.*, *Dunbar v. Greenlaw*, 152 Me. 270, 276-77, 128 A.2d 218, 222-23 (1956). In *Dineen v. Daughan*, the Law Court recognized that this privilege from suit should extend to "attorneys during the course of a judicial proceeding" because "[j]ust as a witness needs the freedom to be able to answer questions posed, free of any concern except the truth as he believes it to be, an attorney must be free to assert relevant statements to pursue fully the interests of his client." 381 A.2d 663, 664-65 (Me. 1978). This privilege applies to material in pleadings and motions. *See id.*; *F.D.I.C. v. S. Prawer & Co.*, 829 F. Supp. 439, 447 (Me. 1993). The privilege also applies to statements made "preliminary to" litigation. *See Simon v. Navon*, 951 F.

Supp. 279, 282 (D. Me. 1997).  If applicable in this case, the privilege afforded by witness immunity would bar *all* claims against Cunniff based on his protected statements.  *See Creamer v. Danks*, 863 F.2d 1037, 1037 (1st Cir. 1998) (per curiam); *Beaulieu v. Bank of Am., N.A.*, No. 1:14-cv-00023-GZS, 2014 WL 4843809, at *9 (D. Me. Sept. 29, 2014).

The witness immunity privilege is not unlimited.  First, the attorney's statements must be relevant to the judicial proceeding at issue.  *See Dineen*, 381 A.2d at 665.  *But see Creamer v. Danks*, 700 F. Supp. 1169, 1173 (D. Me. 1988) (concluding that the issue of relevance should be construed broadly), *aff'd*, 863 F.2d 1037.  Thus, a party "cannot exploit the privilege as an opportunity to defame because the privilege is only available when the challenged remarks are pertinent to the judicial proceeding."  *Simon*, 951 F. Supp. at 282.  Second, "the attorney seeking the protection of the privilege must have become involved in the representation in good faith," not because of a conflict of interest.  *Hamilton v. Greenleaf*, 677 A.2d 525, 527-28 (Me. 1996).  Third, the privilege may be lost by "unnecessary or unreasonable publication beyond the scope of the privileged circumstances."  *Vahlsing Christina Corp. v. Stanley*, 487 A.2d 264, 267 (Me. 1985) (concluding that an attorney may have lost the privilege by publishing false statements originally made in a probate action in New Jersey outside of that proceeding and in other states); *see also Penobscot Indian Nation v. Key Bank of Me.*, 112 F.3d 538, 560-61 (1st Cir. 1997) (concluding that the publication to the media of defamatory statements in judicial documents waived the privilege).

126

In this case, I need not dwell on the contours of the witness immunity claimed by Cunniff.  Even assuming that it could apply to Cunniff's statements under the circumstances of this case, which involve complaints made to a municipality, the office of the Attorney General, and the Academy,[71] the Plaintiffs have adequately alleged that Cunniff lost any privilege he had by, on the Plaintiffs' information and belief, disclosing privileged information to third parties, namely members of the public including D'Alessandro and Murray Stanley.  *See Vahlsing Christina Corp.*, 487 A.2d at 267; *Penobscot Indian Nation*, 112 F.3d at 560-61.

The magistrate judge's recommended decision in *Hoffman v. Connecticut* is instructive.  No. 09-CV-79-B-H, 2009 WL 3055137, at *16 (D. Me. Aug. 7, 2009), *recommended decision accepted in part*, 671 F. Supp. 2d 166 (D. Me. 2009).  In that case, the plaintiffs sued the State of Connecticut and its attorney after a judicial proceeding that the State of Connecticut brought against them.  Although most of the plaintiffs' allegations were based on privileged statements made within a judicial proceeding, the magistrate judge rejected the defendants' assertion of witness immunity because "this case includes allegations of unprivileged statements to third parties outside the bounds of the litigation." *Id.* at *16.  The magistrate judge concluded that these allegations, even though they were made only on the plaintiffs' information and belief, "fall outside the protective aura of the common law privileges

---

[71]  In their Response to Cunniff's Motion for Judgment on the Pleadings, the Plaintiffs assert that Cunniff disclosed information to third parties when he, acting solely on his own initiative and not on behalf of Theriault, disclosed information to the Attorney General's Office and the Academy.  The Plaintiffs contend that because Cunniff acted in his individual capacity and not on behalf of Theriault, witness immunity is inapplicable.  But this argument is inconsistent with the assertions made in the Amended Complaint that Cunniff acted on Theriault's behalf.

because they are extrajudicial in nature and, if supported by discovery, would cause the privilege to be lost." *Id.* (citing *Vahlsing Christina Corp.*, 487 A.2d at 267). In fact, the magistrate judge specifically rejected an argument that the privilege was not defeated because these allegations were made only upon information and belief.[72] *Id.* at *16 n.10.

I am persuaded by the magistrate judge's approach in *Hoffman*. Here, multiple paragraphs of the Amended Complaint assert that, upon the Plaintiffs' information and belief, Theriault, Smith, *and/or Cunniff* disseminated privileged information to third parties, including Murray Stanley and D'Alessandro. Viewing these facts in the light most favorable to the Plaintiffs, as I must at this preliminary stage, the Plaintiffs have adequately pleaded that Cunniff lost any litigation privilege that he may have had, so the claims against him are not barred.

### 2. Timeliness of the Defamation and Invasion of Privacy Claims

Cunniff argues that the Plaintiffs' claims for defamation and invasion of privacy against him must be dismissed because they are barred by the two-year statute of limitations provided by 14 M.R.S.A. § 753 (West 2023). In response, the Plaintiffs argue that their claims against Cunniff relate back to the filing of the original Complaint and are therefore timely.

---

[72] This Court accepted in part Magistrate Judge Margaret Kravchuk's Recommended Decision in *Hoffman*, but it did not reach the witness immunity issue due to jurisdictional defects in the complaint. *See Hoffman*, 671 F. Supp. 2d at 168-70.

The Plaintiffs do not dispute that the claims for invasion of privacy and defamation are governed by the two-year statute of limitations in section 753.[73] They also seem to agree that the two-year period of limitations expired before the Amended Complaint (which added Cunniff as a party) was filed on July 29, 2022. Consequently, unless the amendment to include Cunniff as a party relates back to the filing of the original Complaint on June 6, 2022, Cunniff is entitled to judgment in his favor on the defamation and invasion-of-privacy claims.

Federal Rule of Civil Procedure 15(c)(1)(C) sets out three conditions, "each of which must be satisfied in order to permit relation back of an amended complaint seeking to substitute a newly-designated defendant." *Morel v. DaimlerChrysler AG*, 565 F.3d 20, 26 (1st Cir. 2009). "First, the claim asserted against the newly-designated defendant . . . must arise 'out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.'" *Id.* (quoting Fed. R. Civ. P. 15(c)(1)(B)). "Second, 'within the period provided . . . for serving the summons and complaint, the party to be brought in by amendment' must have 'received such notice of the action that it will not be prejudiced in defending on the merits.'" *Id.*

---

[73] The two-year statute of limitations period set forth in section 753 applies to slander and libel claims, and the Law Court has applied the provision to defamation claims. *Tanguay v. Asen*, 1998 ME 277, ¶ 7, 722 A.2d 49. But whether it applies to the Plaintiffs' invasion-of-privacy claim is a closer question, because neither the Law Court nor the First Circuit have explained what statute of limitations applies to three-out-of-the-four types of invasion-of-privacy torts arising under Maine Law. *See Gashgai v. Leibowitz*, 703 F.2d 10, 13 (1st Cir. 1983). And in this case, it is unclear from the Amended Complaint which of the four types are asserted against Cunniff, so it is not entirely clear that the two-year statute of limitation in section 753 would apply. But the Plaintiffs do not contest the applicability of that statute, so I treat it as conceded that the claims against Cunniff constitute "false light" invasion of privacy claims or otherwise are subject to the two-year statute of limitations. In any event, the invasion of privacy claim would be unavailing against Cunniff for the reasons discussed below with respect to D'Alessandro—a conclusion bolstered by the fact that there are no allegations in the Amended Complaint supporting a conclusion that Cunniff ever contacted Worster's daughter.

(quoting Fed. R. Civ. P. 15(c)(1)(C)(i)).  "Third, it must appear that within the same time frame the newly-designated defendant either 'knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.'"  *Id.* (quoting Fed. R. Civ. P. 15(c)(1)(C)(ii)).

Here, the third condition is plainly not satisfied.  By the Plaintiffs' own admission, the decision not to add Cunniff as a party was a conscious choice and it was not until the Bangor Daily News article was published that the Plaintiffs chose to add Cunniff as a Defendant.  In other words, it was not a mistake of identity that caused the Plaintiffs to fail to add Cunniff as an original party.  *See Cook v. Berger-Hershkowitz*, No. 03-12138-RWZ, 2009 WL 10712600, at *2 (D. Mass. June 18, 2009). Therefore, the amendment does not relate back, and the claims against Cunniff are time-barred.

The Plaintiffs raise two arguments to the contrary.  First, they argue that under the Maine Rules of Civil Procedure, they were entitled to amend their Complaint as a matter of right.  But that is undisputed: the precise issue is whether the amendment relates back to the filing of the original Complaint, not whether it was permissible for the Plaintiffs to amend their pleadings.

Second, the Plaintiffs argue that the particular provisions of Fed. R. Civ. P. 15(c)(1)(C) are inapplicable because they *added* a party rather than *changed* a party. This semantical argument is unpersuasive.  The provisions of Rule 15(c)(1)(C) apply both to the substitution and addition of a party.  *See Wilson v. U.S. Gov't*, 23 F.3d 559, 562 (1st Cir. 1994) ("When a plaintiff amends a complaint to add a defendant, but the plaintiff does so subsequent to the running of the relevant statute of

limitations, then [Rule 15(c)(1)(C)'s predecessor] controls whether the amended complaint may 'relate back' to the filing of the original complaint and thereby escape a timeliness objection."); *Cook*, 2009 WL 10712600, at *2 (applying Rule 15(c)(1)(C) when a party sought to add new parties rather than merely substitute an existing party); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 468 (4th Cir. 2007) (same); *Ferguson v. Loc. 689, Amalgamated Transit Union*, 626 F. Supp. 2d 55, 60 (D.D.C. 2009) (same). It would be illogical to require plaintiffs to comply with the strict requirements of Fed. R. Civ. P. 15(c)(1)(C) if they seek to substitute defendants, but permit plaintiffs who wish to add entirely new defendants to circumvent those restrictions.

Accordingly, the defamation (Count III) and invasion-of-privacy (Count XIV) claims are time-barred and are ordered dismissed with respect to Cunniff.

### 3. The Plaintiffs' Remaining Tort Claims Against Cunniff

Cunniff raises two arguments: first, that the remaining tort claims fail because the Plaintiffs have not shown that he acted with actual malice and, second, that each individual count fails to state a claim upon which relief can be granted. I agree with Cunniff on both points.

#### (a) Actual Malice

Cunniff argues that the Plaintiffs' remaining tort claims "run headlong into the First Amendment" because there is a heightened standard applied for public officials to successfully bring actions based on speech made against them. ECF No. 54 at 4. Cunniff argues that the Plaintiffs, as public officials, cannot meet their burden to show that the statements against them were made with "actual malice," particularly given the lack of specificity as to what statements Cunniff actually made.

131

ECF No. 54 at 5. According to Cunniff, this rule applies to all of the Plaintiffs' tort claims, not just their defamation claim.

In response, the Plaintiffs appear to concede that they must show that Cunniff acted with actual malice, but they argue that they have met that standard. According to the Plaintiffs, "[w]hat has created the 'actual malice' is the fact that Defendant Cunniff made reports to the [Academy] and also the Maine A.G.'s office by submitting the confidential Theriault Complaints to both entities, as well as by asserting information that he knew to be false and misleading." ECF No. 85 at 9. The Plaintiffs also invoke the fact that each of the complaints made by Cunniff were "dismissed." ECF No. 85 at 9.

"[D]iscussions of public officials . . . deserve constitutionally-protected 'breathing space' in a democratic society and thus are subject to a conditional privilege that is overcome only by clear and convincing evidence that . . . defamatory statement[s] [were] made with actual malice, in other words 'with knowledge that [the statement] was false or with reckless disregard of whether it was false or not.'" *Levesque v. Doocy*, 560 F.3d 82, 87 (1st Cir. 2009) (sixth alteration in original) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 272, 279-80 (1964)). "[B]ecause of the First Amendment interests implicated by a claim of defamation by a public figure, the standard for pleading actual malice 'is a daunting one.'" *Franchini v. Bangor Publ'g Co.* ("*Franchini II*"), No. 1:18-cv-00015-GZS, 2020 WL 1879012, at *3 (D. Me. Apr. 15, 2020) (quoting *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002)). To plead actual malice, "a plaintiff must present facts sufficient to allow, at the very least, a plausible inference that the speaker 'entertained serious doubts as to the

truth of his publication,'" *id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)), or "actually had a 'high degree of awareness of . . . probable falsity,'" *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (alteration in original) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).  Thus, actual malice is a "wholly subjective" standard.  *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018).

On a motion to dismiss—and likewise, on a motion for judgment on the pleadings—the court does not inquire into the sufficiency of the evidence; rather, it asks only whether the plaintiff "la[id] out enough facts from which malice might reasonably be inferred."  *Id.* (alteration in original) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012)); *see also id.* (noting that a plaintiff's "well pleaded facts must '"nudge[]" his actual malice claim "across the line from conceivable to plausible"'" (alteration in original) (quoting *Schatz*, 669 F.3d at 58)).  Actual malice can also be pleaded via inference and circumstantial evidence.  *See Levesque*, 560 F.3d at 90.

Although this doctrine originated in the law of defamation, it is not so limited.  It has also been applied to various torts that, under the circumstances of the respective cases, are predicated on defamatory speech.  *See Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 53 (1988) (intentional infliction of emotional distress); *Fiacco*, 484 F. Supp. 2d at 167 (same); *Shay v. Walters*, 702 F.3d 76, 83 (1st Cir. 2012) (negligent infliction of emotional distress); *Piccone v. Bartels*, 40 F. Supp. 3d 198, 221 (D. Mass. 2014) (tortious interference with advantageous business relations); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990) (same); *Dongguk Univ. v. Yale*

133

*Univ.*, 734 F.3d 113, 129 (2d Cir. 2013) (negligence); *Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995) (false light invasion of privacy); *Worrell-Payne v. Gannett Co.*, 134 F. Supp. 2d 1167, 1180-81 (D. Idaho 2000) (invasion of privacy). The principle underlying these cases is that "a failed defamation claim cannot be recycled as a [separate] tort claim." *Shay*, 702 F.3d at 83.

Initially, I note that the Plaintiffs do not contest that they, as a Police Chief and Town Manager, are public officials and, thus, must prove that Cunniff acted with actual malice. *See Roche v. Egan*, 433 A.2d 757, 762 (Me. 1981) (observing that, as a general matter, law enforcement officials, including the Chief of Police, are public officials). The Plaintiffs also do not contest that all of their tort claims against Cunniff would be barred if they failed to show actual malice; thus, they have acquiesced to Cunniff's argument that the claims against him are derivative of defamatory speech. *See Piccone*, 40 F. Supp. 3d at 221 (discussing circumstances in which torts besides defamation are subject to the actual malice standard). I therefore direct my analysis to the issue focused on by the Plaintiffs: whether the Amended Complaint plausibly pleads actual malice with respect to Cunniff. I conclude that it does not.

In essence, the Amended Complaint asserts that Cunniff filed misconduct complaints on behalf of Theriault, including a complaint with the Town, a complaint with the Attorney General's Office, and a report with the Academy—all of which were later dismissed or found to require no response. It also asserts that Cunniff may have disseminated confidential information to the public and that he worked with Smith against the Plaintiffs. What is missing, though, are any facts supporting an inference that Cunniff knew (or recklessly disregarded the possibility) that any of the

statements in his complaints were false.  *See Levesque*, 560 F.3d at 90 ("Recklessness amounting to actual malice may be found where a publisher fabricates an account, makes inherently improbable allegations, relies on a source where there is an obvious reason to doubt its veracity, or deliberately ignores evidence that calls into question his published statements.").  Although the Amended Complaint attempts to make up for this omission with vague and conclusory allegations that Cunniff acted with malice or acted in bad faith, that is insufficient to state a claim.  *See Schatz*, 669 F.3d at 56 ("[The] complaint used actual-malice buzzwords, contending that the [defendant] had 'knowledge' that its statements were 'false' or had 'serious doubts' about their truth and a 'reckless disregard' for whether they were false.  But these are merely legal conclusions, which must be backed by well-pled facts."); *see also Watson v. City of Henderson*, No. 2:20-cv-01761-APG-BNW, 2021 WL 4340501, at *15-16 (D. Nev. Sept. 23, 2021) (concluding that the conclusory assertions and bare allegations that the defendants engaged in a smear campaign against the plaintiff were insufficient to plead actual malice).

The Plaintiffs rely heavily on the fact that Cunniff's complaints were either dismissed or rejected.  But actual malice is a subjective standard, and the fact that Cunniff's complaints were ultimately rejected is insufficient to prove that when Cunniff made his statements, he entertained serious doubts as to the truth of his statements or that he acted with a high degree of awareness of possible falsity.  To hold otherwise would dilute the demanding standard for actual malice and would impose the specter of liability whenever a subsequent investigation determines allegations to be unfounded.  *See Plante v. Long*, 2017 ME 189, ¶ 12, 170 A.3d 243

135

(noting that "[t]he element of objective falsity is distinct from that of actual malice" and that inferring actual malice from objective falsity would dilute the protection provided by the First Amendment).  And to the extent that the Plaintiffs attempt to anchor their allegations of actual malice on Cunniff's alleged bias against them, "a bare assertion of bias, without further facts demonstrating that the alleged bias was accompanied by knowledge of or reckless disregard for falsehood, has little purchase in the actual malice assessment." *Franchini II*, 2020 WL 1879012, at *4.  Finally, contrary to the Plaintiffs' argument, the fact that Cunniff may have disseminated confidential information or may not have been statutorily authorized to make a complaint to the Academy is irrelevant to whether Cunniff acted with reckless disregard for the truth or knowledge of falsity.  *See Michaud v. Inhabitants of the Town of Livermore Falls*, 381 A.2d 1110, 1113 (Me. 1978) (noting that "actual malice" for purposes of the First Amendment is used "in a specialized, rather than literal sense; it refers to the publisher's knowledge or reckless disregard of falsity").

Consequently, I conclude that the Plaintiffs have failed to plead sufficient facts to nudge their actual malice claim across the line from conceivable to plausible. *Lemelson*, 903 F.3d at 24.  As such, the remaining tort claims against Cunniff must be dismissed.

### (b)  Failure to State a Claim

Even if I disagreed with Cunniff that the Plaintiffs failed to plead actual malice, Cunniff would still be entitled to judgment on the pleadings because each of the remaining tort counts independently fails to state a claim against him.

### (i)        Intentional Infliction of Emotional Distress

Cunniff argues that the Plaintiffs failed to state a claim for intentional infliction of emotional distress because their allegations fail to show that his conduct met the necessary threshold of being extreme and outrageous.

To state a claim for intentional infliction of emotional distress, a plaintiff must show that:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Argereow v. Weisberg*, 2018 ME 140, ¶ 27, 195 A.3d 1210 (quoting *Curtis*, 2001 ME 158, ¶ 10, 784 A.2d 18).  "The determination of whether the facts alleged are sufficient to establish that the defendant's conduct is 'so extreme and outrageous to permit recovery' is a question of law for the court to decide."  *Id.* (quoting *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 16, 711 A.2d 842); *see also Rubin v. Matthews Int'l Corp.*, 503 A.2d 694, 699 (Me. 1986) ("It is for the Court to determine, in the first instance whether the Defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery, or whether it is necessarily so.  Where reasonable meanings may differ, it is for the jury . . . to determine whether, in a particular case, the conduct has been sufficiently extreme and outrageous to result in liability." (quoting Restatement (Second) of Torts, § 46 cmt. h (Am. L. Inst. 1965))).

Read in the light most favorable to the Plaintiffs, the Amended Complaint alleges that Cunniff filed, on behalf of Theriault, unsuccessful misconduct complaints against Worster in different fora; that Cunniff disseminated confidential documents about Worster; that Cunniff participated in a "smear campaign" against Worster; and that Cunniff assisted Smith in making complaints about Davis.  As a matter of law, Cunniff's alleged conduct as described in the Amended Complaint is not so outrageous and atrocious that it would be utterly intolerable in a civilized society.  *See Baker v. Charles*, 919 F. Supp. 41, 46 (D. Me. 1996) (concluding that writing a letter to Maine's Land Use Regulation Commission complaining about the plaintiffs' activities and asking for modifications to be denied, though possibly "rude, belligerent, uncivil, and vindictive[,]" was insufficiently outrageous to support an intentional infliction claim); *see also Davis v. Currier*, 1997 ME 199, ¶ 6, 704 A.2d 1207; *Botka v. S.C. Noyes & Co.*, 2003 ME 128, ¶ 19, 834 A.2d 947; *Cheung v. Wambolt*, No. 04-127-B-W, 2005 WL 1331195, at *10 (D. Me. June 2, 2005); *see also Holland v. Sebunya*, 2000 ME 160, ¶ 17, 759 A.2d 205.  Moreover, the Plaintiffs failed to meaningfully respond to Cunniff's argument that his actions were not sufficiently outrageous.  They simply refer to their response to Murray Stanley's Motion to Dismiss, which does not address how *Cunniff's* actions met that prong.  Further, this case is substantially different from and not controlled by other cases in which courts concluded that repeated complaints were sufficient to support an intentional infliction claim.  *See, e.g.*, *Malenko v. Handrahan*, No. 2:11-cv-00250-GZS, 2012 WL 5267530, at *7 (D. Me. Oct. 24, 2012) (finding that there was intentional infliction of emotional distress after a mother

138

repeatedly filed petitions for protection from abuse and made unsubstantiated accusations of sexual assault, possession of child pornography, and domestic abuse).

Therefore, even absent the constitutional deficiencies with the intentional infliction claim, *see Hustler Mag.*, 485 U.S. at 53, Cunniff is entitled to judgment on the intentional infliction claim because his alleged conduct simply does not rise to the necessary level of outrageousness.

### (ii)    Fraudulent Misrepresentation

I also agree with Cunniff that he is entitled to judgment on the Plaintiffs' fraudulent misrepresentation claim.  "The essential elements of fraud, or fraudulent misrepresentation are '(1) that [one party] made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing [another party] to act in reliance upon it; and (5) the [other party] justifiably relied upon the representation as true and acted upon it to [its] damage.'" *Flaherty v. Muther*, 2011 ME 32, ¶ 45, 17 A.3d 650 (alterations in original) (quoting *Me. Eye Care Assocs. P.A. v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707).  Fraudulent misrepresentation is also subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  *See Rodi v. S. New Eng. Sch. Of Law*, 389 F.3d 5, 15 (1st Cir. 2004).

Under any pleading standard, the Plaintiffs have failed to state a claim for fraudulent misrepresentation against Cunniff because the Amended Complaint makes no averment that Worster and Davis relied on any statements by Cunniff to their detriment or that Cunniff made a statement for the purpose of inducing Worster and Davis to rely upon it.

The Plaintiffs argue only that what Cunniff and the other Defendants asserted was false.  But, although the Plaintiffs choose in their memorandum of law not to "endeavor in an analysis of the test a court/jury must embark on to find liability for fraud" and to "focus instead on the Amended Complaint and the facts asserted therein[] that demonstrate that what Defendant Murray Stanley was doing was asserting false information," ECF No. 61 at 16, I must do so.  Because the Plaintiffs have failed to state facts that could establish the necessary elements of fraudulent misrepresentation—most notably, facts showing reliance by the Plaintiffs—Cunniff is entitled to judgment on the claim for fraudulent misrepresentation.

### (iii)   Tortious Interference with Economic Advantage

Cunniff also argues that he is entitled to judgment on Count IV, which is entitled "Interference with Advantageous or Future Economic Relations or Expectations or Misrepresentations."  ECF No. 1-1 at 40.  To establish a claim for tortious interference with an advantageous economic relationship, "a claimant must demonstrate 'the existence of a valid contract or prospective economic advantage, interference with that contract through fraud or intimidation, and damages proximately caused by the interference.'" *Cheung*, 2005 WL 1331195, at *11 (quoting *Barnes v. Zappia*, 658 A.2d 1086, 1090 (Me. 1995)).  Thus, to state such a claim, a plaintiff "must establish the elements of fraud or intimidation." *Devine v. Roche Biomedical Lab'ys*, 637 A.2d 441, 447 (Me. 1994).

The Plaintiffs do not argue in any developed manner that their claim for tortious interference is based on intimidation.  Nor could they.  Intimidation can exist when a person is frightened for coercive purposes into breaching a contract with a

plaintiff or if a defendant has procured a breach of contract by making it clear that they would no longer work with the person unless they breached their contract with the plaintiff. *See Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 31, 915 A.2d 400. Neither circumstance is present here, and the Plaintiffs have pointed to no authority for the proposition that advocacy of the type performed by Cunniff can qualify as intimidation.

The Plaintiffs instead base their argument on Cunniff's alleged fraud. To show that Cunniff interfered by fraud, the Plaintiffs must show that (1) Cunniff made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of the truth, (4) to induce another to rely on it and (5) that the other person justifiably relied on it. *See Rutland v. Mullen*, 2002 ME 98, ¶ 14, 798 A.2d 1111. When a claim for tortious interference is based in fraud, it is subject to the heightened requirements of Fed. R. Civ. P. 9(b), which generally requires the plaintiff to plead the "who, what, where, and when of the allegedly misleading representation." *See Fazeli v. Northbridge Stroudwater Lodge II LLC*, No. 2:20-cv-00350-JDL, 2021 WL 1759860, at *10 (D. Me. May 4, 2021) (quoting *Dumont v. Reily Foods Co.*, 934 F.3d 35, 39 (1st Cir. 2019)).

Here, viewing the Amended Complaint in the most favorable light to them, the Plaintiffs have failed to meet this standard. First, the Amended Complaint fails to specify with any particularity the content of Cunniff's representations beyond vague allegations that Cunniff made complaints about Worster's misconduct on Theriault's behalf. This is particularly true with respect to Davis—the Amended Complaint contains no allegations that Cunniff made any complaints or representations relating

141

to him.  The conclusory statement that Cunniff's allegations were "false, misleading and intended to cause serious harm and irreparable damage to Plaintiffs' reputations . . . as well as to interfere with both Plaintiffs' employment" is insufficient to meet the requirements of Rule 9(b).  ECF No. 1-1 at 24, ¶ 117.  Nor are the statements that Cunniff disseminated confidential information.  *See Town of Lisbon v. Thayer*, 675 A.2d 514, 517-18 (Me. 1996) (concluding that leaking private correspondence to the press was insufficient to state a claim for tortious interference because there was no allegation of fraud).

Second, as noted above, with respect to actual malice, the Plaintiffs have not pleaded facts from which it can be reasonably inferred that Cunniff had knowledge of his statements' falsity or acted with reckless disregard for the truth—a necessary element of fraud.

Finally, statements regarding government officials are generally protected as free speech by the First Amendment.  *See Piccone*, 40 F. Supp. 3d at 222 ("[P]laintiffs cannot evade the constitutional doctrines that bar their defamation claim by reshaping the same claim as an [interference with advantageous business relations] claim."); *Worrell-Payne*, 134 F. Supp. 2d at 1180-81 ("[W]here a plaintiff's claims for tortious interference with business relationships were based on essentially the same facts as the plaintiff's defamation claims, and the plaintiff's tortious interference claims required proof of wrongfulness, they were subject to the same First Amendment standard as the plaintiff's defamation claims.").

Consequently, Cunniff is entitled to judgment on the interference with economic advantage claim.

### (iv)   Negligence and Negligent Infliction of Emotional Distress

Cunniff is also entitled to judgment on the pleadings against him with respect to Count I, negligence, and Count II, negligent infliction of emotional distress.  As to Count I, the Plaintiffs have failed to show that Cunniff owed a duty of care to the Plaintiffs for the same reasons described above with respect to the Union Defendants, *see supra* pp. 110-12.  The Plaintiffs have pointed to no cases imposing a duty on a defendant under any remotely similar circumstances, and the cases that do exist cut against them.  *See Boivin*, 2022 ME 44, ¶¶ 12-14, 279 A.3d 393; *see also Est. of Cabatit v. Canders*, 2014 ME 133, ¶ 9, 105 A.3d 439 (noting that, with respect to a professional negligence claim, "an attorney's duty runs only to his client, and only the client may claim that the attorney has breached that duty" except in egregious circumstances); *Barnes v. McGough*, 623 A.2d 144, 146 (Me. 1993) (noting that "an attorney owes no duty to his client's adversary" and thus "cannot be liable to them on a negligence claim").

In addition, Cunniff is entitled to judgment on the pleadings as to Count II, the claim for negligent infliction of emotional distress.  As discussed above, a standalone duty to avoid negligent emotional harm exists only in the context of bystander liability or the existence of a special relationship.  And although an attorney-client relationship may constitute such a relationship, *see Angelica v. Drummond Woodsum & MacMahon, P.A.*, No. Civ.A. CV-02-15, 2003 WL 22250354, at *9 (Me. Super. Ct. Sept. 9, 2003), the Plaintiffs were not Cunniff's clients.  There is therefore no special relationship and, consequently, no duty for Cunniff to avoid negligently causing

emotional harm to the Plaintiffs.  *See McGough*, 623 A.2d at 146 (dismissing an action for negligent infliction of emotional distress because "an attorney owes no duty to his client's adversary"); *Pacheco v. Libby O'Brien Kingsley & Champion, LLC*, 2022 ME 63, ¶ 4 n.3, 288 A.3d 398 (affirming the dismissal of a negligent infliction of emotional distress claim against a law firm because the firm owed no duty of care to the opposing party in a civil matter).

### 4.  Section 1983 Claims

Cunniff argues that the Plaintiffs' section 1983 claims against him should be dismissed because he is not a state actor and because the Plaintiffs have failed to state a claim that he violated their rights under the Equal Protection Clause.

With respect to the state action issue, the Plaintiffs do not assert that Cunniff is a state actor merely because he represented Theriault, a police officer.  Nor could they.  *See Carney*, 2017 WL 680384, at *12 (noting that private attorneys who represent state actor clients are generally not state actors for purposes of section 1983).  Instead, they seem to argue that Cunniff can be treated as a state actor because he participated in a conspiracy with others who were state actors to deprive the Plaintiffs of their rights.[74]

But the only relevant, non-conclusory allegations in the Amended Complaint related to Cunniff are that (1) he filed, on behalf of Theriault, complaints and supplements to those complaints with the Town of Millinocket; (2) he filed, on behalf

---

[74] In response to Cunniff's argument that he is not a state actor, the Plaintiffs simply incorporate by reference the arguments that they made in response to Murray Stanley's Motion to Dismiss.  But, unsurprisingly, the Plaintiffs' Response to Murray Stanley's motion does not discuss the extent to which *Cunniff* conspired with the state actors.  Again, the Plaintiffs have risked waiver by declining to address how Cunniff himself conspired with the state actors.

of Theriault, a complaint with the Attorney General's office; (3) he filed, on behalf of Theriault, a complaint with the Academy; (4) upon the Plaintiffs' information and belief, he agreed to the Town's use of the private investigator who found no misconduct; (5) upon the Plaintiffs' information and belief, "Defendant Cunniff, Defendant Smith, Defendant Theriault, Defendant D'Alessandro and Defendant Murray, as well as Defendants Golieb, Madore, and Pelletier, continued to engage in a campaign of public disparagement via both written form as well as through public gatherings, *inter alia*, against Plaintiffs Worster and Davis," ECF No. 1-1 at 24, ¶ 116; (6) upon the Plaintiffs' information and belief, he, as well as several other Defendants, communicated with the Town Council regarding the Plaintiffs' employment; and (7) he, as well as some of the state actors, used members of the public, including Murray Stanley and D'Alessandro, as a means to disseminate confidential documents.  These allegations are insufficient because the Plaintiffs have not pleaded facts that would plausibly support the existence of an agreement between Cunniff and any of the state actors to deprive the Plaintiffs of their civil rights.

Moreover, the Plaintiffs have failed to show that Cunniff took any action that violated their rights under the Equal Protection Clause.  As with the Union Defendants, the Plaintiffs have failed to plead any facts showing that they were treated differently than similarly positioned persons by Cunniff.  Thus, Cunniff is entitled to dismissal of Count V.

### 5. Maine Constitutional Claims

For the same reasons as the Union Defendants and Irving, Cunniff is entitled to judgment on Counts XI, XII, and XV, as well as Count XIII to the extent that it is asserted against him.

### 6. Other Claims Against Cunniff

With respect to Count VIII, as Cunniff observes, civil conspiracy is generally not an independent tort in Maine; it is instead a theory of liability. *See Fiacco*, 484 F. Supp. 2d at 176; *Spyderco, Inc. v. Kevin, Inc.*, No. 2:17-cv-00309-DBH, 2017 WL 6375965, at *3 (D. Me. Dec. 12, 2017). The Plaintiffs fail to contest this point. And they have also failed to plead sufficient facts to show that Cunniff conspired with any of the state actors.[75] Accordingly, Count VIII is ordered dismissed against Cunniff.

Cunniff argues that Count X, the Plaintiffs' count for employment discrimination and wrongful termination, cannot be asserted against him because the Plaintiffs were never his employees—instead, they were employed by the Town. The Plaintiffs concede that Cunniff is entitled to judgment on this count, *see* ECF No. 85 at 12. Accordingly, I dismiss Count X as to Cunniff.

### 7. Conclusion as to Cunniff

Because Cunniff is entitled to judgment on all of the claims that are asserted against him, Cunniff's Motion for Judgment on the Pleadings (ECF No. 54) is granted.

---

[75]   Moreover, the Plaintiffs fail to develop any argument that Cunniff conspired with the other Defendants who were not state actors. I therefore consider any argument that Cunniff can be held liable for the torts of other Defendants who are not state actors to be waived. *See Zannino*, 895 F.2d at 17.

**F.      D'Alessandro's Motion to Dismiss**

Susan D'Alessandro filed her Motion to Dismiss on January 3, 2023 (ECF No. 138).  In addition to the anti-SLAPP arguments previously addressed, D'Alessandro raises a variety of arguments as to why the constitutional claims and tort claims asserted against her are subject to dismissal.

As an initial matter, I address the timeliness of D'Alessandro's motion.  The Plaintiffs contend that her motion to dismiss is untimely because it was filed well after D'Alessandro filed an answer in the Superior Court.  The Plaintiffs are correct that motions to dismiss pursuant to Rule 12(b)(6) "must be made before pleading if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b).  I will not, however, treat D'Alessandro's arguments as waived.  Courts may treat motions to dismiss filed after the service of a responsive pleading as motions for judgment on the pleadings, *see Patrick v. Rivera-Lopez*, 708 F.3d 15, 18 (1st Cir. 2013); *Aponte-Torres*, 445 F.3d at 54, which may be brought at any time "[a]fter the pleadings are closed" so long as the filing is made "early enough not to delay trial," Fed. R. Civ. P. 12(c).  Here, in the interests of justice, although D'Alessandro's motion to dismiss was filed well after her *pro se* answer in the Superior Court, I will treat her filing as a motion for judgment on the pleadings.

**1. Tort Claims**

For the following reasons, D'Alessandro is entitled to judgment in her favor on all of the tort claims asserted against her in the Amended Complaint.

### (a) Defamation

Defamation consists of (1) "a false and defamatory statement concerning another;" (2) "an unprivileged publication to a third party;" (3) "fault amounting to at least negligence on the part of the publisher;" and (4) "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Morgan*, 2008 ME 26, ¶ 26, 941 A.2d 447 (quoting *Rice v. Alley*, 2002 ME 43, ¶ 19, 791 A.2d 932).

Federal Rule of Civil Procedure 9(b)'s requirement of pleading with particularity does not apply to defamation claims. *Bishop v. Costa*, 495 F. Supp. 2d 139, 140 (D. Me. 2007). But in keeping with Fed. R. Civ. P. 8, "the pleadings in a defamation case need to be sufficiently detailed to the extent necessary to enable the defendant to respond." *Id.* at 141; *see also Veilleux v. Nat'l Broad. Co.*, 8 F. Supp. 2d 23, 35 (D. Me. 1998). Therefore, the pleadings must "assert the substance of the allegedly defamatory statements and the context of the publication." *Fazeli*, 2021 WL 1759860, at *12 (quoting *McDonald v. Verso Paper LLC*, No. 1:15-cv-00229-JDL, 2015 WL 5993875, at *2 (D. Me. Sept. 22, 2015)). "For instance, if a complaint does not specify 'to whom the statements were allegedly made, the method of publication, or any information that provides insight as to when the statements were allegedly made,' it cannot support a defamation claim." *Id.* (quoting *Beaney v. Univ. of Me. Sys.*, No. 2:16-cv-00544-JDL, 2017 WL 782882, at *6 (D. Me. Feb. 28, 2017)).

Here, the vast majority of allegations about false statements made by D'Alessandro are either conclusory or otherwise insufficient to enable her to defend against them. For example, the Plaintiffs allege that D'Alessandro engaged in a

148

smear campaign, participated in a Facebook group in which "false and misleading information" was circulated, and made allegations in the smear campaign that were "false, misleading, and intended to cause serious harm, and damage."  ECF No. 1-1 at 16, ¶ 74, 24, ¶ 117.  The Plaintiffs also allege that D'Alessandro circulated confidential materials to the public with the knowledge that the materials "were not a complete and accurate representation of the underlying situations."[76]  ECF No. 1-1 at 20, ¶ 93.  These conclusory allegations are insufficient to inform D'Alessandro of the alleged defamatory statement or statements and, therefore, deprive her of a fair opportunity to respond to the defamation claim.  *See Bishop*, 459 F. Supp. 2d at 140; *Fazeli*, 2021 WL 1759860, at *12.

Moreover, because of First Amendment protections, the Plaintiffs must plead sufficient facts from which it can be inferred that D'Alessandro acted with actual malice.[77]  The analysis on this point tracks the analysis with respect to Defendant Cunniff, *see supra*, pp. 134-36, and I need not repeat it in full.  I observe only that to the extent that the Amended Complaint states a claim that D'Alessandro made false statements at all, there is insufficient evidence to infer that she did so with knowledge

---

[76] The closest the Plaintiffs come to providing the substance of any statements by D'Alessandro are when they allege (1) that participants on the Katahdin Citizens' Group Facebook Page, including "many of the Defendants . . . began maliciously attacking Plaintiffs Davis and Worster on social media by misrepresenting the reasons for Defendant Theriault's medical leave among other topics" and (2) that the Bangor Daily News published an article about Worster on December 8, 2020, and published other articles "at various points in time" that parroted what the reporters were told by D'Alessandro. ECF No. 1-1 at 6, ¶ 15, 32, ¶ 162.  But these are still insufficient to give D'Alessandro notice of the substance of the statements that she made that allegedly defamed Worster.  The first allegation does not specifically refer to D'Alessandro at all.

[77] Admittedly, D'Alessandro raises this issue in only the most perfunctory manner, if she raises it at all.  However, given the risk of inconsistent judgments and the fact that this issue was discussed with respect to Cunniff's Motion for Judgment on the Pleadings as well as in the Plaintiffs' Response to D'Alessandro's motion, I decline to consider this issue waived.

of their falsity or with reckless disregard for the truth.  And contrary to the Plaintiffs' arguments that some of D'Alessandro's statements were made after she became aware that Worster was cleared by Davis's investigation, that alone is insufficient to infer that the Plaintiffs can meet the demanding standard for pleading actual malice.[78]

Consequently, D'Alessandro is entitled to judgment on Count III.[79]

**(b)  Intentional Infliction of Emotional Distress**

D'Alessandro is also entitled to judgment on the intentional infliction of emotional distress claim made against her.  The only allegations in the Amended Complaint related to D'Alessandro are that (1) she was the administrator of the Katahdin Citizen's Group Facebook page on which defamatory material was posted; (2) she participated in a smear campaign against Davis and Worster; (3) she organized nighttime protests and car parades outside Davis's house calling for him to do his job and fire Worster; (4) she provided aid to Murray Stanley in connection with Murray Stanley's contact of Worster's daughter; and (5) she disseminated confidential documents.  Taken in the light most favorable to the Plaintiffs, the behavior described in the Plaintiffs' nonconclusory allegations may have been disruptive and rude, but it is not so outrageous as to support a claim for intentional

---

[78]  In support of this argument, the Plaintiffs point to several exhibits attached to their Response to D'Alessandro's Motion to Dismiss.  But, again, the Plaintiffs cannot amend their pleadings by averring new and more detailed facts in response to a motion to dismiss.  *See Willits*, 2021 WL 735784, at *4; *Bates*, 958 F.3d at 483-84.

[79]  Given my conclusion, I do not address D'Alessandro's additional argument that she had a common law privilege to make these statements.

infliction of emotional distress.[80]    Moreover, the constitutional considerations requiring the Plaintiffs to show actual malice apply with equal force to their claim for intentional infliction of emotional distress.  *See Hustler Mag.*, 485 U.S. at 53.  For this reason as well, D'Alessandro is entitled to judgment on Count VIII.

### (c)  Fraudulent Misrepresentation

As with Cunniff, D'Alessandro is entitled to judgment on the fraudulent misrepresentation claim because the Plaintiffs have not pleaded that D'Alessandro made any statement for the purposes of inducing *their* reliance or that *they* justifiably relied upon them.    The Plaintiffs' arguments that D'Alessandro misrepresented information to the Town of Millinocket are meritless.

### (d)  Tortious Interference with Economic Advantage

Additionally, D'Alessandro is entitled to judgment on the Plaintiffs' tortious interference claim for the same reasons as Cunniff, *see supra* pp. 140-42.    The Plaintiffs have pled neither intimidation by D'Alessandro nor fraud with any sufficient particularity.    Nor have they pleaded sufficient facts to show that D'Alessandro acted with actual malice.

---

[80]  In addressing intentional infliction of emotional distress claims, the Law Court has relied upon section 46 of the Restatement (Second) of Torts.  *See, e.g., Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me. 1979).  Comparing the allegations in the Amended Complaint about D'Alessandro with one of the illustrations in the Restatement is illuminating.  Illustration 20 provides: "A organizes a mob[] and brings it to B's door at night.  A tells B that unless he leaves town within ten days the mob will return and lynch him.  B suffers severe emotional distress, but no physical consequences.  A is subject to liability to B."  Restatement (Second Torts) § 46 cmt. k, illus. 20 (Am. L. Inst. 1965).  But unlike the conduct of "A" in the illustration, D'Alessandro's nighttime car parades and protests as pleaded were constitutionally protected activities that did not involve a threat of harm.

### (e)  Negligence and Negligent Infliction of Emotional Distress

The Plaintiffs have also failed to state a claim for negligence against D'Alessandro.  For the reasons discussed above with respect to the Union Defendants, *see supra* pp. 110-12, the Plaintiffs have not pleaded sufficient facts making it plausible that D'Alessandro owed them a duty of care.

The claim for negligent infliction of emotional distress against D'Alessandro must also be dismissed.  As described above with respect to the Union Defendants, the duty to avoid negligent infliction of emotional harm is present only in limited circumstances.  The only possibly relevant circumstance here is the existence of a "special relationship" between D'Alessandro and the Plaintiffs.  The Plaintiffs contend that this requirement is satisfied because D'Alessandro is a "pseudo state actor" who could reasonably have foreseen that she was creating a risk of emotional harm to the Plaintiffs.  ECF No. 145 at 17.  Analogizing to cases in which defendants owed duties based on the vulnerable status of plaintiffs, the Plaintiffs argue that a special relationship is created "by the state placing the victim at risk of an unreasonable harm" and that because D'Alessandro is a pseudo-state actor, she can be held liable under this principle.  ECF No. 145 at 16-17.  D'Alessandro, however, was a private citizen and a Facebook group administrator who called for action to be taken against Worster and Davis.  This is different in kind from the close relationships previously recognized by the Law Court as sufficing to create a duty to avoid negligently inflicting emotional distress.  Nor am I persuaded by the Plaintiffs' argument that D'Alessandro was in a special relationship with the Plaintiffs because she was a "pseudo state actor."  Even if that were true—which, as discussed below,

*see infra* pp. 157-58, I conclude that it is not—state actors do not have a broad duty to avoid negligently causing emotional distress, absent more. *See Richards*, 2001 ME 132, ¶ 34, 780 A.2d 281 (finding that there was no unique relationship between the victim of police conduct and the police officers who injured her).

### (f)  Invasion of Privacy

The final tort claim asserted against D'Alessandro is Count XIV, the claim for invasion of privacy asserted by Worster alone.  In support of this claim for relief, the Plaintiffs state that "[t]he Defendants went after Plaintiff Worster's daughter, contacting her through Facebook (and possibly other means), providing her with false and misleading information about her father, in a further attempt to harass and intimidate Plaintiff Worster and create him harm."  ECF No. 1-1 at 50, ¶ 253. Elsewhere in the Amended Complaint, the Plaintiffs state that "Defendant Murray Stanley, with the aid and/or encouragement from Defendant D'Alessandro . . . and others, were communicating with Plaintiff Worster's minor child . . . in an attempt to further alienate the child from her father, in what they knew to be an already strained relationship; the relationship is now fatally interfered with as a result of the conduct of these Defendants."  ECF No. 1-1 at 18, ¶ 83.  Reading the foregoing portions of the Amended Complaint together, the Plaintiffs appear to assert an invasion-of-privacy claim against D'Alessandro for either contacting Worster's daughter or aiding and abetting Murray Stanley to contact Worster's daughter.[81]

---

[81] To the extent that the Plaintiffs argue that D'Alessandro can be held liable because she aided and abetted Murray Stanley, a tortfeasor, that argument is unavailing.  The invasion of privacy claims against Murray Stanley are unavailing for the same reasons described here with respect to D'Alessandro, and when the primary tortfeasor is not liable, there can be no liability based on aiding

D'Alessandro contends that the Plaintiffs have failed to plead facts constituting an invasion of privacy under Maine law.  I agree.

Under Maine law, invasion of privacy protects four separate interests.  *Nelson v. Me. Times*, 373 A.2d 1221, 1223 (Me. 1977).  Namely, invasion of privacy can occur when a defendant (1) unreasonably intrudes upon the seclusion of another; (2) appropriates another's name or likeness; (3) gives unreasonable publicity to another's private life; and (4) provides publicity that unreasonably places another in a false light before the public.  *See id.*; *see also Loe v. Town of Thomaston*, 600 A.2d 1090, 1093 (Me. 1991).  As set forth in paragraphs 252 to 254 of the Amended Complaint, the factual basis for Count XIV is the contacting of Worster's daughter.  I consider each of the different invasion-of-privacy torts in turn.

With respect to invasion upon the seclusion of another, the elements of this tort are an "(1) intentional, (2) physical intrusion, (3) upon premises occupied privately by a plaintiff for purposes of seclusion, and (4) the intrusion must be highly offensive to a reasonable person."[82] *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 16, 48 A.3d 774.  For several reasons, the Plaintiffs have failed to plead a claim for intrusion upon seclusion against D'Alessandro for having contacted Worster's daughter.

First, although the Law Court's seminal opinion in *Nelson* suggests that intrusion can occur by non-physical means, *see Nelson*, 373 A.2d at 1223 (citing

---

and abetting.  *See Meridian Med. Sys., LLC v. Epix Therapeutics, Inc.*, 2021 ME 24, ¶¶ 22-24, 250 A,3d 122.

[82]  The second type of invasion of privacy, appropriation of likeness, does not apply here and I do not address it further.

Restatement (Second) of Torts § 652B (Am. L. Inst. 1977)), more recent Law Court cases have required a "physical" intrusion. *See Lougee Conservancy*, 2012 ME 103, ¶ 16, 48 A.3d 774; *Champagne*, 1998 ME 87, ¶ 18, 711 A.2d 842; *Loe*, 600 A.2d at 1093; *see also Bloomquist v. Albee*, No. 03-276-P-S, 2005 WL 758456, at *4-5 (D. Me. Mar. 29, 2005) (declining to expand the tort of intrusion upon seclusion to include electronic, rather than physical, intrusions), *report and recommendation accepted*, 2005 WL 1058910 (D. Me. Apr. 22, 2005). It is doubtful whether contacting an individual by Facebook constitutes the required physical intrusion.

Second, even leaving aside the physical-intrusion issue, the Plaintiffs have not pleaded that D'Alessandro intruded "upon premises privately occupied by a plaintiff for purposes of seclusion." *Lougee Conservancy*, 2012 ME 103, ¶ 16, 48 A.3d 774. The Amended Complaint pleads only that D'Alessandro contacted Worster's minor daughter through Facebook and possibly other means. Although it is certainly possible that the Facebook contact occurred while the minor child was in Worster's home (or in another location occupied by Worster for purposes of seclusion), the "sheer possibility that a defendant has acted unlawfully" is insufficient. *Iqbal*, 556 U.S. at 678. Instead, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Here, the Plaintiffs have not pleaded sufficient allegations to support a determination that any intrusion occurred in an area occupied by Worster for his seclusion.[83]

---

[83] Worster asserts additional facts in his response to D'Alessandro's motion about how D'Alessandro used technology to contact Worster's daughter to "gain access to the interior of Plaintiff Worster's home . . . and remove all privacy available to him," ECF No. 145 at 21, but these conclusory allegations do not appear in the Amended Complaint, and I do not consider them.

Third, the Plaintiffs have also failed to plead facts showing that the intrusion would be "highly offensive to a reasonable person." *Lougee Conservancy*, 2012 ME 103, ¶ 16, 48 A.3d 774. The only allegations in the Amended Complaint are that D'Alessandro (and Murray Stanley) communicated with Worster's minor daughter, with whom Worster had "an already strained relationship," ECF No. 1-1 at 18, ¶ 83. Although it is possible that such conduct might be highly offensive to a reasonable person based on what was actually said to Worster's daughter, the Plaintiffs have failed to provide *any* details about what was communicated to Worster's daughter. The vague and conclusory allegations in the Amended Complaint about providing false and misleading information to Worster's daughter are insufficient to "nudge[]" Worster's invasion-of-privacy claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *see also Bloomquist*, 2005 WL 758456, at *5 (rejecting a claim for invasion upon seclusion because the plaintiff had failed to demonstrate that showing an image of the exterior of the plaintiff's house would be "highly offensive to a reasonable person").

Accordingly, the Plaintiffs have failed to state a claim for invasion of privacy by intrusion upon seclusion.

The Plaintiffs have also failed to state a claim that D'Alessandro's actions constitute unreasonable publicity of private facts. According to Count XIV, the claim is based on the fact that the Defendants contacted Worster's daughter. But contacting Worster's daughter is not the same as giving widespread publicity to a private fact. *See Stokes v. Barnhart*, 257 F. Supp. 2d 288, 295 (D. Me. 2003) ("Communication of private facts to only one person . . . is insufficient publication for

156

purposes of this tort."); *Hudson v. S.D. Warren Co.*, 608 F. Supp. 477, 480 (D. Me. 1985) (concluding that a plaintiff's employer could not state a claim for public disclosure of private facts because the disclosure was "not [made] to the public but to a small group of persons").   To the extent that the Plaintiffs now seek to base their claim for invasion of privacy on the general publication of private facts by the Defendants, that is contrary to the allegations made in the Amended Complaint, which anchor Count XIV to the alleged contacting of Worster's daughter.

Finally, the Plaintiffs have also failed to state a claim that D'Alessandro placed Worster in a false light before the public by contacting his daughter.   As with giving unreasonable publicity to private facts, there must be involvement with the public: contacting a single person or a small subset of people is insufficient.   *See Cole v. Chandler*, 2000 ME 104, ¶¶ 17-18, 752 A.2d 1189 (concluding that false light invasion of privacy requires communication with the general public or to many persons, not just an employer).

Thus, the invasion-of-privacy claims brought against D'Alessandro must be dismissed.

## 2.  Section 1983 Claims

D'Alessandro contends that the section 1983 claim against her should be dismissed because the Plaintiffs have failed to plead sufficient facts showing that she is a state actor, a prerequisite for the application of section 1983.   The Plaintiffs argue in response that the Amended Complaint shows that D'Alessandro can be held liable as a "pseudo state actor" because of actions she took in concert with state actors, including the Town, which accepted the benefits of her unconstitutional actions.   ECF

No. 145 at 12. They argue that the Amended Complaint contains sufficient allegations to show that D'Alessandro conspired with some of the state actors against the Plaintiffs.

I agree with D'Alessandro that the Amended Complaint does not include sufficient well-pleaded facts showing that this is one of the rare circumstances in which a private party can be held liable as a state actor for conspiring to violate a plaintiff's civil rights. The only well-pleaded allegations that are possibly relevant to the existence of a conspiracy involving D'Alessandro are: (1) D'Alessandro was the moderator of the Katahdin Citizen's Group Facebook Page, one of the ways in which members of the Town Council and Padilla communicated with the public about the issues concerning Worster and Davis; (2) D'Alessandro disseminated to the public confidential documents that she received from state actors, including Theriault, who, upon the Plaintiffs' information and belief, used her as a mechanism to disseminate the documents to the public; (3) upon the Plaintiffs' information and belief, D'Alessandro was communicating with state actors, including members of the Town Council, about the termination of Worster and Davis; and (4) upon the Plaintiffs' information and belief, D'Alessandro engaged in a public campaign against the Plaintiffs along with state actors, including members of the Town Council. The other well-pleaded factual allegations about D'Alessandro are irrelevant to the state actor issue because they do not, in any conceivable way, relate to cooperation with state actors. The Amended Complaint also contains a number of other conclusory allegations that I disregard, including that the Plaintiffs were fired "in what appeared

as part of a larger conspiracy against [them], initiated and perpetuated by . . . Defendant D'Alessandro" and several state actors.  ECF No. 1-1 at 18, ¶ 84.

These allegations fall short of establishing an agreement between D'Alessandro and the state actors to violate the Plaintiffs' civil rights.  Nor do they suffice to describe the nature of the cooperation between D'Alessandro and the state actors in furtherance of such an agreement.  *See Dominic*, 560 F. Supp. 3d at 589-90.

Moreover, even if the Plaintiffs had shown that D'Alessandro had acted under the color of state law, they have not shown that she violated their rights under the Equal Protection Clause.  As with the other Defendants, the Amended Complaint is devoid of any allegations that D'Alessandro treated any similarly situated parties differently than the Plaintiffs.

Thus, D'Alessandro is entitled to the dismissal of Count V.

### 3.  Maine Constitutional Claims

D'Alessandro is also entitled to dismissal of Counts XI, XII, XV, and XIII (to the extent that they are asserted against her) for the reasons discussed above with respect to Irving and the Union Defendants.

### 4.  Other Claims

I also dismiss Count VIII for civil conspiracy because it is not an independent tort and, to the extent that the Plaintiffs intend that this count should serve as a means of pleading a conspiracy with state actors or any other Defendant, they have failed to plead sufficient facts to do so.[84]

---

[84]  Moreover, the Plaintiffs have not developed any argument that D'Alessandro conspired with the other Defendants who were not state actors.  Thus, I consider that argument waived.

Finally, D'Alessandro assumes that Count X, employment discrimination and wrongful termination, are not asserted against her.  The Plaintiffs seemingly do not dispute that assumption.  I agree, and for the reasons stated above with respect to the Union Defendants and Cunniff, dismiss Count X as to D'Alessandro.

### 5.  Conclusion as to D'Alessandro

For those reasons, D'Alessandro is entitled to judgment on the pleadings as to all of the claims against her, and her motion (ECF No. 138) must be granted.

## G.    Murray Stanley's Motion to Dismiss

The analysis with respect to all of the claims against Murray Stanley is largely the same as my analysis of the claims raised against D'Alessandro because the allegations against the two are essentially identical.

With respect to the tort claims against Murray Stanley, she is entitled to their dismissal for the reasons given above as to D'Alessandro.  The Plaintiffs' arguments that the Court should impose tort liability on Murray Stanley because she acted like a "bully" is unpersuasive and gives short shrift to the elements of the tort claims at issue.

With respect to the Maine Civil Rights Act and constitutional claims against Murray Stanley, the analysis is precisely the same as it was for D'Alessandro.  I reject the Plaintiffs' perplexing argument that if I conclude that Murray Stanley was involved in constitutionally protected petitioning behavior for purposes of the anti-SLAPP statute, I should also conclude that she was a state actor.  Contrary to the Plaintiffs' contention, such a conclusion does not permit Murray Stanley to "have her cake and eat it too."  ECF No. 61 at 10.

I also dismiss Count VII for the reasons given above with respect to the other Defendants, bolstered by the Plaintiffs' failure to oppose dismissal of this claim. Finally, I also dismiss Count X for employment discrimination.  Murray Stanley was not the Plaintiffs' employer and the Plaintiffs have failed to plead sufficient facts that she "aided and abetted" the Town in its wrongful termination of them.

Thus, Murray Stanley is entitled to dismissal of all of the claims against her.

## III.  CONCLUSION

The Amended Complaint portrays the Plaintiffs—two former public officials in Millinocket, Maine—as having encountered strong and sometimes contentious opposition from at least several of the Defendants named in the Amended Complaint. But the question presented for decision at this stage of the case is not whether that opposition was justified or fair, but instead whether the Amended Complaint sets forth sufficient facts to state claims against each Defendant.  And for several of their claims, the Plaintiffs' Amended Complaint must satisfy the heightened pleading requirements borne of our "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  *N.Y. Times Co.*, 376 U.S. at 270.  Applying the well-established requirements of pleading, most of the Plaintiffs' claims for relief are properly dismissed for the reasons I have explained.  In so concluding, I note that there is a reoccurring pleading deficiency in the Amended Complaint.

The Amended Complaint fails to indicate, as to each claim for relief, whether the claim is made by one or both of the Plaintiffs.  Thus, for example, the Amended

161

Complaint asserts over a dozen claims on behalf of both Harold Davis and Craig Worster against Andrew Wright, even though there are no facts alleged in the Amended Complaint connecting Davis to Wright's alleged conduct. Further, the Amended Complaint sets forth sixteen counts for relief but fails to identify, as to each count, the Defendant or Defendants against whom the count is asserted. Instead, the Amended Complaint seeks judgment against the "Defendants" for every count. As a result, a fair reading of the Amended Complaint leaves one guessing as to which claim or claims each Plaintiff asserts and, as to each claim, which of the nineteen Defendants may be liable.

It should not be on the opposing party, or the Court, to identify, in the first instance, such shortcomings. When a lawyer files a complaint asserting multiple claims against multiple defendants, the lawyer is certifying that the specific claim or claims made as to each defendant are warranted and that the supporting factual allegations will likely have evidentiary support after further investigation or discovery. *See* Fed. R. Civ. P. 11(b)(2), (3). In a case involving multiple defendants, a "shotgun" approach to pleading is also contrary to Fed. R. Civ. P. 8(a)(2)'s requirement of "a short and plain statement of [each] claim showing that the pleader is entitled to relief" as to each defendant. *See Ames v. Dep't of Marine Res. Comm'r,* 256 F.R.D. 22, 29-31 (D. Me 2009); *Gonzalez-Camacho v. Banco Popular de P.R.,* 318 F.Supp.3d 461, 475 (D.P.R. 2018). Plaintiffs' counsel would do well to avoid such a shotgun approach in future cases.

Accordingly, it is **ORDERED** that:

- The Plaintiffs' Motion to Amend the Complaint (ECF No. 112) is **GRANTED IN PART** and **DENIED IN PART**. It is granted with respect to the dismissal of Count XVI against all Defendants. It is denied in all other respects.

- The Plaintiffs' Motions to Strike (ECF Nos. 78, 93) are **DENIED**.

- Janet Theriault's Special Motion to Dismiss (ECF No. 58) is **DENIED**.

- Michael Cunniff's Special Motion to Dismiss (ECF No. 55) is **DENIED**.

- Michael Cunniff's Motion for Judgment on the Pleadings (ECF No. 54) is **GRANTED** and the claims against him are **DISMISSED**.

- The Union Defendants' Motion to Dismiss (ECF No. 14) is **GRANTED IN PART** and **DENIED IN PART**. It is granted as to all claims against Brett Miller, and Counts I, II, V, VIII, X, XI, XII, XIII, and XV against Lorne Smith and the Teamsters Local Union # 340. It is denied in all other respects.

- Annette Padilla's Special Motion to Dismiss (ECF No. 57) is **GRANTED IN PART** and **DENIED IN PART**. It is granted as to all counts asserted by Davis, except for Count IX. It is granted with respect to Counts I, II, III, IV, VI, VII, VIII, and XIV as asserted by Worster. It is denied in all other respects.

- The anti-SLAPP component of the Motion to Dismiss filed by Jennifer Murray Stanley is **DENIED**. In all other respects, the motion (ECF No. 34) is **GRANTED**, and the claims against her are **DISMISSED**.

- The anti-SLAPP component of the Motion to Dismiss filed by Susan D'Alessandro is **DENIED**. In all other respects, the motion, which I treat as a Motion for Judgment on the Pleadings (ECF No. 138), is **GRANTED**, and the claims against her are **DISMISSED**.

- Andrew Wright's Motion to Dismiss (ECF No. 73) is **GRANTED** and the claims against him are **DISMISSED**.

- The Wiscasset Police Department's Motion to Dismiss (ECF No. 20) is **GRANTED** and the claims against it are **DISMISSED**.

- Natasha Irving's Motion to Dismiss (ECF No. 39) is **GRANTED** and the claims against her are **DISMISSED**.

163

- The Plaintiffs' Motion for Default Judgment as to Jeffrey Lange (ECF No. 72) is **DENIED**. The Plaintiffs are ordered to, within fourteen days of the issuance of this Order, **SHOW CAUSE** as to why the claims against Lange should not be dismissed.

**SO ORDERED.**

**Dated:  August 31, 2023**

_____
 **/s/ JON D. LEVY**
**CHIEF U.S. DISTRICT JUDGE**

164